## No. 15-1140

# In the United States Court of Appeals for the Federal Circuit

**MICROSOFT CORPORATION**,

*Plaintiff*

**GOOGLE INC.**,

*Plaintiff-Appellee*

**TALEO CORPORATION**,

*Plaintiff*

v.

**GEOTAG, INC.**,

*Defendant-Appellant.*

―――――――――――――――――

Appeal from the United States District Court for the District of Delaware in Case No. 11-CV-00175, Judge Richard G. Andrews

―――――――――――――――――

## NON-CONFIDENTIAL OPENING BRIEF OF DEFENDANT-APPELLANT GEOTAG, INC.

―――――――――――――――――

Joel W. Reese
Adam C. Sanderson
REESE GORDON MARKETOS LLP
750 N. Saint Paul Street, Suite 610
Dallas, TX 75201-3202
Telephone: (214) 382-9810

Dated: March 6, 2015.

*Attorneys for Defendant-Appellant, GeoTag, Inc.*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 27(a) and 47.4, counsel for Defendant – Appellant GeoTag, Inc. certifies the following:

1.    The full name of every party represented by me is:

GeoTag, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not Applicable.

3.    All parent corporations and any publicly-held companies that own 10% or more of the stock of any party represented by me are:

Not applicable.

4.    The names of all law firms and the partners or associates that have appeared for the parties now represented by us in the trial court or that are expected to appear in this Court are:

Joel W. Reese
Adam C. Sanderson
Kendal C. Simpson*
Reese Gordon Marketos LLP
750 N. St. Paul Street, Ste. 610
Dallas, TX 75201
*No longer affiliated with the firm.

*Prior Trial Counsel for GeoTag:*

Paul J. Hayes
Dean Bostock
Kevin Gannon
Jonathan R. DeBlois
Samiyah Diaz*
James Hall*
Anthony L. Miele
Hayes Messina Gilman Hayes LLC
200 State Street, 6th Floor
Boston MA 02109
*No longer affiliated with the firm.

Kenneth Laurence Dorsney
Mary Matterer
Morris James LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306


Christopher M. Joe
Eric Buether
1700 Pacific Avenue, Suite 4750
Dallas, TX 75201

Sean T. O'Kelly
O'Kelly, Ernst & Bielli, LLC
901 N. Market Street, Suite 1000
Wilmington, DE 19801


Brian E. Farnan
Farnan LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801

Todd S. Spickard
Spickard Law P.C.
3131 Turtle Creek, Suite 300
Dallas, TX 75219


Date:  March 6, 2015.

/s/ Joel W. Reese
Joel W. Reese

*Counsel of Record for Defendant-Appellant*

iii

# TABLE OF CONTENTS

**CONFIDENTIAL MATERIAL DELETED**:  Pursuant to Federal Circuit Rule 28(d)(1)(B), material subject to a protective order entered by the United States District Court for the District of Delaware has been redacted from this brief.  The material omitted on pages 61, 64-71 is from confidential documents Google provided related to the operation of the Google Adwords System.

CERTIFICATE OF INTEREST .................................................................. ii

TABLE OF CONTENTS ........................................................................... iv

TABLE OF AUTHORITIES ................................................................. viii

LIST OF ABBREVIATIONS ..................................................................... xi

STATEMENT OF RELATED CASES ....................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 2

STATEMENT OF THE ISSUES .............................................................. 3

STATEMENT OF THE CASE .................................................................. 4

    A.    The Invention ........................................................................... 5

    B.    Google files a Declaratory Judgment Action in Delaware. .... 6

    C.    GeoTag's First Motion to Dismiss. ......................................... 8

    D.    GeoTag's Counterclaim. ......................................................... 10

    E.    June 3, 2013 Stipulated Judgment. ...................................... 11

    F.    *DataTern* and Summary Judgment. ..................................... 11

G.    Amended Complaint and More Jurisdictional Briefing. ...... 15

SUMMARY OF THE ARGUMENT ......................................................... 18

ARGUMENT ........................................................................................... 20

I.    The District Court Lacked Subject Matter Jurisdiction. .............. 20

    A.    GeoTag and Google were legal strangers
        prior to Google's Complaint. .................................................... 21

    B.    The Texas cases did not implicate Google. ............................. 23

    C.    The district court impermissibly based its finding
        of subject matter jurisdiction on an implied
        assertion of direct and indirect infringement. ...................... 25

        1.    The novel theory of an implied assertion
            of direct infringement. ................................................... 25

        2.    Google did not, and could not, prove the
            requirements for an implied assertion
            of induced infringement. ............................................... 29

    D.    The district court impermissibly relied on
        post-filing events. .................................................................... 31

        1.    Google's last-minute, irrelevant evidence.. ................. 31

        2.    A counterclaim cannot serve as an independent
            basis for jurisdiction. .................................................... 34

        3.    Even if a permissible counterclaim could
            create jurisdiction, it makes no difference
            because GeoTag's counterclaims were compulsory ..... 38

II.  The District Court Erred in Construing the Terms
of the '474 Patent and Granting Summary Judgment
of Non-Infringement ......................................................... 41

    A.    The legal standard for claim construction............................ 41

    B.    The district court wrongly construed the
          "hierarchy" phrases ............................................... 43

          1.    The district court wrongfully imported the
                "parent-child" limitation into the claims
                from the specification. ................................... 45

          2.    Four other trial courts properly construed
                the "hierarchy" phrases without a
                parent-child limitation. ................................. 48

          3.    The claim language in the '474 patent also
                makes clear that the "hierarchy" phrases should
                not be limited solely to a parent-child relationship.... 49

          4.    The doctrine of claim differentiation further shows
                that the district court erred when construing
                the "hierarchy" phrases.................................. 51

    C.    The district court misconstrued the dynamic
          replication phrases. ............................................ 53

          1.    The district court misconstrued "dynamic
                replication" by adding a parent-child limitation......... 54

          2.    The district court misconstrued the "dynamic
                replication" phrases by excluding "copying." ............ 56

III. The District Court Erred in Granting Summary
Judgment of Non-Infringement.................................... 59

A.      When issuing its summary judgment decision,
        the district court erroneously added new limitations,
        including limitations that dynamic replication requires
        at least two searches and that one of those searches
        must be inherited into the other search. ............................ 60

B.      Alternatively, even if this Court were to find that
        dynamic replication requires "two searches," Google's
        AdWords System still practices dynamic replication. ......... 64

        1.      Google's AdWords System practices dynamic
                replication. .................................................................... 64

        2.      The district court wrongly substituted itself for
                the jury by finding that "filtering" is not a search...... 68

CONCLUSION ......................................................................... 72

CERTIFICATE OF SERVICE ................................................. 73

CERTIFICATE OF COMPLIANCE ........................................ 74

# TABLE OF AUTHORITIES

## *Cases*

*Acumed LLC v. Stryker Corp.*,
    483 F.3d at 800 (2007) ................................................................. 46

*Already LLC v. Nike, Inc.*,
    133 S. Ct. 721 (2013) .................................................................... 20

*Arris Grp., Inc. v. British Telecomm. PLC*,
    639 F.3d 1368 (Fed. Cir. 2011) ................................... 12, 20, 26, 30

*Ass'n for Molecular Pathology v. U.S.P.T.O.*,
    689 F.3d 1303 (Fed. Cir. 2012) ............................................... 22, 24

*Benitec Australia, Ltd. v. Nucleonics, Inc.*,
    495 F.3d 1340 (Fed. Cir. 2007) ...................................................... 35

*BMC Res., Inc. v. Paymentech, L.P.*,
    498 F.3d 1373 (Fed. Cir. 2007) ...................................................... 28

*Creative Compounds, LLC v. Starmark Labs.*,
    651 F.3d 1303 (Fed. Cir. 2011) ............................................... 22, 24

*DSU Medical Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006) ...................................................... 29

*Hewlett-Packard Co. v. Acceleron LLC*,
    587 F.3d 1358 (Fed. Cir. 2009) ...................................................... 23

*Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*,
    535 U.S. 826 (2002) ........................................................... 35, 36, 37

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*,
    599 F.3d 1377 (Fed. Cir. 2010) ........................ 22, 24, 27, 34, 35, 38

*Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*,
    309 F.3d 1365 (Fed. Cir. 2002) ...................................................... 44

*Matthews Int'l Corp. v. Biosafe Eng'g, LLC,*
    695 F.3d 1322 (Fed. Cir. 2012) ..................................................... 21

*Microchip Tech. Inc. v. Chamberlain Group, Inc.,*
    441 F.3d 936 (Fed. Cir. 2006) ....................................................... 24

*Microsoft Corp. v. DataTern, Inc.,*
    755 F.3d 899 (Fed. Cir. 2014) .... 4, 7, 11, 12, 18, 20-24, 26-30, 34-38

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ..................................... 41, 42, 52, 58

*Polymer Industrial Products Co. v. Bridgestone/Firestone, Inc.,*
    347 F.3d 935 (2003)................................................................... 39, 40

*Prasco, LLC v. Medicis Pharm. Corp.,*
    537 F.3d 1329 (Fed. Cir. 2008) ..................................................... 23

*Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.,*
    599 F.3d 1308 ................................................................................ 62

*Rengo Co. Ltd. v. Molins Machine Corp., Inc.,*
    657 F.2d 535 (3d Cir. 1981) .......................................................... 14

*Salazar v. Procter & Gamble Co.,*
    414 F.3d 1342 (Fed. Cir. 2005) ..................................................... 56

*Teva Pharmaceuticals USA, Inc. v. Sandoz*, Inc.,
    113 S. Ct. 831 (2015)..................................................................... 41

*Transamerica Occidental Life Ins. Co. v. Aviation Office of America,*
    *Inc.,* 292 F.3d 384 (3d. Cir. 2002) ............................................ 38, 39

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) .................................................. 42, 58

*Vivid Technologies, Inc. v. American Science & Engr.,*
    200 F.3d 795 (Fed. Cir. 1999) ....................................................... 39

*Warner–Lambert Co. v. Apotex Corp.*,
  316 F.3d 1348 (Fed. Cir. 2003) ................................................. 29-30

## *Statutes*

28 U.S.C. § 1295(a)(1) ........................................................... 2, 18

28 U.S.C. § 1404(A) .......................................................... 13, 15

## *Rules*

Fed. R. Civ. P. 12(b)(1) ............................................................. 8

x

## <u>LIST OF ABBREVIATIONS</u>

| <u>Abbreviation</u> | <u>Reference</u> |
|---|---|
| AdWords System | Google's AdWords and AdWords Express |
| '474 patent | U.S. Patent No. 5,930,474 |
| GeoTag | GeoTag, Inc. |
| Google | Google, Inc. |
| Microsoft | Microsoft Corporation |

# STATEMENT OF RELATED CASES

Counsel for Defendant-Appellant GeoTag states that no other appeal in or from the same civil action in the lower court below was previously before this or any other appellate court.

Counsel for Defendant-Appellant GeoTag is not aware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal. But in an abundance of caution, GeoTag notifies this Court that GeoTag is the plaintiff in two pending patent-infringement suits involving the same patent at issue in this appeal: (1) *GeoTag v. Classified Ventures, LLC*, Civil Action No. 1:13-cv-295, in the United States District Court for the Northern District of Illinois (Eastern Division); and (2) *GeoTag, Inc. v. Starbucks Corp., et. al.,* Civil Action No. 2:10-CV-572, in the United States District Court for the Eastern District of Texas (Marshall Division).

# JURISDICTIONAL STATEMENT

This Court has jurisdiction from the district court's final judgment entered on October 8, 2014 (signed October 7, 2014) under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in exercising subject matter jurisdiction over Google's declaratory judgment action and GeoTag's counterclaim.

    A.    Whether the district court erred in basing subject matter jurisdiction on a newly created legal theory of an implied assertion of direct infringement.

    B.    Whether the district court erred in basing subject matter jurisdiction on the theory of an implied assertion of induced infringement.

    C.    Whether the district court erred in basing subject matter jurisdiction on post-complaint facts, including GeoTag's counterclaim for patent infringement of the '474 patent.

2.    Whether the district court erred in granting Google's Motion for Summary Judgment of Non-Infringement by improperly (a) reading in a "parent-child" limitation into the claims, especially with respect to "hierarchy" and "dynamic replication"; (b) excluding "copying" from its construction of the "dynamic replication" terms; and (c) construing dynamic replication to require at least two searches.

3.    Whether the district court erred in finding no issues of material fact in dispute regarding whether Google's AdWords System practices dynamic replication.

## STATEMENT OF THE CASE

This case should never have happened. The district court erroneously found subject matter jurisdiction over Google's request for a declaration that its customers did not infringe the '474 patent. Three years later, the Federal Circuit issued its opinion in *DataTern*, which immediately caused the district court in this case to question whether it ever had jurisdiction over this dispute. Despite its concerns, the district court issued an erroneous summary judgment ruling and then spent four months searching for a basis for jurisdiction. After Google amended its Complaint post-summary judgment, the district court entered an opinion that, if it is allowed to stand, will effectively reverse *DataTern*. Accordingly, GeoTag seeks to vacate the judgment of non-infringement because the district court lacked the jurisdiction to enter it.

Alternatively, GeoTag seeks reversal of the judgment because the district court read limitations into the patent that are not in the claims of the '474 patent and further erred in finding that no issues of material fact are in dispute regarding whether Google's AdWords System practices dynamic replication.

4

## A.    The Invention.

On January 31, 1996, inventors Peter Dunsworth, John Veenstra ("Veenstra"), and Joan Nagelkirk filed their original application for the '474 patent, titled "Internet Organizer for Assessing Geographically and Topically Based Information." (A00089).  Larry Page and Sergey Brin would not form their own search engine, Google, until more than two years later.

Veenstra is the current CEO and a principal of GeoTag, the owner of the '474 patent.  (A05275).  In 1995, Mr. Veenstra and his co-inventors realized that Internet search technology, including the available Internet browsers such as YAHOO!, MOSAIC, and NETSCAPE, suffered from a number of limitations. (A00112).  In particular, they realized that topical information on the Internet (e.g., products, services, news, phone numbers) could not be efficiently searched using geographical search criteria. *See id.*  In response to this problem, Veenstra and his co-inventors developed the patented invention, which is a system, method, and machine for integrating geographically organized information (e.g., city, state, zip codes, etc.) with topical information (e.g., products, services, news, schools, etc.)

5

(A00112-13).   Among other things, the invention gave businesses the power to dynamically tailor their advertising in response to a customer's online, geographic search request. (A00115-16).   Businesses no longer needed to passively serve up static webpages that advertised the same products and services to all customers, regardless of their location. (A00112-13; A00124).   For the first time, businesses could actively target their Internet advertising to geographic areas calculated to be convenient and relevant to the customer. (A00112-13; A00124).

## B.   Google Files a Declaratory Judgment Action in Delaware.

Prior to receiving Google's Complaint, GeoTag had no communications with Google. (A05274; A05276).   GeoTag never sent any demand letters to Google or threatened litigation against Google. *Id.*   GeoTag never created any claims charts or other documents that referenced Google products or services.   *Id.*

6

On March 1, 2011, one month before Microsoft filed its Complaint in *DataTern*, Microsoft[1] and Google filed their Complaint for Declaratory Judgment ("Complaint" or "Original Complaint") in Delaware seeking a declaration that the '474 patent is invalid and "not infringed by the use of Plaintiffs' web mapping services." (A05192; A05196-98). Microsoft and Google alleged that they provided Mapping Services that "allow customers to create customized maps for display on their websites" and that "GeoTag alleges infringement of the '474 patent based on the use of Mapping Services to create store locators and similar locator services on websites." (A05196).  According to Google, the justiciable controversy was not any dispute about whether Google infringed the '474 patent.  (A05197).  Instead, the justiciable controversy was based on GeoTag's lawsuits in Texas against Google's customers. (A05197).  Plaintiffs alleged that there was "an actual controversy between Plaintiffs and GeoTag regarding whether

---

[1] All claims by and against Microsoft have been severed and dismissed through Stipulation of Dismissal. (A07790).  Because Microsoft is not a party to this appeal, this brief references pleadings and evidence regarding Google's claims.  However, it is relevant to note that, within a month of suing GeoTag, Microsoft filed a very similar complaint against DataTern, Inc.

customers infringe the '474 patent by use of Microsoft's Bing Maps and Google's Google Maps for the purposes of store locator services, or other similar uses, and whether the '474 patent is valid." (A05197).

Google only sought a declaratory judgment that "customers of [Google's] Mapping Services to [sic] provide store locators and the like do not infringe any valid claim of the '474 patent." (A05197). Google did not seek a declaration regarding whether or not Google infringed the '474 patent. *Id.*

## C.  GeoTag's First Motion to Dismiss.

On April 29, 2011, GeoTag filed its original Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Fed. R. Civ. P. 12(b)(1) or, In the Alternative, to Transfer Venue Pursuant to 28 U.S.C. § 1404(A) ("First Motion to Dismiss"). (A05246; A05254-56). In connection with the First Motion to Dismiss, GeoTag submitted affidavits contesting the allegation that GeoTag had alleged infringement against Google's customers based on the use of Google's mapping services. (A05273-76). The Affidavit of Lawrence P. Howorth stated:

> 14.   GeoTag has never accused any defendant in the Texas Actions of infringing the '474 patent based upon a map provided or generated by Bing Maps or Google Maps.

8

GeoTag has never explicitly or directly, or to my knowledge implicitly or indirectly, accused any defendant in the Texas Actions of infringing the '474 patent on the basis, in whole or part, of Bing Maps or Google Maps.

15.    None of the complaints in the Texas actions accuse Google Maps or Bing Maps as infringing methods, systems or apparatuses.  None of the complaints in the Texas actions explicitly or directly, or to my knowledge implicitly or indirectly, accuse any defendant of infringement, in whole or part, based upon Bing Maps or Google Maps.

16.    To the extent any defendants in the Texas Actions display Bing Maps or Google Maps on their websites, those maps or mapping services are not, and have never been, accused of infringing the '474 patent by GeoTag.

(A05276). *See also* Affidavit of Elizabeth Morgan. (A05274).

In opposing the First Motion to Dismiss, Plaintiffs submitted declarations from three individuals, two of which are relevant to this appeal: (1) the declaration of Ramsay M. Al-Salam ("Al-Salam"), a lawyer representing Microsoft and Google; and (2) the declaration of Carlos Cuesta ("Cuesta"), a Product Marketing Manager at Google. (A05303-04; A05305-09).  Al-Salam, outside counsel for Microsoft and Google, offered no testimony in his declaration regarding the hosting of store locator data and functionality on Plaintiffs' servers. (A05305-09). His only testimony regarding Google's customers was that an

unidentified assistant had told him that some of the customers sued by GeoTag "use" "Google Maps" or "Bing Maps." (A05306). Cuesta only discussed in general the services Google provides to all customers without mentioning any specific customers. (A05303-04). Cuesta also stated that "[i]t is possible for a Google customer to use Google Mapping Services and/or Fusion Tables, along with other non-Google provided products and services, to create store locator features on the customer's web site." (A05304).

On December 9, 2011, the district court denied GeoTag's First Motion to Dismiss. (A00035; A02045-46).

### D. GeoTag's Counterclaim.

On February 13, 2012, GeoTag filed its Answer and Counterclaim. (A05577). GeoTag asserted that several Google products and services infringed the '474 patent, including Google's AdWords and AdWords Express. (A05583-86). Consistent with the arguments in GeoTag's First Motion to Dismiss, GeoTag stated that its claim of infringement was "not based upon Google's sale or distribution of any store locator services to any third party, including any other person who has been sued by GeoTag for infringement of the '474 patent." (A05584).

### E.    June 3, 2013 Stipulated Judgment.

GeoTag was not interested in fighting a declaratory judgment action that sought an irrelevant declaration regarding mapping services.  Consequently, on June 3, 2013, the parties entered into a Stipulated Judgment that resolved all justiciable issues on which Google originally based its declaratory judgment claims.  (A06168-72). The parties agreed that there was no dispute concerning patent infringement by Google in connection with the services—hosted or otherwise—referenced in its Complaint. (A06171-72).    The only remaining claims in the lawsuit were GeoTag's ad-related counterclaims. *Id.*

### F.    *DataTern* and Summary Judgment.

On April 4, 2014, this Court issued its original opinion in *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014).[2]  This opinion triggered more than four months of briefing and argument over whether the district court had jurisdiction over the case. (A00180-85). Within three days of the issuance of the *DataTern* opinion, the district

---

[2] The April 4, 2014 opinion was withdrawn and superseded by the May 5, 2014 opinion.

court entered an oral order requesting that each party submit a letter by 5:00 P.M. on April 10, 2014, advising the court of "its position in regard to subject matter jurisdiction" in light of *DataTern*. (A00181).

On April 10, 2014, GeoTag submitted the requested letter and asserted that, as in *DataTern*, the district court did not have jurisdiction at the time Google filed its Complaint and, therefore, the case must be dismissed. (A07791-93). Google also submitted the requested letter on April 10, 2014. (A07103-06). Google asserted that the district court had jurisdiction for two reasons: (1) GeoTag had asserted counterclaims that created a justiciable case or controversy; and (2) jurisdiction was proper under *Arris Grp., Inc. v. British Telecomm. PLC*, 639 F.3d 1368, 1375 (Fed. Cir. 2011), because GeoTag's claims against Google's customers created a controversy as to Google's liability for induced or contributory infringement. *Id.*

Within hours of receiving the April 10 letters, the district court filed its 18-page Memorandum Opinion, granting Google's Motion for

Summary Judgment of Non-Infringement. (A00045-46).[3] The district court found that Google's AdWord System did not infringe the "dynamic replication" requirement of the patent claims. (A00058).

The district court had effectively ended the case by granting summary judgment of non-infringement. (A02252-57). Yet, for the next four months, the court continued to request briefing on jurisdictional issues. The next day, on April 11, 2014, the district court entered an oral order directing the parties to confer with each other about the impact of the court's recent summary judgment order on trial "assuming that the Court will decide that there is jurisdiction for the Court to hear the case." (A00181-82). The district court also requested that the parties be prepared to discuss two issues at the pretrial conference on April 14, 2014: (1) "the Third Circuit's precedent concerning whether a counterclaim can cure a jurisdictional defect in

---

[3] Google moved for summary judgment on a number of grounds. The district court denied Google's motion for summary judgment in its entirety as to the issue of invalidity. (A00044). The district court, however, granted summary judgment on non-infringement, but solely because the court found that Google's Adwords System did not practice dynamic replication. (A00058). The district court's ruling as to the issue of non-infringement is analyzed and discussed below in the Arguments Section of this Opening Brief. *See infra* Argument, Sections II and III.

the complaint, including *Rengo Co. Ltd. v. Molins Machine Corp., Inc.*, 657 F.2d 535 (3d Cir. 1981); and (2) the significance of the fact that Google did not assert, or reassert, its declaratory judgment invalidity claim as a counterclaim in its answer to GeoTag's Complaint." (A00181-82).

On April 14, 2014, the parties attended the requested pretrial conference and advised the district court that they did not want to proceed to trial on any issues. (A02252-57). The parties advised the court that GeoTag intended to appeal the jurisdictional ruling to the Federal Circuit. *Id.*

On April 28, 2014, GeoTag submitted the requested jurisdictional briefing through a second motion to dismiss Plaintiffs' complaint for declaratory judgment for lack of subject matter jurisdiction ("Second Motion to Dismiss"). (A07245; A07248-53). In opposition to GeoTag's Second Motion to Dismiss, Google argued for the first time that customer data related to the Texas lawsuits resided entirely on Google's servers, and Google—not its customers—performed all of the steps that GeoTag accused of infringing the '474 patent. (A07261-62). Google further alleged that "GeoTag's assertions against the hosted customers

14

were implied assertions of *direct* infringement against Microsoft and Google . . . ." (A07261).  In its Reply, GeoTag pointed out that Google had never pled its new "hosted customers" jurisdiction theory nor proven the theory at the December 12, 2011 hearing on the First Motion to Dismiss. (A07609).

On June 16, 2014, the district court requested further jurisdictional briefing on two additional jurisdictional issues. (A07618-19).  On June 30, 2014, after the parties submitted additional briefing, the district court permitted Google to amend its complaint, but the court reminded Google that factual amendments to the complaint must have been extant at the time the Original Complaint was filed in March 2011.  (A07634).  The district court also instructed GeoTag to either withdraw its motion to dismiss or file a supplemental brief indicating why the Court continued to lack subject matter jurisdiction in light of the amended complaint. *Id.*

## G.  Amended Complaint and More Jurisdictional Briefing.

On July 17, 2014, Microsoft and Google filed their First Amended Complaint in an attempt to correct prior jurisdictional defects. (A07636-

37; A07641-46).  In contrast to its Original Complaint, Google alleged in its Amended Complaint that some unknown portion of its customers that were sued by GeoTag in the Texas actions were fully hosted customers whose data and software were hosted on Google's servers and that, due to this hosted relationship, GeoTag's lawsuits against its customers constituted "implied assertions of infringement (either indirect or direct)." (A07637).  Unlike the Original Complaint, Microsoft and Google now sought a judicial declaration that "[n]either Plaintiffs nor their customers infringe any valid claim of the '474 patent." (A07646).

On August 4, 2014, as required by the district court's June 30, 2014 Order, GeoTag filed its third Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction ("Third Motion to Dismiss") along with additional briefing. (A7698-99; A07701; A07710-13).  On August 15, 2014, Google responded to GeoTag's Third Motion to Dismiss with additional briefing. (A07721).  To support its new subject matter jurisdiction arguments, Google submitted the Declaration of Reid P. Mullen ("Mullen"), an attorney representing Google. (A07755).  Mullen's Declaration did not include any information

16

regarding the new hosted customer theory for subject matter jurisdiction. *Id.* Instead, attached to the Mullen Declaration were two articles regarding store locators and a March 27, 2012 set of interrogatory answers. (A07755-79). Nothing in Mullen's Declaration indicated when the articles were published or showed any connection between the articles and the '474 patent, GeoTag, or the Texas lawsuits. (A07755). The interrogatory answers were never referenced or cited by Google in any motion or briefing. (A07724-42).

On August 29, 2014, the district court found that it had subject matter jurisdiction because GeoTag's Texas lawsuits constituted "an implied assertion of direct and indirect infringement" against Google and because GeoTag's counterclaims in this case created an independent basis for subject matter jurisdiction. (A00038-43).

On October 7, 2014, the parties entered into a Stipulated Judgment to permit the prosecution of this appeal. (A00032-33).

17

# SUMMARY OF THE ARGUMENT

This district court's decision on subject matter jurisdiction cannot be reconciled with the Federal Circuit's opinion in *DataTern*. Allowing subject matter jurisdiction to be based on a creative concept like an implied assertion of direct infringement or on subsequently filed counterclaims would eliminate the rigorous jurisdictional requirements this Court reaffirmed in *DataTern*. Either *DataTern* is the law on subject matter jurisdiction or it is a minor obstacle that can be circumvented with creative pleadings and argument. This is the primary issue that this Court must decide.

Alternatively, the district court's grant of summary judgment of non-infringement was erroneous for at least four independent reasons. Namely, the court erred by: (1) reading in a "parent-child" limitation into the asserted claims; (2) omitting the concept of "copying" from its construction of the dynamic replication terms; (3) requiring that dynamic replication be conducted only through the use of two separate search operations; and (4) even *if* dynamic replication requires two searches, as the district court found, it still erred because a fact issue

18

exists regarding whether Google's AdWords System performs two separate searches.

# ARGUMENT

## I.   The District Court Lacked Subject Matter Jurisdiction.

The district court lacked subject matter jurisdiction and thus its judgment should be vacated.  For a federal court to accept a declaratory judgment action, there must first be a case or controversy. *Already LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) ("courts have 'no business' deciding legal disputes or expounding on law in the absence of such a case or controversy.") (citation omitted).   The threshold question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 903 (Fed. Cir. 2014). "The dispute must be 'definite and concrete, touching the legal relations of parties having adverse legal interests,' such that the dispute is 'real and substantial' and 'admi[ts] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Arris Grp., Inc. v. British Telecomm. PLC*, 639 F.3d 1368, 1373-74 (Fed. Cir. 2011) (citations omitted).   The declaratory judgment

20

plaintiff—in this case, Google—bears the burden of proving that a case or controversy existed at the time it filed its complaint. *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1328 (Fed. Cir. 2012). The existence of a case or controversy is a question of law, which this Court reviews de novo. *DataTern*, 755 F.3d at 903.

The district court erred because the parties had no adverse legal interests that would justify subject matter jurisdiction when Google filed its complaint. GeoTag's Texas lawsuits against other parties—which did not reference Google—did not create a reasonable probability that GeoTag would sue Google. To the contrary, the absence of Google from the Texas lawsuits is an indication that GeoTag did not intend to sue Google. Further, post-complaint facts, like GeoTag's counterclaim against Google, cannot create jurisdiction where none existed at the time of filing.

## A.   GeoTag and Google were legal strangers prior to Google's Complaint.

Prior to the filing of Google's Complaint on March 1, 2011, GeoTag and Google were legal strangers. Google produced no evidence that there were any communications between the parties prior to the

lawsuit. GeoTag never approached Google regarding a license, never accused it of infringement, and never threatened to sue Google. Prior to the filing of the Complaint, GeoTag never created any claims charts or other documents that referenced any Google products or services. At the time of Google's Complaint, the parties were legal strangers in every sense. As such, the district court erred in finding that there was a sufficiently immediate and real adverse legal interest between GeoTag and Google that would justify jurisdiction. *See Ass'n for Molecular Pathology v. U.S.P.T.O.*, 689 F.3d 1303, 1318 (Fed. Cir. 2012) (hereinafter, *Myriad*) ("[T]o establish an injury in fact traceable to the patentee, a declaratory judgment plaintiff must allege both (1) an affirmative act by the patentee related to the enforcement of his patent rights, and (2) meaningful preparation to conduct potentially infringing activity.") (citations omitted); *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1316 (Fed. Cir. 2011) (district court lacked jurisdiction because, inter alia, the patentee "never accused Starmark of infringing its [patent]"); *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1382 (Fed. Cir. 2010) (no jurisdiction due to, inter alia, "the absence of any act directed toward [the declaratory judgment

22

plaintiff]"); *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1364 (Fed. Cir. 2009) (explaining that "declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee.") (citation omitted); *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1340 (Fed. Cir. 2008) (noting that "the defendants have not accused Prasco of infringement" and that "[t]he lack of any evidence that defendants believe or plan to assert that plaintiff's product infringes their patents creates a high barrier to proving that Prasco faces an imminent risk of injury.").

## B.  The Texas cases did not implicate Google.

GeoTag sued several defendants in Texas for their use and operation of electronic yellow pages and website store locators. (A05305).  Google's evidence showed that an assistant to Google's outside counsel told him that some of the Texas defendants used Google Maps as part of their store locator services. (A05306).  Google's evidence showed that, as of the filing of Google's Complaint, "nothing substantive has happened in the [Texas] cases."  (A05305).

23

GeoTag's lawsuits against the Texas defendants did not establish adverse legal interests vis-à-vis Google. *See DataTern*, 755 F.3d at 905-06 (recognizing that lawsuits against customers alone cannot be a basis for subject matter jurisdiction); *Myriad*, 689 F.3d at 1323 (holding that the district court erred in finding standing based on patentee's actions towards others); *Creative Compounds*, 651 F.3d at 1316 (noting that "[w]hile Creative did send letters to purchasers of [the patented product] alleging that [the product] would infringe claims of the '273 Patent, none of those letters were sent to Starmark" and thus there was no case or controversy); *Microchip Tech. Inc. v. Chamberlain Group, Inc.*, 441 F.3d 936, 943 (Fed. Cir. 2006) (holding that manufacturer could not maintain declaratory judgment action to protect its customers from infringement claims); *Innovative Therapies*, 599 F.3d at 1382 (noting that "the fact that KCI has filed infringement suits against other parties for other products does not, in the absence of any act directed toward ITI, meet the minimum standard discussed in *MedImmune*"). Because Google failed to show GeoTag took any affirmative act to enforce its patent against Google, there was no adverse legal interest between Google and GeoTag at the time Google

24

filed its Original Complaint.  Google was obviously aware of the lack of dispute between Google and GeoTag because Google did not originally seek any declaration concerning its infringement of the '474 patent. Google was only concerned about whether others infringed the '474 patent—which is not a proper basis for subject matter jurisdiction.

### C.  The district court impermissibly based its finding of subject matter jurisdiction on an implied assertion of direct and indirect infringement.

The core of the district court's subject matter jurisdiction decision is the finding that GeoTag's Texas lawsuits constituted an implied assertion of direct and indirect infringement against Google.  Implied assertion of indirect infringement is a recognized doctrine that Plaintiffs have not proven and cannot prove.  On the other hand, implied assertion of direct infringement has never been recognized by any prior court and makes no sense.

### 1.  The novel theory of an implied assertion of direct infringement.

The district court's subject matter jurisdiction decision creates an entirely new legal concept, the implied assertion of direct infringement. No court has held that lawsuits against a supplier's customers could

constitute an implied assertion of direct infringement against a supplier. The holdings in *DataTern* and *Arris* are limited to implied assertions of induced or contributory infringement. *See DataTern*, 755 F.3d at 905-06; *Arris*, 679 F.3d at 1375. There was no legal authority for the district court to expand the holdings in *DataTern* and *Arris* to an "implied assertion of direct infringement."

Expanding the holdings to an implied assertion of direct infringement makes no sense. Implied assertion of indirect infringement is based on the premise that the patentee's allegations and conduct are sufficient to constitute an assertion of direct infringement against the customer and an implied assertion of indirect infringement against the supplier. In other words, through its action for direct infringement against the customer, the patentee knowingly asserted allegations that constitute indirect infringement against the supplier. Plaintiffs' new theory of an implied assertion of direct infringement would mean the mere filing of a lawsuit that never mentions the supplier could be construed to assert a direct and concrete dispute against the supplier because, unbeknownst to the patentee, the supplier allegedly infringes the patent in the same way as the customer.

This new theory would open the door for any declaratory judgment plaintiff to create subject matter jurisdiction by merely pointing to a complaint in another jurisdiction and alleging, "I do the same thing." Of course, this new theory contradicts several Federal Circuit opinions that require more than a lawsuit against another party to create subject matter jurisdiction. *See, e.g., DataTern*, 755 F.3d at 905-06; *Innovative Therapies*, 599 F.3d at 1382.

Even if federal law recognized an "implied assertion of direct infringement," there is no evidence for that implied assertion in this case. The district court noted that "[i]t is entirely possible that a customer and a vendor can both directly infringe a patent based on the same conduct." (A00039). While this statement is conceivable correct, it skirts the real issue. The real issue is whether GeoTag's patent infringement lawsuits in Texas against Google's customers can—with no claims charts, demand letters, or pleadings implicating Google— create a justiciable controversy between GeoTag and the Google.

To determine whether there is a case or controversy of sufficient immediacy to establish declaratory judgment jurisdiction, federal courts

look to the elements of the potential cause of action. *DataTern*, 755 F.3d at 904-05. "Direct infringement requires a party to perform each and every step or element of a claimed method or product." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007). Google provided no evidence that GeoTag ever asserted that Google performed each and every element of any claim of the '474 patent. In fact, Google argued that, at most, it only supplied a component of its customers' store locators. (A05303-04; A02032-33) (Plaintiffs' counsel recognizing that "customers have their choice about how to create these store locators" and that the store locators may not be entirely based on what Google and Microsoft provide). Additionally, GeoTag's evidence proved that GeoTag never accused any defendant in the Texas lawsuits of infringing based on Google's services and never asserted that Google's mapping services infringed the '474 patent. (A05274; A05276). Accordingly, even if the implied assertion of direct infringement were a recognized legal theory, there is no evidence that GeoTag's Texas lawsuits impliedly asserted that Google performed each and every step or element of the claimed system and method.

28

### 2. Google did not, and could not, prove the requirements for an implied assertion of induced infringement.

A supplier has standing to commence a declaratory judgment action if "there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers." *Arris*, 679 F.3d at 1375. To prove a controversy existed for induced infringement,[4] Google had the burden to submit evidence of allegations that it (*i.e.*, the alleged inducer) took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement. *DataTern*, 755 F.3d at 904; *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (holding that, to plead inducement, a plaintiff must show sufficient facts that "the alleged infringer . . . possessed specific intent to encourage another's infringement"). "[M]ere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven.'" *Id.* (*quoting Warner–Lambert Co. v.*

---

[4] The only indirect infringement theory at issue was induced infringement, not contributory infringement. (A00038).

*Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003). While "definitive proof" need not exist as to every element of inducement of infringement, to establish a substantial controversy, "there must be allegations by the patentee or other record evidence that establish at least a reasonable potential that such a claim could be brought." *DataTern*, 755 F.3d at 905.

In *DataTern,* proof of the "required mental state" for inducement came from claims charts prepared by the patentee. *DataTern*, 755 F.3d at 905. In *Arris*, proof of contributory infringement came from a 118-page presentation concerning the patentee's infringement contentions. *Arris*, 679 F.3d at 1375. In this case, there is no evidence in the record that Google knowingly encouraged the Texas defendants to infringe the '474 patent. The absence of this type of proof is the reason this Court rejected Microsoft's claim of subject matter jurisdiction in *DataTern. See DataTern*, 755 F.3d at 905 ("Nothing in the record suggests that Microsoft encouraged the acts accused of direct infringement . . . .").

Not only do we have a record devoid of any claim charts or allegations by the patentee that would establish a reasonable potential of a lawsuit, the evidence shows that Google never viewed the Texas

lawsuits as potential claims against Google. Google's Original Complaint did not seek any declaration as to whether it infringed the '474 patent. In fact, Google never mentioned the words "induced" or "encouraged" in either the Original Complaint or the Amended Complaint. Further, in its Brief in Support of Motion for Summary Judgment, Google represented that "GeoTag never told Google that it too might be sued or that GeoTag believed it had a claim against Google." (A06178). Google also stated that GeoTag "never provided any notice of any potential claims during its delay [prior to filing its infringement counterclaims]." *Id.* Google reiterated that "GeoTag never notified Google of any potential claim, much less put Google on notice that it would one day be sued." (A06191). Consequently, the district court's finding that the Texas lawsuits somehow constituted an implied assertion of induced infringement against Google is completely unsupported by the record.

**D. The district court impermissibly relied on post-filing events.**

### 1. Google's last-minute, irrelevant evidence.

More than two years after the district court denied GeoTag's First

Motion to Dismiss and three years after the lawsuit was filed, Google submitted new jurisdictional evidence. (A007754-79). The new evidence consisted of two internal Google articles regarding store locators and answers to interrogatories that were served more than a year after Google filed its Complaint. *Id.*

Google's evidence created more questions than it answered. Google never cited to the interrogatory answers in any briefing or motion, so GeoTag never understood the connection, if any, between the March 27, 2012 interrogatory answers and subject matter jurisdiction as of the March 1, 2011 Complaint. (A07721-45). The two articles created even more confusion. Neither of the articles mention GeoTag or the '474 patent. (A007759-74). Google produced no evidence that the articles played any role in the decision to sue GeoTag. (A07755). None of the Google executives who decided to sue GeoTag testified that they considered, reviewed, or were even aware of the articles at the time Google filed its Complaint. *Id.* Google produced no evidence that any of the Texas defendants ever saw or used any of the articles in connection

with their store locators.[5]  Further, Google produced no evidence that
GeoTag had ever cited to, or was even aware of, the articles at the time
Google filed its Complaint. *Id.*  In fact, there is no evidence of who, if
anyone, ever saw the articles prior to their submission in this case.

The most glaring deficiency in Google's new evidence is the lack of
any proof of when the articles were created or published.  In other
words, did these irrelevant articles even exist on March 1, 2011 when
Google filed its Complaint?  The front pages of the articles are dated
2008 and 2009, but, as GeoTag pointed out to the district court, no one
testified that these dates are correct. (A07783-84).  The purported 2009
article Google relied upon the most shows that it was last updated on
June 24, 2014. (A07774).  Because the article was last updated on June
24, 2014, the only fact known for certain is that the version attached to
the Mullen Declaration existed in 2014, not 2011. (A07774).  Nothing in
the record indicates what information was included in any prior

_____

[5] There is no evidence that the store locator technology discussed in the
Google articles is the same type of store locator technology that was the
subject of the Texas actions.  The only connection between the two is
that they both concern store locators, but that does not mean the
articles are discussing the same type of store locator technology that
was the subject of the Texas action.

versions of the article. The district court dismissed GeoTag's objection to this 2014 article in a footnote with the notation that the "article title makes clear that it was originally published in August 2009." (A00040). However, the district court's conclusion begs the question, "How does the district court know that the title itself was not updated on June 24, 2014?"

In summary, Google's two random articles—one of which was published three years after the Complaint was filed—do not prove that there was a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

### 2. A counterclaim cannot serve as an independent basis for jurisdiction.

The district court held that, "even if there were no subject matter jurisdiction over the original declaratory judgment complaint, there would still be an independent basis for subject matter jurisdiction over the counterclaims." (A00041). This holding directly conflicts with binding precedent from this Court and the Supreme Court. *See DataTern*, 755 F.3d at 906; *Innovative Therapies*, 599 F.3d at 1383; *see*

34

*also Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 831 (2002).

In the Federal Circuit, the "burden is on the party claiming declaratory judgment jurisdiction to establish that such jurisdiction existed at the time the claim for declaratory relief was filed." *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007). Post-complaint facts cannot create jurisdiction where none existed at the time of filing. *DataTern*, 755 F.3d at 906; *Innovative Therapies*, 599 F.3d at 1383. To hold otherwise would be to allow a prospective declaratory judgment plaintiff having dubious grounds for jurisdiction to file a case in hopes of trapping the patent owner into counterclaiming for infringement, thereby retroactively establishing jurisdiction. *Id.* at 1384.

The law in this Circuit is consistent with the Supreme Court's view of counterclaims. In *Holmes*, the Supreme Court held that "a counterclaim—which appears as part of the defendant's answer, not as part of the plaintiff's complaint—cannot serve as the basis for 'arising under' jurisdiction." *Holmes*, 535 U.S. at 831. In *Holmes*, the plaintiff

sought declaratory judgment that its product did not infringe its competitor's trade dress. *Id.* at 828. The competitor then filed a counterclaim for patent infringement. *Id.* After the manufacturer prevailed on its claims at the district court level, the case was appealed to the Federal Circuit based on the patent infringement counterclaim. *Id.* at 829. After the Federal Circuit vacated and remanded, the United States Supreme Court granted certiorari regarding the issue of jurisdiction. *Id.* The Supreme Court held that the Federal Circuit— which has jurisdiction to hear appeals of cases that "arise under" federal patent law—lacked jurisdiction over the appeal because the only patent claim at issue had been injected by the defendant as a counterclaim. *Id.* at 830. Hence, a case cannot be deemed to "arise under" the laws of the United States when the only federal question is raised in the defendant's counterclaim. Admittedly, the Court's holding pertained to the question of appellate jurisdiction, but the Court made abundantly clear in its opinion that the same test applied when deciding whether a federal district court had subject matter jurisdiction

under Section 1331.[6]

> Respondent argues that the well-pleaded-complaint rule,
> properly understood, allows a counterclaim to serve as the
> basis for a district court's arising under jurisdiction. We
> disagree. Admittedly, our prior cases have only required us
> to address whether a federal defense, rather than a federal
> counterclaim, can establish 'arising under' jurisdiction.
> Nevertheless, those cases were decided on the principal that
> federal jurisdiction generally exists only when a federal
> question is presented on the face of the plaintiff's properly
> pleaded complaint.... It follows that a counterclaim—which
> appears as part of the defendant's answer, not as part of the
> plaintiff's complaint—cannot serve as the basis for 'arising
> under' jurisdiction.

*Id.* at 831. Stated succinctly, under *Holmes* and *DataTern*, the district

court's jurisdiction must be determined at the time of the complaint and

pursuant to the well-pleaded-complaint rule, which cannot take into

account a defendant's counterclaim. Hence, a counterclaim cannot

confer subject matter jurisdiction over a case where none previously

existed.

---

[6] In particular, the Court emphasized that Section 1338(a)—which
confers "original jurisdiction of any civil action arising under any Act of
Congress relating to patents"—uses the same operative language as
Section 1331, which confers general federal question jurisdiction. *Id.* at
829. The Court stated that for purpose of "linguistic consistency," courts
must "apply the same test to determine whether a case *arises under*
Section 1338(a) as under Section 1331." *Id.* at 830.

37

3.  **Even if a permissible counterclaim could create jurisdiction, it makes no difference because GeoTag's counterclaims were compulsory.**

To circumvent *DataTern* and *Innovative Therapies*, the district court relied upon Third Circuit law, which permits a counterclaim to serve as an independent basis for jurisdiction if the counterclaim is permissive. Aside from being legally incorrect, this argument is a red herring because GeoTag's counterclaims were compulsory.

Federal Rule of Civil Procedure 13(a) requires that a party plead a counterclaim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." To qualify as a compulsory counterclaim, there "need not be precise identity of issues and facts between the claim and the counterclaim; rather, the relevant inquiry is whether the counterclaim bears a logical relationship to an opposing party's claim." *See Transamerica Occidental Life Ins. Co. v. Aviation Office of America, Inc.,* 292 F.3d 384, 389 (3d. Cir. 2002). The concept of "logical relationship" is generously applied to promote judicial efficiency. *Id.* All that is required for a claim to be compulsory is that it would involve a substantial duplication of effort and time by

the parties and the courts, as compared to the plaintiff's original claim. *Id.* at 389-90.

In this patent case, Federal Circuit law governs whether GeoTag's counterclaims are compulsory. *See Polymer Industrial Products Co. v. Bridgestone/Firestone, Inc.*, 347 F.3d 935 (2003).  The Federal Circuit has adopted the following four tests, *any one of which* will render a counterclaim compulsory: (1) whether the legal and factual issues raised by the claim and counterclaim are largely the same; (2) whether, absent the compulsory counterclaim rule, res judicata would bar a subsequent suit on the counterclaim; (3) whether substantially the same evidence supports or refutes both the claim and counterclaim; (4) whether there is a logical relation between the claim and counterclaim. *See Vivid Technologies, Inc. v. American Science & Engineering*, 200 F.3d 795, 801 (Fed. Cir. 1999).  Additionally, the Federal Circuit has repeatedly stated that a "counterclaim for patent infringement, in an action for declaration of non-infringement of the same patent, readily meets all four of these criteria." *Id.*  Indeed, in *Vivid*, the Federal Circuit noted that "[o]f the cases compiled in the treatises and that we have found, every court that has discussed the issue has recognized that

39

an infringement counterclaim is compulsory in an action for declaration of non-infringement." *Id.*

GeoTag's counterclaims were clearly compulsory. The counterclaims were "logically" related to Defendants' declaratory claims because, among other things, they involved the same parties, the same inventors and witnesses, the same infringement and damages experts, and even the same patent and claim construction issues. The law does not require as much before finding a counterclaim to be compulsory. In fact, in *Polymer Industrial Product*, the Federal Circuit stated that it "is generally recognized that when the same patent is at issue in an action for declaration of non-infringement, a counterclaim for patent infringement is compulsory and if not made is deemed waived." *Polymer Indus. Products Co.*, 347 F.3d at 938. There is no reason for this Court to create new law by adopting Google's novel "mirror image" legal standard that would require every fact and issue raised in the declaratory action to also be present in the counterclaim.

Because the district court did not have subject matter jurisdiction over this case—and never had subject matter jurisdiction over this case—its judgment must be vacated.

40

## II.  The District Court Erred in Construing the Terms of the '474 Patent and Granting Summary Judgment of Non-Infringement.

The district court erred in granting summary judgment of non-infringement.  Specifically, the court determined that Google's AdWords System did not practice dynamic replication, a necessary element of the asserted independent claims. (A00058).  As demonstrated below, the district court misconstrued the "hierarchy" and "dynamic replication" phrases in the '474 patent, and further erred by overlooking disputed fact issues regarding whether Google's AdWords System practices dynamic replication.

### A.  The legal standard for claim construction.

Intrinsic evidence and the ultimate construction of the patented claim is reviewed de novo. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 839 (2015).  Underlying factual determination concerning extrinsic evidence is reviewed for clear error.  *See id.* at 837.  The "claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  Words in a patent claim are given their ordinary and customary meaning, and the "ordinary and customary meaning of a

41

claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13. The specification is a helpful guide for understanding the claims because it is intended to serve as a teaching tool; that is, it should explain to those of ordinary skill in the art how to make and use the invention. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996). But courts are advised that even though a specification often describes a specific embodiment of a particular invention, the trial court should avoid importing limitations from the specification into the claims. *Phillips*, 415 F.3d at 1323. Indeed, trial courts are warned that even if a patent describes only a single embodiment, the claims of the patent should not ordinarily be construed as limited to the embodiment in the specification. *See id.*, 415 F.3d at 1323.

**B.   The district court wrongly construed the "hierarchy" phrases**.

The term "hierarchy" appears in various forms in several of the asserted claims.[7]  During claim construction, the parties disputed the meaning of *hierarchy*.[8] (A05606-505611, A05621-A05625).  Although the parties agreed that "hierarchy" of geographical areas is comprised of an organization of broader geographic areas and related narrower

---

[7] For example, independent claim 1 refers to "a database of information organized into a hierarchy of geographical areas wherein entries to each one of said hierarchy of geographical areas is further organized into topics." (A00130 at 38:43-45).  Similarly, independent claim 20 refers to a "database of information organized into a predetermined hierarchy of geographical areas comprising at least a geographical area of relatively smaller expanse and a geographical area of relatively larger expanse…" (A00131 at 39:44-47).

[8] The parties submitted multiple "hierarchy" phrases to the district court, all of which included some form of the word *hierarchy.* These phrases will be referred to in this Brief as the "hierarchy phrases." Similarly, the parties submitted multiple "dynamic replication" phrases having either the words "dynamically replicated" or "dynamically replicating."  These phrases will be referred to in this Brief as the "dynamic replication terms."

The district court decided that these groups of terms should be construed as a single phrase, when possible, as opposed to construing each phrase separately. (A00068)("[T]he Court agrees with Microsoft's proposal that this group of [hierarchy] terms should be construed as a single phrase.");(A00073)("The Court agrees with Google's suggestion that the [dynamic replication] terms should be construed as a single phrase when possible.").

geographic areas, the parties disagreed as to how the broader and narrower geographic areas are arranged in relation to one another. (A00068).  GeoTag proposed, for example, that *hierarchy of geographical areas* should mean "an arrangement of related information or data, ordered from broader general categories to narrower specific ones." (A00066-67; A05606-505611, A05621-A05625).

The district court, however, agreed with Microsoft's proposal and erroneously determined that hierarchy must, among other things, include "parent geographic areas and child geographic areas."[9] (A00069; A00073).  Even Google's counsel did not argue before the district court that "hierarchy" should be narrowly limited to require a parent-child relationship; instead, Google advocated for a broader meaning. (A02132 at 16-20) (Google's counsel stating that: "I will note at the outset, your

---

[9] Specifically, the district court construed the phrase "a database of information organized into a hierarchy of geographical areas wherein entries to each one of said geographical areas is further organized into topics" to mean "a database of information organized into interrelated geographic areas such that there are parent geographic areas and child geographic areas, wherein the records associated with a geographic area are further organized into topics." (A00073)(emphasis added).  *See Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

Honor made a comment, 'encompass' is somehow saying the same thing as parent-child, and it's not.  I want to take some time to explain to Your Honor.  It is language in the patent 'encompass,' and it's much broader than parent-child.").

For the reasons explained below, the district court erroneously construed "hierarchy" to require a parent-child data relationship.

> 1.  **The district court wrongfully imported the "parent-child" limitation into the claims from the specification.**

The district court determined that hierarchy must always include a parent-child relationship because a parent-child hierarchy was taught in an embodiment in the specification.[10] (A00069-00072).  For instance, the district court stated that:

> Although the specification's use of (e.g., parent) would seem to indicate that the parent-child relationship is merely exemplary, there is no indication elsewhere as to how automatic inheritance would function without the parent-child relationship.  (A00070).

---

[10] The district court's construction was also erroneously based on a unilateral statement made by the examiner in the form of a handwritten note.  GeoTag's argument relating to this issue is included herein in the section addressing dynamic replication.

It was an error to import the parent-child limitation from the specification. *See Acumed LLC v. Stryker Corp.*, 483 F.3d at 805 ("attempt to import a feature from a preferred embodiment into the claims is flawed"). As the district court itself acknowledged, the language in the specification indicates that the parent-child embodiment was "merely exemplary." (A00070). Indeed, the specification is replete with general disclaimers, notifying its audience that the embodiments in the specification were illustrative and not exhaustive. *See e.g.*, (A0125 at 28:8-28; A0124 at 25:21-24). Additionally, when discussing "hierarchy," the specification often uses broad, general language, further proving that the patentee never intended for the invention to be limited to one, particular type of hierarchy. *See e.g.*, (A00115 at 8:49-50) ("The geography database contains hierarchically ordered geographic information."). Consider the following excerpts from the specification discussing hierarchy, none of which require something as rigid as a parent-child data relationship:

> …structure comprising plural geographic levels into which the geographical areas are geographically categorized by size to provide a low level, one or more intermediate levels and a high level. (A00113 at 3:19-22).

46

…predetermined hierarchy of geographical areas comprising at least a geographical area of relatively small expanse, a geographical area of intermediate expanse and a geographical area of relatively large expanse. (A00113 at 3:50-54).

…the databases are organized in a hierarchy which descends from the most universal to lease universal. (A00115 at 8:60-61).

It is also telling that even though the patentee was his own lexicographer in expressly defining in the specification what "parent entry" and "children entries" should mean, *the patentee never used either of those terms in the patented claims*—further proving that the claims were never intended to be limited to a parent-child relationship. (A00117 at 12:25-32) (teaching in the specification that: "In this case, the parent country would be . . ., [a]s used herein, a 'parent entry is an entry . . . which encompasses one or more children entries within the geographic or topical hierarchy, and a 'child' entry is an entry which is encompassed by a parent entry within the geographical or topical hierarchy.").

Accordingly, the language in the specification relating to *hierarchy* was intended to be broad and the embodiments were intended to be exemplary, not exhaustive. Therefore, the district court's decision

47

to import the parent-child limitation into the claims from the specification was improper.

2. **Four other trial courts properly construed the "hierarchy" phrases without a parent-child limitation**.

Although four other trial courts have construed the *hierarchy* phrases in the '474 patent, none of them added a parent-child limitation. As demonstrated in the following chart, the other four trial courts provided broad constructions that are more consistent with the patentee's intent.[11]

| Term(s) | Court's Construction | Case (Judge) |
|---|---|---|
| hierarchy | An arrangement of related information of data, ordered from broader general categories to narrower specific ones. | *Geomas (Int'l) Lim'd, et. al, v. Idearc Media Services-West Inc.,* Case No. 2:06-cv-475-CE (E.D. Tex)<br><br>(Magistrate Judge Chad Everingham) |
| hierarchy<br><br>hierarchy of geographical | An arrangement of related information or data ordered from broader general categories to narrower specific ones. | *GeoTag, Inc., v. Frontier Comm. Corp., et al.,* Case No. 2:10-cv-00265 |

_____

[11] (A05000; A05030; A05098; A05130).

| areas | An arrangement of related information or data ordered from broader geographical categories to narrower geographical categories. | (E.D. Tex.)<br><br>(Judge Rodney Gilstrap) |
|---|---|---|
| hierarchy<br><br>hierarchy of geographical areas | No construction of "hierarchy" alone is necessary.<br><br>An arrangement of related information or data, ordered from broader geographical areas to narrower geographical areas, wherein each area at least partially overlaps one or more of the other areas. | *GeoTag Inc. v. Starbucks Corp., et. al*, Case No. 2:10-cv-00572-JRG (E.D. Tex.);<br><br>(Magistrate Judge Roy S. Payne) |
| hierarchy | Arrangement ordered from broader to narrower | *GeoTag, Inc. v. AT&T Mobility, LLC and AT&T Services, Inc.*, Case No. 3:13-cv-169-K (N.D. Tex);<br><br>(Judge Ed Kinkeade) |

3.    **The claim language in the '474 patent also makes clear that the "hierarchy" phrases should not be limited solely to a parent-child relationship.**

The claims in the '474 patent do not use or reference the words "parent" or "child."  This is true even though the specification defines

49

what those terms mean. (A00117 at 12:25-32). The terms "hierarchy" and "hierarchically" are instead used in the claims to describe a general organization of data, not a term of art that is intrinsically tied to a particular data format such as a parent-child relationship. For instance, claim 1 refers to a "hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas is further organized into topics." (A00130 at 38:44-47). Claim 1 further provides that: "wherein within said hierarchy of geographical areas at least one of said entries associated with a broader geographical areas is dynamically replicated into at least one narrower geographic area." *Id.* at 38:52-57. The only type of data organization that is required in claim 1 is a hierarchy that includes broader *and* narrower geographical areas.

When considering claim 20, in light of claim 1, the district court's error becomes more apparent. For instance, *hierarchy* is described in claim 20 as a "predetermined hierarchy of geographical areas comprising at least a geographical area of relatively small expanse and a geographical area of relatively larger expanse, *said area of larger expanse including a plurality of areas of small expanse.*" (A00131 at

39:44-49)(emphasis added).   When construing "hierarchy" in a related case involving the '474 patent, Judge Kinkeade provided the following excellent analysis:

> This description of the structure of the hierarchy is more limiting than that of Claim 1.   Whereas, Claim 1 merely refers to broader and narrower geographical areas. Claim 20 incorporates the limitation that small areas are included in larger areas.   While the hierarchy of Claim 20 reflects a hierarchy that is more tree like. It also does not require a tree hierarchy.   For example, there is no requirement that the smaller areas within the larger areas do overlap.   Even more telling is the difference in the claim language of Claims 1 and 20 that indicates that the meaning of hierarchy is broad and not limited because the inventors used the term in different ways in the two claims.

(A05174; *see also* A05175-77).

The district court in this case applied a rigid and narrow construction— one that contradicts the specification, the claims, and is at odds with the other *Markman* orders issued by four other trial courts.

### 4.    The doctrine of claim differentiation further shows that the district court erred when construing the "hierarchy" phrases.

The doctrine of claim differentiation further shows that the district court wrongly imported a limitation into the hierarchy phrases. For example, claim 5, which depends on claim 1, imposes a new limitation on *hierarchy,* as it requires that smaller geographical areas

51

be encompassed within broader areas. For instance, claim 5 provides that:

> …said hierarchy has a structure comprising plural geographical levels into which the geographical areas are geographically categorized by size to provide a low level, one or more intermediate levels and a high level, *each of the geographical levels above the lowest level encompassing a plurality of lower level geographical areas.*

(A00130 at 38:66-39:5).

Where a dependent claim such as claim 5 adds a limitation, as it does here, there must be a presumption that the same limitation does not also exist in the independent claim. *Phillips*, 415 F.3d at 1314-15 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). The district court in this case either did not consider the doctrine of claim differentiation or failed to properly give credit to the presumption. The specific *hierarchy* described in dependent claim 5 must be more limited than the *general hierarchy* referred to in claim 1, and any construction of the hierarchy phrases must take that fact into consideration.

Claim 6, which is dependent on claim 5, also places new limitations on the *hierarchy referred to in claims 1 and 5*. Claim 6 requires a hierarchy whose low level is a city, its intermediate level is a territory, and its high level is a state. (A00131 at 39:6-8). The fact that several dependent claims add new limitations to the general concept of hierarchy provides further proof that the district court erred in imposing a rigid, parent-child limitation. For all the reasons set forth above, the district court erred by imposing a parent-child limitation on the hierarchy phrases in the claims of the '474 patent.

## C.   The district court misconstrued the dynamic replication phrases.

The district court also erred in construing the dynamic replication phrases. GeoTag contended that "dynamically replicating" should mean "automatically copying or inheriting at the time needed rather than at a time decided or established in advance." (A0073-74; A05634-5637, A05647-A05650).

The district court erred by: (1) determining that dynamic replication requires a parent-child hierarchy; and (2) excluding the word "copying" from the definition of the dynamic replication terms.

*See* (A00069-70)(construing "automatic inheritance" to require a parent-child hierarchy); (A00078-79)(construing the dynamic replication phrases to mean "automatically inheriting at the time of a search"). Each of these errors is addressed in turn.

1.   **The district court misconstrued dynamic replication by adding a parent-child limitation**.

The district court first erred by finding that dynamic replication requires a parent-child hierarchy.   In its Claim Construction Order, the district court stated that:

> Claim 1 requires entries associated with broader geographical areas to be "dynamically replicated" to "narrower geographical areas."   The dynamic replication phrase are the second group of disputed terms and are not construed in this section, but that group's meaning has ramifications for the hierarchy phrases' construction.   Both Geotag and Google agree that dynamic replication must be construed to mean automatic inheritance. . . . Automatic inheritance requires that hierarchy be construed according to the parent-child relationship. (A00069-70).

For all the same reasons that the district court erred in adding a parent-child limitation to "hierarchy," it also erred in determining that "automatic inheritance" requires a parent-child hierarchy.[12]

The district court also erred in adding the "parent-child" limitation because its decision was mistakenly based on an unreliable, handwritten note made by the examiner during the prosecution of the '474 patent. *See* (A00071-72)("This understanding is bolstered by the file history. . . . Within this form, the examiner noted. . . ."). That handwritten note appears on the examiner's Search Request Form. (A5784).

The allegedly relevant portion of the handwritten note is cryptically written, lacks punctuation, and does not express a complete thought. It provides: "*Synonyms: dynamic replication = automatic inheritance = parent-child = inheriting attributes.*" *See id.* No further explanation is offered or available. If anything, this handwritten note

---

[12] Those prior arguments pertaining to "parent-child" relationships are incorporated by reference again here for purpose of showing that the district court also erred in finding that "dynamic replication" requires a parent-child hierarchy. *See supra* Section "II.B" titled, "The district court wrongly construed the 'hierarchy' phrases."

was intended to facilitate the examiner's search for prior art, not to disavow subject matter.

The district court, however, mistakenly assumed from those few handwritten words that "dynamic replication" must *always* require a parent-child relationship. (A00071-72). This was an error. The note certainly does not overcome the presumption arising from the doctrine of claim differentiation (as previously discussed in connection with the hierarchy phrases), and other legal arguments warning against importing a limitation from a specification that does not exist in the claims. Moreover, this Court has repeatedly warned that unilateral statements made by an examiner do not give rise to a clear disavowel of claim scope by an applicant. *See Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1348 (Fed. Cir. 2005) ("Moreover, as the regulation and this court's reasoning above discuss, the examiner's unilateral remarks alone do not affect the scope of the claim, let alone show a surrender of claimed subject matter that cannot be recaptured under the doctrine of equivalents."). Furthermore, "an applicant's silence regarding statements made by the examiner during prosecution, without more,

cannot amount to a 'clear and unmistakable disavowal' of claim scope."

*Id.* at 1345.  For theses reasons, the district court erred.

### 2.  The district court misconstrued the "dynamic replication" phrases by excluding "copying."

The district court next erred by excluding the concept of "copying" from the "dynamic replication" phrases.[13]  GeoTag argued that dynamic replication should be construed as "automatically copying *or* inheriting," while Google sought to limit its meaning to "automatically inheriting." (A00077; A05634-5637; A05647-A05650).   The district court decided that "copying" should be excluded entirely from the definition of those terms because, according to the district court, if the patentee had intended it to mean copying, the patentee could have used the word "copying." (A00078).

---

[13] The district court construed "dynamically replicating" as meaning "automatically inheriting at the time of a search." (A00078).   The district court further construed various other phrases using the term "dynamically replicating" or similar terms such as "dynamically replicated."  *See id.* These various phrases are collectively referred to herein as the "dynamic replication" phrases or simply "dynamic replication."   Each of the independent claims requires dynamic replication.   For instance, claim 1 requires that at least one of said entries associated with a broader geographical area is dynamically replicated into at least one narrower geographical area. . . ."

The district court's analysis is flawed because it overlooks the cardinal rule in claim construction that the words actually used in the claims must be given their plain and ordinary meaning. *See Philips*, 415 F.3d at 1312 ("It is a bedrock principal of patent law that the claims of a patent define the invention…"); *Vitronics*, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves…to define the scope of the patented invention."); *id.* (stating that the words of a claim "are generally given their ordinary and customary meaning.").

The plain and ordinary meaning of *replicate* is "to copy." (A06005)(IBM COMPUTING DICTIONARY defining "replicate" to mean "to copy all or a specific portion of data."); (A06020)(WEBSTER'S II NEW COLLEGE DICTIONARY defining "replication" to mean "a copy or reproduction."). A person of ordinary skill in the art would have simply given *replicate* its plain and ordinary meaning.

Moreover, if the patentee had intended to equate "dynamic replication" with "automatic inheritance," the patentee could have simply chosen to use the words "automatic inheritance" instead of "dynamic replication." Indeed, the patentee chose to use the words "automatic inherit" *only* in the specification and, alternatively, opted to

use the broader term "dynamically replicating" in the claims. *Compare* (A00071-72) (examiner handwritten note mentioning "automatic inheritance") and (A00121 at 19:61-62)(specification teaching "The label field is . . . automatically inherited. . . .), *with* (A00130-131)(showing that there is no mention of automatic inheritance in the claims).

Finally, three other trial courts have correctly construed dynamic replication to include both copying and inheriting.[14] The district court's decision in this case to *exclude* "copying" from the plain and ordinary meaning of dynamic replication was an error.

## III. The District Court Erred in Granting Summary Judgment of Non-Infringement.

The district court also erred in granting summary judgment for the reasons discussed below.[15]

---

[14] *See e.g.*, (A05022-05024) (Magistrate Judge Everingham); (A05051-055) (Judge Rodney Gilstap); (A05113-5123) (Magistrate Judge Roy S. Payne).

[15] The district court's summary judgment of non-infringement was limited solely to its finding that Google's AdWords System does not practice dynamic replication. (A00058).

A. **When issuing its summary judgment decision, the district court erroneously added new limitations, including that dynamic replication requires at least two searches *and* that one of those searches must be inherited into the other search**.

When deciding the question of infringement, the district court erred by introducing new limitations into the dynamic replication terms, likely because, in part, it was fixated on the embodiment in the specification that teaches automatic inheritance through the use of a parent-child hierarchy. As previously discussed, the language in the claims is not limited to that embodiment.

As a result, the district court mistakenly compared Google's AdWords System to that particular embodiment, and not to the actual patented claims. For instance, the court erroneously required the existence of a parent-child hierarchy and required that dynamic replication be implemented through the use of two database searches. Indeed, the court noted that Google's AdWords System does not "trace up linkages in a hierarchy, or repeat the search in order to obtain results from a broader geographic area, as the claims [purportedly] require." (A00061). Those features are only found in the embodiment taught in the specification that specifically uses parent-child

60

relationships; they are not limitations found in the asserted claims. Neither the claims nor the Court's Claim Construction Order require more than one search or that the accused instrument "trace up linkages in a [parent-child] hierarchy."[16]  It was an error for the district court to require at least two separate searches for purpose of dynamic replication.  Specifically, the district court stated that:

> As discussed above, for the independent claims to be infringed the accused device must conduct dynamic replication.  This limitation requires that the accused system automatically inherit[s] at the time of the search *from one search to another search*. (A00061)(emphasis added).

Further, the district court similarly stated that:

> However, as the Google system performs only a single search and then simply [████████████████] *it is not possible for a*

---

[16] These are just a few examples of how the district court's insistence on importing an embodiment from the specification into the claims led to its erroneous decision of non-infringement.  For instance, the court also misidentified the geographical search area.  The district court wrongly considered both [████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ ]

*second search to inherit from the first search, as there is no second search.* (A00062)(emphasis added).

These requirements were added during summary judgment and they are not found in the Court's Claim Construction Order. Of course, it is true that courts may engage in a rolling patent claim construction, in which the court may revisit and alter its interpretation of the claim terms as its understanding of the technology evolves. *See Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1315. But a district court's decision to make late adjustments to its claim constructions has the potential to prejudice or surprise the party that falls on the wrong side of those last-minute adjustments. *See id.* at 1315-16 (recognizing the potential for prejudice and surprise).

In any event, it was an error for the district court to add these limitations because dynamic replication does *not* require that *one search be inherited into another search*; rather, dynamic replication requires only that *one or more data entries* associated *with a broader geographic area be automatically inherited [or copied]*. *See* (A00130 at 38:52-55) (claim 1 stating that: "wherein within said hierarchy of geographical areas at least one of said entries associated with a broader

62

geographical area is dynamically replicated into at least one narrow geographical area"); (A00131 at 39:56-59)(claim 20 stating that: "wherein at least one of said entries in said geographical area of relatively larger expanse is dynamically replicated into at least one of said geographical areas of smaller expanse"); *id.* at 40:53-55 (claim 31 stating that: "dynamically replicating an entry from broader geographical area into said geographical search area"). It was an error for the district court to add this new limitation into the claims.

Furthermore, not only is there no requirement that a second search be inherited, there is also no requirement that a second search be conducted *at all.* Dynamic replication requires only that data entries associated with a broader geographic area (or entries in an area of larger expanse) be automatically inherited [or copied]. That is, although "one or more data entries associated with a broader area" must be automatically inherited, there is nothing in the asserted claims that speaks to how those data entries should be identified, retrieved, or copied, so long as they are obtained from the database. Specifically, there is no requirement in the claims that those entries must be obtained from the database pursuant to a completely separate and

63

distinct database search operation.  Stated otherwise, there is nothing in the patent that would exclude the practice of dynamic replication through the use of a single search aimed at gathering entries associated with both narrower and broader geographical areas.  To require a second search was an error.

> **B.    Alternatively, even if this Court were to find that dynamic replication requires "two searches," Google's AdWords System still practices dynamic replication.**

Alternatively, even if this Court were to agree that dynamic replication requires at least two searches, the district court still erred by overlooking GeoTag's evidence showing that Google's AdWords System, in fact, practices dynamic replication by performing two searches.[17] *See* e.g., (A07021-7027).

> **1.    Google's AdWords System practices dynamic replication.**

The purpose of Google's AdWords System is to [█████████████

███████████████████████████████████████████████████

---

[17] Although two searches are not required, the '474 patent does not preclude the use of two or more searches, so long as at least one data entry associated with a broader geographic area is automatically inherited or copied.

[redacted].

[redacted]

[redacted]

[redacted]

[redacted]

---

[18] Technically, these query terms and location IDs [[redacted]].

[redacted]

[redacted]

███████████████████████████████████████

███████████████████████████████████████

████████████] satisfies the limitations of dynamic replication. GeoTag's expert explained this process and opined that, in his opinion, as a person of ordinary skill in the art, this process meets all of the limitations for dynamic replication. *See* e.g., (A07021-7027). This process—automatically inheriting entries associated with the broader geographic areas into the narrower geographic areas—is what permits, for example, a florist in Palo Alto to target an ad campaign to the entire state of California. (A06874-75; A06878-79).

The district court erred by finding that this process does not satisfy the limitations of dynamic replication.

> 2. **The district court also wrongly substituted itself for the jury by finding that "filtering" is not a search**.

As previously discussed, the district court believed that dynamic replication requires at least two database searches (because the embodiment in the specification taught more than one search). But even if this Court agrees that two database searches are required, the district court still erred in granting summary judgment because

Google's AdWords System, in fact, performs at least two database searches.

As previously explained, [███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████



(A00061).

The court then mischaracterized the remaining database searches—especially those executed by the Creative Server—as merely "filtering."

What the district court referred to as "filtering" was actually a database search [■■■■■■■■■■■■■■■■■■■■■■■■] for purpose of identifying those records (ad groups) that should be displayed based on geographical location. (A06875; A06878-79). The district court erred in assuming that *filtering* is not a search. (A00062)("However, as the Google system performs only a single search and then simply filters the results, it is not possible for a second search to inherit from the first search, as there is no second search. Furthermore, as the AdWords System does not repeat the search, there can be no larger or smaller search area.").

Tellingly, no expert witness for either party testified or opined that "filtering" is not a search.  In fact, GeoTag submitted evidence proving that, or at least raising a fact issue whether, this supposed act of "filtering" was, indeed, a "search" that met the limitations of dynamic replication. (A06875) (GeoTag's infringement expert stating that:

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████.]

Moreover, nothing in the district court's claim construction order limits the meaning of "search" to exclude "filtering."  In fact, the parties never considered "search" to be a disputed term or one that needed to be construed.  Still, the district court determined on its own that "*filtering*" one set of data for purpose of finding particular records within that data

set that are associated with a broader geographical area is not, *itself*, another *search*. (A00061-62).  Whether searching through one set of data records to find specific records within that set of data qualifies as a *search* or, alternatively, not a search, was a question that a layperson could have answered and it should have been presented to the jury. The district court crossed the line from performing claim construction, which is the sole responsibility of the court, to fact-finding, which is the sole responsibility of the jury.  Because the district court determined a fact question that was genuinely disputed, the court overstepped its role and improperly substituted its judgment for that of the trier of fact.

## CONCLUSION

For these reasons, GeoTag respectfully requests that the Court vacate the judgment of non-infringement because the district court lacked subject matter jurisdiction.  Alternatively, GeoTag requests that the Court reverse the judgment and the order granting Google's motion for summary judgment of non-infringement and remand this case to the district court for further proceedings.

## CERTIFICATE OF SERVICE

I certify that, on March 6, 2015, I served the Confidential Opening Brief of Defendant-Appellant on the counsel of record listed below by electronic mail and by third party commercial carrier for delivery within three days.  I electronically filed the Non-Confidential Opening Brief of Defendant-Appellant and served a copy on counsel of record listed below electronically through the CM/ECF System.

Daryl Joseffer
Direct: 202-737-0500
Email: djoseffer@kslaw.com
Paul Alessio Mezzina
Direct: 202-626-8972
Email: pmezzina@kslaw.com
Fax: 202-626-3737
King & Spalding LLP
Firm: 202-626-9252
1700 Pennsylvania Avenue, NW
Washington, DC 20006

Adam Conrad
Direct: 704-503-2569
Email: aconrad@kslaw.com
Fax: 704-503-2622
King & Spalding LLP
100 N Tryon Street
Charlotte, NC 28202

Date:  March 6, 2015

/s/ Joel W. Reese
Joel W. Reese

*Counsel of Record for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32 (a)(7)(B).   The brief contains 13,176 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).   In preparing this certificate, the undersigned counsel relied on the word count of the word-processing system used to prepare the brief.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).   This brief has been prepared in a proportionally spaced typeface using Century typeface in 14-point font.

Date:  March 6, 2015.


/s/ Joel W. Reese
Joel W. Reese

*Counsel of Record for Defendant-Appellant*

74

# Addendum

# TABLE OF CONTENTS

Stipulated Final Judgment, filed Oct. 7, 2014.....................................A1-3

Order Denying Motion to Dismiss, filed Dec. 9, 2011 ...........................A4

Memorandum Order Denying GeoTag, Inc.'s Motion to Dismiss, filed Aug. 29, 2014................................................................................A5-12

Order Granting Motion for Summary Judgment of Non-Infringement, filed April 10, 2014.................................................A13

Memorandum Order Granting Motion for Summary Judgment of Non-Infringement, filed April 10, 2014........................................A14-32

Claim Construction Opinion, filed May 3, 2013 ..............................A33-57

United States Patent No. 5,930,474, dated Jul. 27, 1999 .............A58-102

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICROSOFT CORPORATION and GOOGLE INC., | ) ) ) |
| Plaintiffs, | ) C.A. No. 11-175-RGA ) |
| v. | ) **JURY TRIAL DEMANDED** ) |
| GEOTAG, INC., | ) ) |
| Defendant. | ) |

## [PROPOSED] STIPULATED FINAL JUDGMENT

1.  WHEREAS, on June 10, 2013, the Court entered a Stipulated Judgment between Plaintiff and counterclaim-Defendant Google Inc. ("Google") and Defendant and counterclaim-Plaintiff GeoTag, Inc. ("GeoTag"). (D.I. 323);

2.  WHEREAS, on April 10, 2014, the Court entered an Order granting Google's Motion for Summary Judgment of Non-Infringement. (D.I. 470);

3.  WHEREAS, on October 1, 2014, the Court entered an Order granting Google's Unopposed Motion to Sever the Microsoft-related claims from this action pursuant to FED. R. CIV. P. 21. (D.I. 517);

4.  WHEREAS, on October 1, 2014, the Court entered a Stipulation of Dismissal between GeoTag and Plaintiff and Counterclaim-defendant Microsoft Corp. ("Microsoft") regarding the Microsoft-related claims, which Stipulation had no effect on the Google-related claims. (D.I. 518);

5.  WHEREAS, Google stipulates and agrees to voluntarily dismiss without prejudice its cause of action for declaratory judgment of patent invalidity. (D.I. 496);

6.    **THEREFORE, IT IS HEREBY ORDERED, ADJUDGED** and **DECREED** as follows:

i)    In accordance with the Order Granting Google's Motion for Summary Judgment of Non-Infringement (D.I. 470) and in accordance with the Stipulated Judgment entered on June 10, 2013 (D.I. 323), judgment is entered in favor of Google on its claim for declaratory judgment of non-infringement.

ii)    Judgment in favor of Google is entered on GeoTag's counterclaim for patent-infringement against Google.

iii)    Google's claim for declaratory judgment of patent invalidity is voluntarily dismissed without prejudice.

iv)    Pursuant to FED. R. CIV. P. 54(d)(1), Google, as the prevailing party, is entitled to its court costs to the extent permitted under Rule 54(d)(1).

v)    Google may submit a motion for an award of attorneys' fees, to the extent appropriate, under 35 U.S.C. § 285 within 14 days following the later of (1) the expiration of time to appeal this judgment without any appeal being filed; or (2) the issuance of a mandate following appeal to the United States Court of Appeals for the Federal Circuit that affirms this judgment in whole or part.

vi)    This is a final, appealable judgment in this action.

**O'KELLY ERNST & BIELLI, LLC**

By: _/s/ Sean T. O'Kelly_
    Sean T. O'Kelly
    901 North Market Street
    Suite 1000
    Wilmington, DE 19801
    (302) 778-4000
    (302) 295-2873 (fax)
    sokelly@oeblegal.com

_Attorneys for Defendant and Counterclaim
Plaintiff Geotag, Inc._

Dated: October 7, 2014
1168168/ 40718

**SO ORDERED.**

Date: _October 7, 2014_

**POTTER ANDERSON & CORROON LLP**

By: _/s/ David E. Moore_
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com
    bpalapura@potteranderson.com

_Attorneys for Plaintiff and Counterclaim-
Defendant Google Inc._

Honorable Richard G. Andrews

3

**A3**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MICROSOFT CORPORATION,                  :
a Washington corporation, and           :
GOOGLE, INC., a Delaware Corporation,   :
                                        :
              Plaintiffs,               :
                                        :
      v.                                :      Civil Action No. 11-175-RGA
                                        :
GEOTAG INC., a Delaware Corporation,    :
                                        :
                                        :
              Defendant.                :

**ORDER DENYING MOTION TO DISMISS FOR LACK OF SUBJECT MATTER
JURISDICTION**

This **9th** day of **December 2011**, for the reasons stated in open court on December 8,

2011, Defendant GeoTag's Motion to Dismiss for Lack of Subject Matter Jurisdiction under Fed.

R. Civ. P. 12(b)(1) (D.I. 10)  is denied.


Richard G. Andrews.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**Microsoft Corporation, et. al.,**

                    Plaintiffs,

          v.                                    Civil Action No. 11-175-RGA

**GeoTag, Inc.,**

                    Defendant.

MEMORANDUM ORDER

Presently before the Court is Defendant GeoTag, Inc.'s Motion to Dismiss Plaintiffs' First

Amended Complaint For Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P.

12(b)(1). (D.I. 497). This issue has been fully briefed. (D.I. 498, 501, 505). An earlier motion to

dismiss on similar grounds was previously before the Court. (D.I. 478).  On June 16, 2014, the

Court requested supplemental letter briefing on whether Plaintiffs could amend the complaint to

address any deficiencies regarding subject matter jurisdiction. (D.I. 491). After receiving that

briefing (D.I. 492, 493), the Court gave Plaintiffs leave to amend their complaint. (D.I. 494). On

July 17, 2014, Plaintiffs filed an amended complaint. (D.I. 496). Defendant then filed the instant

motion.

This litigation originated from litigation in the Eastern District of Texas, where, in

December 2010, GeoTag sued more than 300 entities in ten separate complaints. (D.I. 1 at 5).

The suits were based on store locator services used by the entities but, for some of the

defendants, provided by Microsoft and Google. In response to GeoTag's suits, Google and

Microsoft filed a declaratory judgment action against GeoTag in this Court. *Id.* On April 29,

2011, GeoTag filed a Motion to Dismiss for lack of subject matter jurisdiction under Fed. R. Civ.

1

**A5**

P. 12(b)(1). (D.I. 10). The Court denied GeoTag's motion, finding that there was subject matter

jurisdiction. (D.I. 28).

On February 13, 2012, GeoTag counterclaimed that the Plaintiffs directly infringed the

'474 patent. (D.I. 36). These counterclaims enlarged the scope of the suit from the determination

of whether the '474 patent as used by Google and Microsoft's customers infringed, to whether or

not Google and Microsoft's internal use of various systems, including their ad serving systems,

directly infringed the patent. *Id*. GeoTag never conditioned its assertion of any of the

counterclaims on an ultimate appeal of the Court's jurisdictional finding.

On May 30, 2013, GeoTag granted Google and Microsoft a covenant not to sue based

upon their provision of store locator-related services to customers. (D.I. 467-1 at 2-4; D.I. 482-1

at 102-04). Following these stipulations, GeoTag proceeded with its infringement counterclaims

against both Google and Microsoft. (D.I. 296; D.I. 323). The Court granted Google's motion for

summary judgment of non-infringement. (D.I. 470).[1]

The parties now disagree whether the First Amended Complaint satisfies the tests for

subject matter jurisdiction set forth in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127

(2007), and *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014). The Defendant

maintains that "this Court has at all times lacked subject matter jurisdiction over all matters *sub*

*judice* in this case. The minimal additional allegations included in the Amended Complaint do

not create subject matter jurisdiction." (D.I. 498 at 5). Conversely, the Plaintiffs maintain that

"GeoTag's Texas lawsuits implied an assertion of both indirect and direct infringement against

Google and Microsoft, and a live controversy therefore existed as to the Google and Microsoft

products accused by GeoTag's Texas lawsuits against their customers." (D.I. 501 at p. 1).

---

[1] Microsoft's case was severed and trailed Google's in the schedule. Microsoft's case has since been essentially
stayed. (D.I. 483).

The test for subject matter jurisdiction in a declaratory judgment action is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127. Google and Microsoft contend that GeoTag's lawsuits in the Eastern District of Texas against Google and Microsoft's customers were implied assertions of direct and indirect patent infringement. Google and Microsoft further contend that under *MedImmune*, those implied infringement assertions created a justiciable dispute. GeoTag argues that there is no such theory of an implied assertion of direct infringement, and that there was no implied assertion of indirect infringement.

In the Eastern District of Texas, GeoTag sued customers to which Google and Microsoft provide mappings services that those customers use to display store locator maps on their websites, as well as so-called hosted customers to which Google and Microsoft additionally host the data that feeds into the mapping services. Plaintiffs contend that GeoTag's lawsuits against these customers created an actual controversy under two theories: first, that GeoTag's allegations against Plaintiffs' customers constituted an implied assertion of indirect[2] infringement against Plaintiffs; second, that GeoTag's allegations against Plaintiffs' hosted customers also constituted an implied assertion of direct infringement.

GeoTag disputes Plaintiffs' implied assertion of direct infringement because it "would mean that the patentee made incorrect allegations of direct infringement against a customer that, unbeknownst to the patentee, would constitute implied assertions of direct infringement against the supplier." (D.I. 498 at 13). I disagree. Section 271(a) imposes liability for infringement against one who "makes, uses, offers to sell, or sells," a patented invention. 35 U.S.C. § 271(a).

---

[2] While not expressly stated, this is an induced infringement theory.

It is entirely possible that a customer and vendor can both directly infringe a patent based upon the same conduct.[3] GeoTag argues, "Plaintiffs would have to prove not just that they performed each and every step of the claim, but, as with an implied assertion of indirect infringement, that GeoTag had alleged Plaintiffs' hosting of customers' data or functionality performed each and every element of any claim of the '474 Patent." (D.I. 498 at 13). I do not think GeoTag's allegations and Plaintiffs' proof are determinative of the jurisdictional issue. Rather, in determining whether a case or controversy exists, "we look to the elements of the potential cause of action." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904-05 (Fed. Cir. 2014). There only need be "a reasonable potential that such a claim could be brought." *Id.* at 905. GeoTag could just as easily have asserted a claim of direct infringement against Google and Microsoft, based on the same underlying circumstances in the customer suits. An express accusation by GeoTag was unnecessary. *Arris Grp., Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1379 (Fed. Cir. 2011). There was a "reasonable potential" of such a suit, and therefore I find that there is subject matter jurisdiction.

Additionally, I find that there is subject matter jurisdiction based on an implied assertion of induced infringement. "[T]o establish a substantial controversy regarding inducement, there must be allegations by the patentee or other record evidence that establish at least a reasonable potential that such a claim could be brought." *DataTern*, 755 F.3d at 905. In *DataTern*, the Federal Circuit held that claim charts provided to customers of the declaratory judgment plaintiff were sufficient to establish an implied assertion of indirect infringement. *Id.* The claim charts

---

[3] I also disagree with GeoTag's argument that allowing declaratory judgment actions in such a scenario should be disfavored. The Court does not see any legal impediment to allowing a declaratory judgment action simply because a plaintiff has sued a customer where it could have sued the vendor. *See Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990) (describing customer suit exception to the first-filed rule); *Delphi Corp. v. Automotive Technologies International, Inc.*, 2008 WL 2941116 (E.D. Mich. 2008).

showed that the declaratory judgment plaintiff provided its customers with necessary

components to infringe and cited to guides and documentation provided by the declaratory

judgment plaintiff. The Federal Circuit noted that, "Providing instructions to use a product in an

infringing manner is evidence of the required mental state for inducing infringement.

Considering these instructions in view of the rest of the evidence on record, we conclude that

[the declaratory judgment plaintiff] has established that there existed a substantial controversy

regarding whether [the declaratory judgment plaintiff] induces infringement." *Id.* (internal

citation omitted).

GeoTag does not dispute that Google and Microsoft were aware of the '474 patent. Nor

does GeoTag contest the fact that Google provided articles on how to create store locators.[4] (*See*

D.I. 496-1 Ex. B, D.I. 504-1 Ex. 1 & 2). GeoTag states that, "The issue is whether there is an

implied assertion of induced infringement *by GeoTag.*" (D.I. 505 at p. 4) (emphasis in original). I

do not think this is entirely correct. It is the "objective words and actions of the patentee that are

controlling." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009). Put

another way, "it is the reality of the threat... not the [declaratory judgment] plaintiff's subjective

apprehensions." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1338-39 (Fed. Cir. 2008).

Yet the inquiry must go both ways. The scope of the inquiry can just as easily be understood as

what an objective supplier would infer based upon the underlying customer suit. It does not

matter what GeoTag intended to imply. Here, Plaintiffs, aware of the allegations against their

customers, and the factual circumstances surrounding those allegations, as well as the existence

of documentation supporting the state of mind necessary for induced infringement, established a

"reasonable potential" that GeoTag could have brought induced infringement claims.

---

[4] GeoTag contests the dates of one of the articles because it states, "Last updated June 24, 2014." (D.I. 504-1 at 17). Yet the article title makes clear that it was originally published in August 2009. (D.I. 504-1 at 5).

I therefore find subject matter jurisdiction under an implied assertion of direct and indirect infringement.

Alternatively, even if there were no subject matter jurisdiction over the original declaratory judgment complaint, there would still be an independent basis for subject matter jurisdiction over the counterclaims.[5] GeoTag contends that the counterclaims were compulsory, and therefore should be dismissed if the declaratory judgment action lacks subject matter jurisdiction. Plaintiffs contend that the counterclaims were permissive, and therefore, under Third Circuit law, form an independent basis for jurisdiction. I agree with Plaintiffs. It is generally true "that when the same patent is at issue in an action for declaration of noninfringement, a counterclaim for patent infringement is compulsory and if not made is deemed waived." *Polymer Indus. Products Co. v. Bridgestone/Firestone, Inc.*, 347 F.3d 935, 938 (Fed. Cir. 2003) (citing *Vivid Technologies, Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 802 (Fed. Cir. 1999)). However, in arriving at this general rule, the Federal Circuit in *Vivid* discussed the four bases for finding a counterclaim compulsory: "(1) whether the legal and factual issues raised by the claim and counterclaim are largely the same; (2) whether, absent the compulsory counterclaim rule, res judicata would bar a subsequent suit on the counterclaim; (3) whether substantially the same evidence supports or refutes both the claim and counterclaim; or (4) whether there is a logical relation between the claim and counterclaim." *Vivid*, 200 F.3d at 801. The Federal Circuit stated that, "A counterclaim for patent infringement, in an action for declaration of non-infringement of the same patent, readily meets all four of these criteria." *Id.*

---

[5] It is not entirely clear that a decision that the Court lacked subject matter jurisdiction over the Plaintiffs' claims in their original declaratory judgment complaint would have any practical effect. The subject of that litigation was resolved by agreement of the parties more than a year ago. What is really disputed is the viability of the counterclaims.

Indeed, when the same product is the subject of the declaratory judgment action and the infringement counterclaim, the counterclaim is clearly compulsory. *See Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1326 (Fed. Cir. 2008) ("Thus, two claims for patent infringement do not arise from the same transactional facts unless the accused devices in each claim are 'essentially the same.'") (internal citation omitted). Here, Google and Microsoft filed the declaratory judgment action seeking a declaration of noninfringement relating to their provision of store locator services. GeoTag's counterclaims accused Google's AdWords and AdWords Express, completely separate products. (D.I. 414 at 6, 7). Had GeoTag not filed its counterclaims against Google's AdWords products, GeoTag would not have been precluded from later bringing suit against those products. I see no reason why a counterclaim should be labeled permissive in a traditional patent suit but the very same counterclaim be labeled compulsory in the context of a declaratory judgment. *See Fujitsu Ltd. v. Tellabs Operations, Inc.*, 2013 WL 361810, at *5 (N.D. Ill. Jan. 30, 2013); *Coca-Cola Co. v. Pepsi-Cola Co.*, 500 F. Supp. 2d 1364, 1376-77 (N.D. Ga. 2007) ("The better approach, and one that is consistent with both *Polymer Industrial Products* and *Vivid Technologies*, is to limit the preclusive effect of Rule 13(a) to infringement claims concerning those products that were explicitly or impliedly placed in issue by a non-infringement claim in the prior case.").

Applying the four factors set forth in *Vivid*, I find that the counterclaims drawn to different products are permissive, not compulsory. First, the legal and factual issues raised by the claim and counterclaim are different because the accused products are different, which presents different factual infringement issues. Second, under *Acumed*, res judicata would not bar a subsequent suit on the counterclaim. Third, the evidence supporting or refuting the claim and counterclaim are different, again because the accused products are different. Fourth, while there

7

**A11**

is some logical relation between the claim and counterclaim, since they involve the same patent, it is not a strong relationship. Plaintiffs' claims seek to clarify legal liability for services rendered by Plaintiffs to their customers. Defendant's counterclaims are based on separate, and solely internal, actions by Plaintiffs.

I find that GeoTag's counterclaims were permissive, and not compulsory. I therefore retain subject matter jurisdiction over them. *See Rengo Co. Ltd. v. Molins Mach. Co., Inc.*, 657 F.2d 535, 539 (3d Cir. 1981) ("[A] jurisdictional defect in the complaint will not preclude adjudication of a counterclaim over which the court has an independent basis of jurisdiction."). GeoTag does not dispute that Third Circuit law allows for subject matter jurisdiction over permissive counterclaims, but argues that Federal Circuit law applies because patent law warrants a uniform national rule. I agree that Federal Circuit law applies to whether the counterclaims are permissive or compulsory, and I applied Federal Circuit law in determining that they are permissive. Whether I retain subject matter jurisdiction over a permissive counterclaim is a procedural issue to which Federal Circuit law does not apply. *See Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1279 (Fed. Cir. 2012) ("This court generally reviews application of the Federal Rules of Civil Procedure by applying the law of the regional circuit."). I therefore apply Third Circuit law to find subject matter jurisdiction over GeoTag's permissive counterclaims.

Defendant GeoTag, Inc.'s Motion to Dismiss Plaintiffs' First Amended Complaint For Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) (D.I. 497) is **DENIED**.

Entered this 29th day of August, 2014.

*[signature]*

United States District Judge

8

**A12**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**MICROSOFT CORPORATION, et. al.,**

               Plaintiffs,

     v.                            Civil Action No. 11-00175-RGA

**GEOTAG, INC.,**

               Defendant.

ORDER

Having reviewed the relevant papers, for the reasons stated in the accompanying

Memorandum Opinion, IT IS ORDERED:

The Defendant's Motions for Summary Judgment on the Basis of Laches (D.I. 369) and

Invalidity (D.I. 375) are **DENIED** and Defendant's Motion for Summary Judgment of Non-

Infringement (D.I. 379) is **GRANTED**.  Defendant's Motion to file a sur-reply to Google Inc.'s

Reply Brief in Support of its Motion for Summary Judgment of Non-Infringement (D.I. 444) is

**DISMISSED AS MOOT**.  Plaintiff's Motion to Exclude the Expert Testimony of Phillip Green

(D.I. 372) is **DISMISSED AS MOOT**.[1]

Entered this 10th day of April, 2014.

Richard G. Andrews

United States District Judge

---

[1] The Court notes that Google raises substantial methodological issues regarding multiple aspects of Dr. Phillip
Green's Testimony.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MICROSOFT CORPORATION, et. al.,

               Plaintiffs,

       v.

GEOTAG, INC.,

            Defendant.

Civil Action No. 11-00175-RGA

**PUBLIC VERSION**

MEMORANDUM OPINION

Richard L. Horwitz, Esq. (argued), Potter, Anderson & Corroon, Wilmington, DE; Robert A. Van Nest, Esq., Keker & Van Nest LLP, San Francisco, CA; Asim M. Bhansali, Esq. (argued), Keker & Van Nest LLP, San Francisco, CA; Matthias Kamber, Esq. (argued), Keker & Van Nest LLP, San Francisco, CA; attorneys for Plaintiff Google.

Sean T. O'Kelly, Esq., O'Kelly, Bielli & Ernst LLC, Wilmington, DE; Paul J. Hayes, Esq. (argued), Hayes, Messina, Gilman & Hayes, Boston, MA; Anthony L. Miele, Esq. (argued), Hayes, Messina, Gilman & Hayes, Boston, MA; attorneys for the Defendant.

April 10 , 2014

ANDREWS, UNITED STATES DISTRICT JUDGE:

Presently before the Court for disposition are Plaintiff and Counterclaim-Defendant

Google Inc.'s Motion for Partial Summary Judgment on the Basis of Laches (D.I. 369), Google

Inc.'s Motion for Summary Judgment of Invalidity (D.I. 375), and Google Inc.'s Motion for

Summary Judgment of Non-Infringement (D.I. 379).   These matters have been fully briefed.

(D.I. 370, 408, 418, 376, 411, 416, 380, 414, 419).   The Court heard oral argument on the

motions on February 20, 2014.   (D.I. 451).   For the reasons set forth herein, Google's Motions

for Summary Judgment on the Basis of Laches and Invalidity are **DENIED** and Google's Motion

for Summary Judgment of Non-Infringement is **GRANTED**.

## BACKGROUND

### Procedural Background

Microsoft Corporation and Google Inc. filed this declaratory judgment action on March

1, 2011 against GeoTag, Inc. regarding Patent No. 5,930,474 ("'474 Patent").   (D.I. 1).

GeoTag counterclaimed against both Plaintiffs on February 13, 2012 for infringement of the '474

Patent.   (D.I. 36).

### The '474 Patent

Claim 1 of the '474 patent is representative and reads:

A system which associates on-line information with geographic areas, said system
comprising:

> a computer network wherein a plurality of computers have access to said
> computer network; and

> an organizer executing in said computer network, wherein said organizer is
> configured to receive search requests from any one of said plurality of
> computers, said organizer comprising:

1

A15

a database of information organized into a hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas is further organized into topics; and

a search engine in communication with said database, said search engine configured to search geographically and topically, said search engine further configured to select one of said hierarchy of geographical areas prior to selection of a topic so as to provide a geographical search area wherein within said hierarchy of geographical areas at least one of said entries associated with a broader geographical area is dynamically replicated into at least one narrower geographical area, said search engine further configure [sic] to search said topics within said selected geographical search area.[1]

**The Accused Product**

The Defendant accuses Google AdWords and Google AdWords Express ("the AdWords System"). (D.I. 414 at 6, 7). The purpose of the AdWords System is to display advertising copy along with the results of a search query. *Id.* at 7. Advertisers create ad campaigns, which are arranged as a group of ads and keywords and referred to as an "adgroup." *Id.*

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the

---

[1] Quotations from the patent reflect the language of the patent as amended by the July 27, 1999 Certificate of Correction.

2

A16

moving party may be discharged by demonstrating that there is an absence of evidence supporting the non-moving party's case.   *Celotex*, 477 U.S. at 325.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial.   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989).   A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ."   FED. R. CIV. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.   *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).   A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.   *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.   *See Celotex Corp.*, 477 U.S. at 322.

## ANALYSIS

**Laches**

Google moves for partial summary judgment for pre-suit damages arguing that the damages are barred by laches.   (D.I. 370 at 5).

*Legal Standard*

3

Laches is an equitable defense to a claim for patent infringement. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc). When a party establishes the defense of laches, the patentee's claim for pre-suit damages may be barred. *Id.* Laches requires the moving party to prove two elements: "(a) [that] the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) [that] the alleged infringer suffered material prejudice attributable to the delay." *Id.* Furthermore, a presumption of laches arises when the moving party proves that the patentee "delay[ed] bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity." *Id.* "This presumption shifts to the patentee the burden of producing evidence, which if believed, would show that either the patentee's delay was reasonable or excusable under the circumstances or the defendant suffered neither economic nor evidentiary prejudice." *Wanless v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998).

The clock begins to tick for laches when the patentee first knew or should have known of the infringer's activity. *A.C. Aukerman Co.*, 960 F.2d at 1028. While constructive knowledge is sufficient to start the clock for laches, the Federal Circuit has held that "the patentee must have actual or constructive knowledge of an act of infringement that gives rise to a legal claim. . . ." *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1297-98 (Fed. Cir. 2004). Furthermore, constructive knowledge exists when the alleged infringement is "pervasive, open, and notorious" such that a "reasonable patentee would suspect" the existence of infringement, triggering a duty to investigate. *Wanless*, 148 F.3d at 1338. "For example, sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement." *Id.* Furthermore, constructive knowledge may be

4

**A18**

imputed "if these activities are sufficiently prevalent in the inventor's field of endeavor," even if the patentee has no actual knowledge of the activities. *Id.*

In the context of a motion for summary judgment, an accused infringer must prove that no genuine issue of material fact exists regarding both the unreasonableness prong and the material prejudice prong. *Id.* at 1337. Finally, if the accused infringer relies on the six-year presumption to support its motion for summary judgment, the accused infringer must demonstrate an absence of disputed material facts that the patentee delayed for more than six years. *Wanless v. Fedders Corp.*, 145 F.3d 1461, 1464 (Fed. Cir. 1998).

*Discussion*

Google argues that, "GeoTag and its predecessors-in-interest have had actual or constructive notice of Google's allegedly infringing product since at least 2003, well over six years before February 2012, when it first asserted infringement against Google." (D.I. 370 at 13). Google maintains that GeoTag should have had at least constructive knowledge as of July 1, 2003, eight and a half years before this suit was filed. *Id.* at 13. Google cites as evidence (1) a reference to the ability to restrict ads based on geographic area in the AdWords FAQ website on July 1, 2003, (2) a third-party blog post on August 4, 2003, (3) a third-party blog post on October 24, 2003, (4) a New York Times article on February 16, 2004, (5) a third-party blog post on April 15, 2004, (6) a Google blog post on September 14, 2004, and (7) a Google blog post on November 21, 2005. Conversely, GeoTag argues that the aforementioned facts are not sufficient to put GeoTag on notice and thus do not create a presumption of laches. (D.I. 408 at 14). The Court agrees with GeoTag.

The relevant portions of the evidence that Google references read:

5

**A19**

(1) Google AdWords FAQs: "At the campaign level, you choose your daily budget, geographic targeting, syndication preference, and start and end dates." (D.I. 371-1 at 35).

(2) Third-party blog post at www.searchengineguide.com: "[Google g]oing one step further and filtering search engine users according to their country or state for advertisers is nothing short of spectacular from an advertiser's point of view. However, none of the other search engines provide this facility currently, the way Google does with AdWords, and till such time that you find another search engine that does so, and assuming that geotargeting ads is absolutely essential to you, you will probably have to continue to focus on Google AdWords." *Id.* at 39.

(3) Third-party blog post at www.traffick.com: "Google has launched a beta version of regional targeting for Google AdWords advertisers. . . . Now, firms . . . can simply bid on the generic term . . . while targeting only their local area . . . ." *Id.* at 47.

(4) New York Times article: "Google also began allowing advertisers to aim their ads at users in specific geographical areas. With that program, Google estimates the user's general location by checking the Internet Protocol address assigned to the user's computer, and then serves local ads that are related to the search terms entered." *Id.* at 50.

(5) Third-party blog post at www.searchenginejournal.com: "Google today will introduce the next chapter in Google AdWords Advertising, the ability for U.S. and international advertisers to target Web surfers by their city of origin. . . . Now, Google is using a mix of local targeting and AdWords to track surfers' location at the city level. AdWords advertisers in the US can focus their promotional messages to target people in a specific city." (D.I. 371-2 at 2).

(6) Google blog post: "Meet Google Local, our local search service, which we've just enhanced with some new features. We beefed up the technology that delivers more precise results." *Id.* at 13.

(7) Google blog post: Announcing that advertisers may now specify "a distance . . . around [their] location target." *Id.* at 19.

Google has not shown an absence of disputed material facts that constructive notice of the infringement existed six years before the filing of the present lawsuit. First, there is no showing that GeoTag, or anyone whose knowledge can be attributed to GeoTag, had actual knowledge of any of these publications. Second, none of the publications are sufficiently detailed to establish constructive notice or to trigger GeoTag's duty to investigate, even had

6

GeoTag known of them.   The publications lack even a barebones description of the method by which Google's AdWords System works, which is not surprising considering the confidential nature of Google's method.   Third, the various publications do not establish that Google's activities in promoting the AdWords System were so prevalent that GeoTag can be charged with knowledge sufficient to trigger a duty to investigate.   Therefore, Google has not provided sufficient evidence to show that GeoTag is subject to the six-year presumption of laches.   As Google's motion relies upon this presumption, its Partial Motion for Summary Judgment based on laches is denied.

### Validity

Google moves for summary judgment for invalidity of the '474 Patent on the grounds that it is both anticipated and obvious.   (D.I. 370 at 5).

<u>Anticipation</u>

*Legal Standard*

A patent claim is anticipated if the accused infringer is able to show by clear and convincing evidence that "a single prior art reference discloses each and every element of a claimed invention." *Silicon Graphics, Inc. v. ATI Tech., Inc.*, 607 F.3d 784, 796 (Fed. Cir. 2010).   "Anticipation is a question of fact." *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1369 (Fed. Cir. 2003).

*Discussion*

Google argues that Patent No. 5,682,525 ("Bouve") anticipates the asserted claims of the '474 Patent.   (D.I. 376 at 6).   Specifically, Google argues that, "Bouve discloses using an Internet-connected database to select a search area, search for certain categories of information within that area, and return results from both the search area and a broader area." *Id.* (emphasis

7

A21

omitted). GeoTag argues that, "at a minimum, Bouve fails to teach: (i) an online system; (ii) a search engine; (iii) dynamic replication; and (iv) a database of information organized into a hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas is further organized into topics." (D.I. 411 at 8). The Court agrees with GeoTag.

There is a genuine dispute of a material fact as to whether Bouve discloses a search engine. Independent claims 1, 20, and 31 each require a "search engine." '474 Patent, 38:36-40:56. The Court construed "search engine" to have its "plain and ordinary meaning." (D.I. 284 at 24). GeoTag argues that the Bouve specification indicates that searching is performed in a step-by-step fashion rather than with a search engine and therefore fails to disclose this element. Google conversely argues that GeoTag's expert "never offered an opinion that Bouve fails to disclose a search engine, whether in an expert report, in his supplemental declaration in support of GeoTag's opposition, or in his deposition." (D.I. 416 at 8).

The relevant portion of GeoTag's Rebuttal Expert Report of Mr. William C. Easttom II reads:

> 247. [Google's expert] has failed to show in 288 to 292 that Bouve discloses a "search engine". [Google's expert] states that items of interest can be selected by typing in a desired search area. *Bouve does not disclose a search engine because "searching" in Bouve is done manually by the user selecting and user traversing through the hierarchy of information.* Bouve 8:29-38 describes the "search" conducted by the Bouve user.
>
> 248. *As can be seen in the Bouve specification, "searching" is a step by step process performed by the user, not performed by a "search engine."* Bouve does not teach nor suggest this element.

(D.I. 413-2 at 74 (emphasis added)). It is evident from this passage that GeoTag's expert did opine on the method of searching disclosed in Bouve and found that this method does not equate

8

A22

to the method of searching used in the `474 Patent.   Therefore, there exists a genuine dispute of

material fact as to whether a "search engine" is disclosed by Bouve.   Thus Summary Judgment

on the grounds of anticipation is denied.

<div align="center">Obviousness</div>

*Legal Standard*

> While the ultimate question of patent validity is one of law, [the issue of
> obviousness] lends itself to several basic factual inquiries.   Under § 103, the scope
> and content of the prior art are to be determined; differences between the prior art
> and the claims at issue are to be ascertained; and the level of ordinary skill in the
> pertinent art resolved.   Against this background, the obviousness or
> nonobviousness of the subject matter is determined.

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966) (internal citations omitted).[2]

Furthermore, the fact finder must additionally determine that one of skill in the art "would have

been motivated" to combine or modify the prior art to create the patent.   *Kinetic Concepts, Inc.*

*v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012).

There is no preset test to determine whether a claimed invention is obvious.   Instead,

each case must be subjected to a highly fact intensive analysis.   *In re Ochiai*, 71 F.3d 1565,

1571 (Fed. Cir. 1995).   The Court must guard against "hindsight bias and ex post reasoning"

when determining whether a patent is obvious.   *St. Jude Med., Inc. v. Access Closure, Inc.*, 729

F.3d 1369, 1381 (Fed. Cir. 2013) (internal quotation marks omitted).

*Discussion*

Google argues that the combination of an article by K. Aberer, W. Klas, and A. L.

Furtado ("Aberer") and Yahoo! plus Magellan ("Yahoo!") "renders obvious the asserted claims."

(D.I. 376 at 21).   Google maintains that, "Aberer discloses traversing a database hierarchy at the

---

[2] GeoTag asserts secondary considerations of non-obviousness (D.I. 411 at 13-14), but there is no need to address
these arguments at this time.

<div align="center">9</div>

time of search to capture records from a higher, or more general, level in the database hierarchy"

and "provide[s] an express motivation to combine its teachings with a geographical and topical

database, such as Yahoo! . . ." *Id.* at 21-22.  Furthermore, Google argues that Yahoo! alone

teaches all of the '474 elements, with the exception of "dynamic replication,"[3] which it argues is

taught by Aberer.  *Id.*  GeoTag argues that Aberer does not teach dynamic replication in the

context of a geographic hierarchy and therefore cannot do so when combined with any other

reference.  (D.I. 411 at 12, 13).

> Relevant portions of GeoTag's rebuttal expert report read:

> 403. First, the most apparent deficiencies in Aberer is that it teaches neither a database of geographic information nor is it able to respond to searches for geographical information.  It is, rather, a system solely directed to searching in object-oriented databases.

> 404. Aberer does not disclose any geographic areas, much less a hierarchy of geographical areas.

> . . . .

> 406. Aberer does not disclose any components that operate on the internet or in a computer network.  [Google's expert] simply speculates that it could have operated over the internet.  It is noteworthy that [Google's expert] never claims that it was indeed ever made to work over the internet.  [Google's expert's] statements are mere speculation.

(D.I. 413-2 at 111).  Section 3.2 of Aberer discusses the "inheritance of properties."  (D.I. 397-

4 at 8).  The most relevant section reads:

> Informally speaking, the prevailing principle is that every property that is common to all specialized classes should be "factored out", i.e. moved up to the general class. . Then the term "inheritance" means that, when a query asks about such properties when referring to specialized instances, the appropriate values will be found at the level of the general instance, and duly passed down.  Ambiguities may arise with non strictly hierarchical [database], when a class may specialize

---

[3] The Court has construed "dynamically replicating" as meaning "automatically inheriting at the time of a search." (D.I. 284 at 16).

10

A24

> more than one general class having the same property. In this case a criterion
> must be fixed which property value should be chosen.

*Id.* Google's expert, Dr. Worboys, opines that the aforementioned section discloses the

"dynamic replication" requirement of the '474 Patent. (D.I. 377-1 at 117-21). Dr. Worboys

further maintains that, "[I]t would have been obvious for a person of ordinary skill in the art to

try to combine Yahoo—with its disclosure of a database that the Examiner recognized—with a

database exhibiting automatic inheritance as disclosed in Aberer . . . ." *Id.* at 165.

As evidenced by the disagreement between the experts regarding the meaning of a prior

art reference, whether or not one would have thought to combine Aberer with a geographic

hierarchy remains in dispute and is a genuine material issue in the determination of obviousness.

Therefore, the Court denies Google's Motion for Summary Judgment as it relates to obviousness.

### Infringement

Google moves for summary judgment of noninfringement. (D.I. 380 at 4).

*Legal Standard*

"To show infringement of a patent, a patentee must supply sufficient evidence to prove

that the accused product or process contains, either literally or under the doctrine of equivalents,

every limitation of the properly construed claim." *Seal-Flex, Inc. v. Athletic Track & Court

Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999). A patent claim is literally infringed when "every

limitation recited in the claim is found in the accused device, i.e., when the properly construed

claim reads on the accused device exactly." *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398,

1405 (Fed. Cir. 1996). "The absence of even a single limitation of [a claim] from the accused

device precludes a finding of literal infringement." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472,

1477 (Fed. Cir. 1998).

11

A25

A patent claim may also be infringed under the doctrine of equivalents "if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). To apply this doctrine, the fact finder must ask, "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Id.* at 40. Further, "[t]he determination of equivalence should be applied as an objective inquiry on an element-by-element basis." *Id.*

*Discussion*

Google argues that the accused AdWords System does not directly infringe independent claims 1, 20, and 31 and dependent claims 3, 5, 9-15, 18-19, 24, 25, 32, and 36-38 of the `474 Patent ("Asserted Claims") either literally or under the doctrine of equivalents. (D.I. 380 at 5). The three independent claims claim a system, a machine, and a method, and are similar, although not exactly the same. Specifically, Google maintains that its accused product does not meet the following limitations of Claim 1:

1. "a database of information organized into a hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas is further organized into topics," `474 Patent, 38:36;

2. "said search engine further configured to select one of said hierarchy of geographical areas prior to selection of a topic so as to provide a geographical search area," `474 Patent, 38:49-52; and

12

**A26**

3.  "a broader geographical area is dynamically replicated into at least one narrower

geographical area,"[4]  `474 Patent, 38:54-56.

The Court finds that the accused Google product does not infringe the "dynamic

replication" requirement of the patent claims[5] and therefore will focus the remainder of this

section on this limitation alone.

GeoTag argues that this limitation is met by the accused service because, "Once AdMixer

has the adgroup and keyword IDs, it sends these to the Creative Server along with the location

information it has processed.  The Creative Server then checks this location information along

with the query, to see if it should be deemed an eligible ad."  (D.I. 414 at 20 (internal citation

and quotation marks omitted)).  GeoTag argues that the Creative Server accomplishes this "by

keeping and referencing ███████████████████████████

███████████████"  *Id.*  GeoTag argues that it is this process that meets the required

"dynamic replication" requirement as set forth in the `474 Patent.

Google argues that, "The Ad Serving System does not perform dynamic replication

because it conducts its search against all of the keyword IDs and adgroup IDs in the Keyword

---

[4] The Court has construed the phrase to mean "a broader geographic area is automatically inherited into at least one narrower geographic area at the time of the search."  (D.I. 284 at 15).

[5] Independent claims 1, 20, and 31 each require a form of "dynamic replication."  As construed by the Court, Claim 1 requires, "wherein within the hierarchy of geographic areas at least one of said records associated with a broader geographic area is automatically inherited into at least one narrower geographic area at the time of the search," Claim 20 requires, "wherein at least one of said records in said geographic area of relatively larger expanse is automatically inherited at the time of the search into at least one of said geographic areas of smaller expanse," and Claim 31 requires, "automatically inheriting, at the time of a search, a record from the broader geographic area into said geographic search area."  For each of these claims the Court has construed "dynamically replicating" to mean "automatically inheriting at the time of the search."  All three of these claims require dynamic replication.  Therefore as the court finds that there is no "dynamic replication," a term common to all three of the independent claims, the Court's analysis applies equally to independent claims 1, 20, and 31.  Furthermore, as the Court finds that the independent claims are not infringed, the dependent claims cannot, by definition, be infringed.  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 n. 5 (Fed. Cir. 2008).

13

Server, ████████████████████ As such, no search is performed within a narrower

geographical area." (D.I. 419 at 12).

While the parties disagree as to whether or not Google's Ad Serving System contains

"dynamic replication," there is no genuine dispute as to how Google's Ad Serving System itself

functions.

The following figure depicts the general functionality of the accused system:



(D.I. 414 at 8).

First, a user inputs a search query, which is then sent to the Google Web Search

("GWS"). *Id.* The query is then sent to the Location Extraction Server ("LES"), which

determines the ████████████ and any ████████████████████████

████████ (D.I. 380 at 9; D.I. 381-2 at 27-31). The query and user are then associated with

████████ which are derived from the Oyster database[6] and several other GeoTargets SS

Tables.[7] (D.I. 414 at 10; D.I. 381-2 at 22-24, 119, 120; D.I. 419 at 5). The query terms, along

---

[6] Oyster "is a database of information organized into interrelated geographic areas such that there are parent
geographic areas and child geographic areas." (D.I. 381-2 at 100). "Google's Oyster [database] contains ████
████████████████████████████████. In this way, someone interacting with Oyster may determine
the interrelated nature of the information contained in the database." *Id.* at 101.
[7] The GeoTargets SS table is ████████████████████████" (D.I. 381-2 at 102). The GeoTargets SS table is
"organized into interrelated geographic areas such that there are parent geographic areas and child geographic areas"
and is designed for "████████." *Id.*

14

with the ███████ are then passed back to the GWS, which forwards them to the Google

Search System[8] and the AdMixer. The AdMixer then sends the terms and the ████████ to

QRewrite, which analyzes the terms and generates ████████████████ (D.I. 380 at

9; D.I. 381-2 at 32, 33). These ████████████ are then sent back to the AdMixer. The

AdMixer then sends all of the query terms and █████████ to the Keyword Server, which

associates the terms with █████████ via a █████████ (D.I. 414 at 12; D.I. 380 at 9, 10; D.I.

381-2 at 53, 54). The Keyword Server contains a list of millions of keywords and is organized

as ████████ (D.I. 381-2 at 34; D.I. 380 at 9). Furthermore, the search conducted by

the Keyword Server determines all responsive ads ██████████████████████

████████████ Id. at 53, 54. The Keyword Server returns the results to the AdMixer.

(D.I. 380 at 10). The AdMixer then sends the ████████ the █████████ and the ████████

██ to the Creative Server, which filters the list based upon ██████████ and

███████████████ (D.I. 414 at 12; D.I. 380 at 10; D.I. 381-2 at 38-43). The eligible ads

are then passed back to the AdMixer, which applies a set of algorithms to determine which ads to

show, based on an auction process. (D.I. 380 at 10, 11). Finally, the ads are passed back to the

GWS. Id. at 11.

    Here, the key portion of the aforementioned description of the AdWords System is that at

no point does the accused system do anything more than return results from the defined search

area. Specifically, the LES determines ████████████████████████████ the

████████████ or █████████████ within the search query during the initial search.

██████these locations constitute the "geographic search area." Conversely, the Keyword Server

searches a list of millions of different keywords that are not organized by location. After

---

[8] The Google Search System is not at issue in this case.

15

A29

conducting this search, Google's system then begins to filter the results.    The Keyword Server

itself filters the results by ███████████and ██████████    This filtered list is then

further filtered by the Creative Server, which, among other things, filters the list of responsive

ads by ████    Therefore, Google's accused system does not trace up linkages in a hierarchy,

or repeat the search in order to obtain results from a broader geographic area, as the claim

limitation would require, and thus cannot meet the "dynamic replication" requirement of the `474

Patent.

> GeoTag argues:
>
> [W]hen the Creative Server filters adgroups to identify those being geo-targeted,
> campaigns with adgroups associated with a broader geographical area (all cities in
> a metropolitan area contained in a certain radius of the lat/long. above) are
> dynamically replicated (automatically inherited at the time of the search), and a list
> of the selected adgroup IDs are passed to AdMixer into the search of the narrower
> geographical area (i.e., the end-user's geographic location).

(D.I. 414 at 12-13).    However, this argument looks only to the result of Google's accused

system and not to its method.

It is uncontested that the accused system conducts its search against all of the keyword

IDs and adgroups IDs and then consecutively filters this list of results.    In other words the

accused system performs a single search, which yields all possible results for the keyword IDs

and the adgroups IDs.    The results of this search are then progressively filtered, using factors

such as geography.    This progressive filtering means that the accused system does not later

rerun the search to expand its results, as the entire database was initially searched.

As discussed above, for the independent claims to be infringed the accused device must

conduct "dynamic replication."    This limitation requires that the accused system "automatically

inherit[s] at the time of the search" from one search to another search.    Each of the three

16

A30

independent claims requires that this inheritance occur from a larger search area to a smaller

search area, though the smaller search area is not necessarily a subset of the larger search area.

Claim 1 requires a "broader geographic area" as compared with a "narrower geographic area."

`474 Patent, 38:54, 56.   Claim 20 requires a "geographic area of relatively larger expanse" as

compared with a "smaller expanse."   `474 Patent, 39:57-58.   Claim 31 requires a "broader

geographic area" as compared with "said geographic search area."   `474 Patent, 41:53-54.

However, as the Google system performs only a single search and then simply filters the results,

it is not possible for a second search to inherit from the first search, as there is no second search.

Furthermore, as the AdWords System does not repeat the search, there can be no larger or

smaller search area.   As the accused product does not meet the aforementioned limitation, the

Court grants Google's Motion for Summary Judgment of Non-Infringement.

     Google additionally argues that the "dynamic replication" limitation cannot be met under

the doctrine of equivalents as the `474 Patent's prosecution history raises a presumption that the

doctrine of equivalents is unavailable.   (D.I. 380 at 23).   Google argues that this presumption

exists because the limitation was added during prosecution to distinguish the claims from the

prior art.   *Id.*   The Defendant failed to rebut this presumption.   "A patentee's decision to

narrow his claims through amendment may be presumed to be a general disclaimer of the

territory between the original claim and the amended claim."   *Festo Corp. v. Shoketsu Kinzoku

Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 740 (2002).   "[T]he patentee should bear the burden

of showing that the amendment does not surrender the particular equivalent in question."

*Id.*   The Defendant did not address this issue either in the briefing or during oral argument.

(D.I. 414 at 18; *see* D.I. 451).   On the issue of the doctrine of equivalents, the Defendant states

in totality, "Google's arguments that the doctrine of equivalents cannot apply must also fail.   In

<div align="center">17</div>

<div align="center">A31</div>

addition, in the unlikely event there is a difference between what is claimed and the accused system, such a difference is insubstantial." (D.I. 414 at 18). This statement is insufficient to raise a disputed issue in regard to the doctrine of equivalents. Further, this statement was only made in connection with the argument that the database limitation was present in the accused device. It was not made, nor was it referenced, in the Defendant's arguments concerning dynamic replication. Therefore, as the Defendant offered nothing in support of a doctrine of equivalents argument, the Defendant has not only not met its burden, but has waived the argument entirely.

## CONCLUSION

For the reasons above, Google's Motions for Summary Judgment on the Basis of Laches (D.I. 369) and Invalidity (D.I. 375) are **DENIED** and Google's Motion for Summary Judgment of Non-Infringement (D.I. 379) is **GRANTED**. An appropriate order will be entered.

18

A32

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MICROSOFT CORPORATION and            :
GOOGLE INC.,                         :
                                     :
            Plaintiffs,              :
                                     :
        v.                           :     C.A. 11-175-RGA
                                     :
GEOTAG, INC.,                        :
                                     :
            Defendant.               :

## CLAIM CONSTRUCTION

Arthur G. Connolly, III, Esq., Wilmington, Delaware; Michael J. Bettinger, Esq. (argued), San Francisco, California; Attorneys for Plaintiff Google, Inc.

Arthur G. Connolly, III, Esq., Wilmington, Delaware; Grant E. Kinsel, Esq. (argued), Los Angeles, California; Attorneys for Plaintiff Microsoft Corporation.

Sean T. O'Kelly, Esq., Wilmington, Delaware; James C. Hall, Esq. (argued), Andover, Massachusetts; Attorneys for Defendant Geotag, Inc.

May _3_ , 2013
Wilmington, Delaware

ANDREWS, UNITED STATES DISTRICT JUDGE:

This is a claim construction opinion. Plaintiffs Google Inc. and Microsoft Corporation

filed a declaratory action asserting non-infringement of Defendant Geotag, Inc.'s U.S. Patent No.

5,930,474 ("'474 Patent"). The '474 Patent discloses computer software informational databases

integrated with search engine technology that allow users to find points of interest according to

desired geographic regions.

## DISCUSSION

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d

967, 977–78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388–90 (1996). When construing the claims

of a patent, a court considers the literal language of the claim, the patent specification and the

prosecution history. *Markman*, 52 F.3d at 979. Of these sources, the specification is "always

highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best

guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed.

Cir. 2005) (en banc) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

1996)). However, "[e]ven when the specification describes only a single embodiment, the claims

of the patent will not be read restrictively unless the patentee has demonstrated a clear intention

to limit the claim scope using 'words or expressions of manifest exclusion or restriction.' "

*Liebel–Flarsheim Co. v. Medrad*, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (*quoting Teleflex, Inc.

v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

A court may consider extrinsic evidence, including expert and inventor testimony,

dictionaries, and learned treatises, in order to assist it in understanding the underlying

technology, the meaning of terms to one skilled in the art and how the invention works. *Phillips*,

2

**A34**

415 F.3d at 1318–19; *Markman*, 52 F.3d at 979–80. However, extrinsic evidence is considered

less reliable and less useful in claim construction than the patent and its prosecution history.

*Phillips*, 415 F.3d at 1318–19 (discussing "flaws" inherent in extrinsic evidence and noting that

extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless

considered in the context of intrinsic evidence").

In addition to these fundamental claim construction principles, a court should also

interpret the language in a claim by applying the ordinary and accustomed meaning of the words

in the claim. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed. Cir. 1984). If the

patent inventor clearly supplies a different meaning, however, then the claim should be

interpreted according to the meaning supplied by the inventor. *Markman*, 52 F.3d at 980 (noting

that patentee is free to be his own lexicographer, but emphasizing that any special definitions

given to words must be clearly set forth in patent). If possible, claims should be construed to

uphold validity. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

The parties organize the disputed phrase terms into five groups: the "hierarchy" phrases,

the "dynamic replication" phrases, the "topics" phrases, the "entries" phrases, and the

"additional" phrases.

### A.    The "Hierarchy" Phrases

The first group is referred to as the "hierarchy" phrases by the parties. The proposed

constructions for this group follows:

| Claim term phrase | Google | Microsoft | Geotag |
|---|---|---|---|
| #1. "hierarchy of | "related geographical | No separate | "an arrangement of |

| geographical areas" (claims 1, 4, 20)[1] | areas, ordered such that broader general areas encompass narrower specific ones" | construction. See construction for term #2 | related information or data, ordered from broader general categories to narrower specific ones" |
|---|---|---|---|
| #2. "a database of information organized into a hierarchy of geographical areas wherein entries to each one of said hierarchy of geographical areas is further organized into topics"<br><br>(claim 1) | Google focuses on the separate terms in the limitation and does not construe this entire term. | "a database of records primarily organized into interrelated geographic areas such that there are parent geographic areas and child geographic areas, wherein the records associated with a geographic area are further organized into topics" | No need to separately construe; see constructions for #3 and #19 |
| #3. "a database of information organized into a hierarchy of geographical areas" (claim 1)<br><br>#4. "said database of information organized into a predetermine [sic] hierarchy of geographical areas" (claim 20) | No need to separately construe. See term # 1 | No separate construction necessary. See construction for term # 2 | "a collection of interrelated information or data organized such that a computer program can quickly retrieve selected information or data, ordered from broader geographical categories to narrower geographical categories" |
| #5. "hierarchy" (claims 1, 5, 20)<br><br>#6. "hierarchically organized" (claim 32) | No need to separately construe. See term #1, term #16 for "topics," and term #17 for "wherein said topics are hierarchically organized" | No separate construction necessary. See construction for term #2, term #16 for "topics" and term #17 for "wherein said topics are hierarchically organized." | "an arrangement of related information or data, ordered from broader general categories to narrower specific ones" (same as #1, 17) |
| #7. "narrower geographical area" (claim 1)<br><br>#8. "geographical area of relatively smaller expanse" (claim 20) | "a geographic area in the database encompassed by a broader geographic area in the database" | "a geographic area in the database which is a child of the broader geographic area" | No need to construe. Plain and ordinary meaning |
| #9. "broader | "a geographic area in | "a geographic area in | No need to construe. |

4

**A36**

| geographical area" (claims 1, 31) #10, "geographical area of relatively larger expanse" (claim 20) | the database that encompasses one or more narrower geographic areas in the database" | the database which is a parent of one or more narrower geographic areas" | Plain and ordinary meaning |
|---|---|---|---|

This group concerns the organization of the "hierarchy of geographical areas" of the database. The phrase appears in claim 1 as follows: "a database of information organized into a hierarchy of geographical areas wherein entries to each one of said hierarchy of geographical areas is further organized into topics." As an initial matter, the Court agrees with Microsoft's proposal that this group of terms should be construed as a single phrase, as opposed to breaking down the construction into multiple component phrases. The parties do agree that the "hierarchy of geographical areas" is comprised of an organization of broader geographic areas and related narrower geographic areas. They do not agree as to how the broader and narrower geographic areas are arranged in relation to one another. Google argues that the broader geographic areas should be understood to "encompass" the narrower geographic areas. Microsoft argues that the broader geographic areas and the narrower geographic areas are organized according to a "parent-child" relationship. Geotag argues that both of those constructions are wrongful attempts to employ the specification to limit the claims, and argues that the hierarchy is simply "ordered from broader general categories to narrower specific ones."

Google relies on the specification in support of its argument that the broader geographic regions necessarily "encompass" the narrower geographic regions. It refers to the following quotation in support: "Each of the geographical levels above the lowest level encompasses a plurality of lower level geographical areas." '474 Patent, col. 3 ll. 22-24. Google argues that

5

**A37**

this portion of the specification demonstrates the full scope of the invention, as the very function of the hierarchy requires the broader geographic area to completely encompass a narrower area. The Court is not convinced by this argument. Google relies on a few sparse statements in the specification in support of its construction, and Google does not provide any persuasive reasoning as to why the claimed invention hinges on broader areas "encompassing" narrower areas. This understanding of the claim term is bolstered by a comparison of the claims. In Claim 1, the word "encompass" is not used to describe the relationship between the broader and narrower areas. In contrast, dependent Claim 5 does use "encompass" to describe these relationships. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). Although there are other differences between these two claims than the presence of "encompass" in dependent Claim 5, the presumption is this difference was intentional. For these reasons, the Court rejects Google's construction.

Microsoft's proposal to construe the phrases according to the "parent-child relationship," on the other hand, explains a necessary aspect of the claims. During claim construction, the Court must look to see "whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003).

Claim 1 requires "entries" associated with "broader geographical areas" to be "dynamically replicated" to "narrower geographical areas." The "dynamic replication" phrases are the second group of disputed terms and are not construed in this section, but that group's meaning has ramifications for the "hierarchy" phrases' construction. Both Geotag and Google

6

**A38**

agree that "dynamic replication" must be construed to mean "automatic inheritance." The Court adopts this construction in Part B of this opinion *infra*.

"Automatic inheritance" requires that "hierarchy" be construed according to the "parent-child relationship." The specification describes the function of "automatic inheritance" as follows:

> These values are the parentage name keys related to the current entry, and provide the key to displaying related entries to the internet user, and are automatically inherited from the parent entry. These reference values are used to retrace the path back through the geographic hierarchy when the user wishes to return to a related (e.g., parent) location display screen.

'474 Patent, col. 19 ll. 33-38. "Automatic inheritance" as described here is strictly dependent on the existence of "parentage name keys" and a "parent entry." They are the "reference values" that allow retracing through the hierarchy when the user returns to the related location display screen. Although the specification's use of "(e.g., parent)" would seem to indicate that the "parent-child" relationship is merely exemplary, there is no indication elsewhere as to how "automatic inheritance" would function without the "parent-child relationship." Because neither "automatic inheritance" nor "dynamically replicated" are terms with a plain and ordinary meaning, the Court can only construe their meaning and function according to what is disclosed in the patent. There is nothing in the patent indicating how these functions would occur absent a "parent-child" hierarchy.

The necessity of the "parent-child relationship" to "automatic inheritance" is again demonstrated below:

> The data contained within the geographic database 210 also includes reference field 1305 which include a reference city, reference region, reference state, province or territory, reference country, reference continent, and reference world values. These values are the parentage name keys related to the current entry, and

7

**A39**

> provide the key to displaying related entries to the internet users, and are
> automatically inherited from the parent entry.

*Id.* at col. 19 ll. 29-39. The "parentage name keys" are necessary to displaying "related entries to

the internet users." They are "automatically inherited from the parent entry." To further

demonstrate the necessity of the "parent-child relationship" to "automatic inheritance," the patent

teaches the importance of "label fields" to the invention. *See id.* at col. 19 ll. 45-63. When a

user selects a certain geographic region, all corresponding "parent entries" are taken from the

"label field" and displayed to the user. *Id.* at col. 19 ll. 52-57. The patent then specifically

teaches that the label field is "automatically inherited" from the "parent entry," and warns that

the values within the parent label field should not be changed. *Id.* at col. 19 ll. 61-63. The most

reasonable interpretation of the admonition to leave the label field unchanged is to preserve the

function of "automatic inheritance." It is language of restriction that strongly demonstrates that

"automatic inheritance" requires the "parent-child relationship." There is no clue within the

specification as to how "automatic inheritance" would possibly function in any other context.

This understanding is bolstered by the file history. While "unilateral statements by an

examiner do not give rise to a clear disavowal of claim scope by an applicant, it does not

necessarily follow that such statements are not pertinent to construing claim terms." *Salazar v.*

*Proctor & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2007). The file history includes the

examiner's "Search Request Form." (D.I. 174, Exh. D at 91). Within this form, the examiner

noted that "dynamic replication = automatic inheritance = parent-child = inheriting attributes."

(*Id.*).[2] While only "dynamically replicat[e]" actually appears within the claims, the notations

indicate that "dynamic replication," "automatic inheritance," and the "parent-child relationship"

---

[2] The examiner categorized these terms as "synonyms." Although they do not all literally have the same meaning and are thus not true synonyms, the examiner clearly viewed these terms as interrelated.

are at the very least closely interrelated. This is not an example of adopting unilateral examiner statements as disclaimer, but is an example of using the file history to understand the contours of the invention. For all these reasons, the Court determines that the "hierarchy of geographical areas" is organized according to the "parent-child relationship."

There is a second dispute regarding the "hierarchy" phrases. Microsoft argues that phrases should be construed with the primacy of the geographical as opposed to topical information of the hierarchy in mind.[3] It points to claim 1, which states, "a database of information organized into a hierarchy of geographical areas wherein entries . . . [are] further organized into topics." There is no reason to insert "primarily" into the construction. The claim's use of the word "further" shows that the database is organized into a hierarchy of geographical areas, and also organized into topics, but does not imply any additional limitation. "Primarily" is not a synonym for "further." Moreover, it is not at all clear what "primarily" would mean in this context.

The parties also propose the construction of the following related terms: "narrower geographical areas," "geographical area of relatively smaller expanse," "broader geographical areas," and "geographical area of relatively larger expanse." The Court agrees with Geotag that these terms should be construed according to their plain and ordinary meaning. They are easily understandable and neither Microsoft nor Google demonstrate that the meanings differ from the plain and ordinary meaning.

The Court's claim construction chart for this group of terms follows.[4]

---

[3] Microsoft proposes, "a database of records primarily organized into interrelated geographic areas..."
[4] The Court has renumbered the terms consistent with its decision to construe longer phrases as a single term when possible.

| Term Phrase | Court's Construction |
|---|---|
| # 1. "a database of information organized into a hierarchy of geographical areas wherein entries to each one of said geographical areas is further organized into topics" | "a database of information organized into interrelated geographic areas such that there are parent geographic areas and child geographic areas, wherein the records associated with a geographic area are further organized into topics" |
| # 2. "narrower geographical area" | Plain and ordinary meaning |
| #3. "geographical area of relatively smaller expanse" | Plain and ordinary meaning |
| #4. "broader geographical area" | Plain and ordinary meaning |
| #5. "geographical area of relatively larger expanse." | Plain and ordinary meaning. |

## B.    The "Dynamic Replication" Phrases

The second group of terms is referred to as the "Dynamic Replication" phrases. The

Court agrees with Google's suggestion that the terms should be construed as a single phrase

when possible. The parties' proposed constructions follow:

| Term | Google | Microsoft | Geotag |
|---|---|---|---|
| #11. (collectively) "dynamically replicating" <br><br> "dynamically replicating" (claims 1, 20, 31) | "automatically inheriting at the time of a search" | Incapable of being construed because term or phrase is part of a claim limitation which is indefinite and/or lacks written description | "automatically copying or inheriting, at the time needed rather than at a time decided or established in advance" |
| #12. (collectively) "replicated" "replicating" (claims 1, 20, 31) | No need to separately construe; see constructions for term #11: "dynamically replicating" / "dynamically replicated" | Incapable of being construed because term or phrase is part of a claim limitation which is indefinite and/or lacks written description | "copied or inherited" and "copying or inheriting" |
| #13. "dynamically replicating an entry | Incapable of being construed because | Incapable of being construed because | "automatically copying or |

| | | | |
|---|---|---|---|
| from broader geographical area into said geographical search area"<br><br>(claim 31) | term or phrase is part of a claim limitation which is indefinite and/or lacks written description | term or phrase is part of a claim limitation which is indefinite and/or lacks written description | inheriting, at the time needed rather than at a time decided or established in advance, at least a piece of data contained in a database that is associated with a broader geographical area into an area from which topical information can be accessed that is a subset of that broader geographical area" |
| #14. "wherein within said hierarchy of geographical areas at least one of said entries associated with a broader geographical area is dynamically replicated into at least one narrower geographical area"<br><br>(claim 1)<br><br>#15. "wherein at least one of said entries in said geographical area of relatively larger expanse is dynamically replicated into at least one of said geographical areas of smaller expanse"<br><br>(claim 20) | Incapable of being construed because term or phrase is part of a claim limitation which is indefinite and/or lacks written description | Incapable of being construed because term or phrase is part of a claim limitation which is indefinite and/or lacks written description | "wherein within the hierarchy of geographical areas, at the time needed rather than at a time established in advance, at least a piece of data in a database associated with a broader geographical area is automatically copied or inherited into at least one narrower geographical area" |

11

**A43**

"Dynamically replicated" is used in claim 1 as follows: "…a geographical search area wherein within said hierarchy of geographical areas at least one of said entries associated with a broader geographical area is dynamically replicated into at least one narrower geographical area…"

Microsoft argues that "dynamically replicated" is indefinite. Geotag argues that the term is not indefinite and should be construed as "automatically copying or inheriting, at the time needed rather than at a time decided or established in advance." Google argues that the term is not indefinite in isolation and should be construed as "automatically inheriting at the time of the search." Google also argues, however, that "dynamically replicated" is indefinite when used within the context of the patent's claims.

The Court begins with Microsoft's indefiniteness argument. A patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. The purpose of the definiteness requirement is to "ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). Claims are considered indefinite when they are not amenable to construction or are insolubly ambiguous. "Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning." *Id.* Indefiniteness requires a determination of whether those skilled in the art would understand what is claimed. "In the face of an allegation of indefiniteness, general principles of claim construction apply." *Id.* at 1348. In that regard, claim construction involves consideration of primarily the intrinsic evidence, *viz.*, the claim language, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1303.

12

**A44**

"Dynamically replicating" has no plain and ordinary meaning within the art of computer science. Therefore, the Court must consider the term's usage within the claim, specification and file history to gain guidance as to what the inventor intended this term to mean. The crux of Microsoft's indefiniteness argument is that "dynamic replication" is a function of the search engine, yet Google and Geotag rely on "automatic inheritance" to construe the term, despite the fact that "automatic inheritance" is a function of the database. Thus, "automatic inheritance" is an improper construction of "dynamic replication," and because there are no plausible alternative constructions, the term is indefinite.[5]

The relevant element of claim 1 follows:

> a search engine in communication with said database, said search engine configured to search geographically and topically, said search engine further configured to select one of said hierarchy of geographical areas prior to selection of a topic so as to provide a geographical search area wherein within said hierarchy of geographical areas at least one of said entries associated with a broader geographical area is dynamically replicated into at least one narrower geographical area, said search engine further configured to search said topics within said selected geographical search area.

The Court does not agree that "dynamically replicated" is solely a function of the search engine. Rather, the element claims "a search engine in communication with said database." This element thus speaks to both the search engine and the database. The "dynamically replicating" occurs "within" the hierarchy of geographical areas: "wherein within said hierarchy of geographical areas at least one of [the] entries …is dynamically replicated[.]" As the hierarchy of geographical areas is indisputably the substance of the database, "dynamic replication" is a

---

[5] Although the Court will construe the term, the Court is not definitively rejecting any indefiniteness arguments.

13

**A45**

function of the database.[6]  Although it is true that an "entry" is only "dynamically replicated" in response to the search engine, that does not require it to be a function only of the search engine. This makes sense, as the specification shows that the invention depends on interaction between the search engine and the database of hierarchically organized information.  *See* '474 Patent at col. 3 ll. 1-14.  The claim describes search engine functions within the context of the search engine's interrelationship with the database and the database's own function.  If "dynamically replicated" is a function of the database, as I believe it is, then "automatic inheritance" is not an incompatible construction.  The specification is replete with examples of automatic inheritance occurring within the database.[7]  The file history further makes clear that the examiner equated automatic inheritance with dynamically replicating.  (*See* D.I. 174, Exh. D at 91).  The Court thus construes "dynamically replicated" as involving "automatic inheritance."

Although Geotag and Google agree that "automatic inheritance" is an appropriate part of the construction, they disagree as to other limitations.  Geotag argues that "dynamically replicating" should be construed as "automatically copying or inheriting."  Google argues that "copying" is nowhere to be found in the specification or claims and limits its construction to "automatically inheriting."  Geotag does not point to any intrinsic evidence justifying the inclusion of the "copying" limitation.  Further "copying" is a well-known term used in the art of computer science, and if the patentee had intended his invention to be understood as having this

---

[6] A previous element of Claim 1 states, "a database of information organized into a hierarchy of geographical areas[.]"

[7] These examples include Figure 13 and relevant lines col. 19 ll. 16-63, as well as Figure 16 and relevant lines col. 23 ll. 30-39 and col. 23 ll. 48-51.

function he could have easily done so by using this word *somewhere* in the patent.[8] The Court thus agrees with Google that "copying" is not a valid construction of "replicating."

The parties also differ as to the temporal limitation of "dynamically replicating." Geotag argues that it occurs "at the time needed, rather than at a time decided or established in advance." Google argues that it occurs "at the time of the search."[9] Claim 1 clearly states that an entry is "dynamically replicated" within the database in connection with a search. There is no indication in the record of any other moment where the function would occur or be needed. For this reason, the Court adopts "at the time of the search" as the temporal limitation.

The Court's constructions for the "dynamic replication" group of terms follow:

| Term Phrase | Court's Construction |
|---|---|
| # 6. "dynamically replicating" (claim 1, 20, 31) | "automatically inheriting at the time of a search" |
| # 7. "dynamically replicating an entry from broader geographical area into said geographical area." (claim 31) | "automatically inheriting, at the time of a search, a record from the broader geographic area into said geographic search area" |
| #8. "wherein within said hierarchy of geographical areas at least one of said entries associated with a broader geographical area is dynamically replicated into at least one narrower geographical area" (claim 1) | "wherein within the hierarchy of geographic areas at least one of said records associated with a broader geographic area is automatically inherited into at least one narrower geographic area at the time of the search" |
| #9. "wherein at least one of said entries in said geographical area of relatively larger expanse is dynamically replicated into at least one of said geographical areas of smaller expanse" | "wherein at least one of said records in said geographic area of relatively larger expanse is automatically inherited at the time of the search into at least one of said geographic areas of smaller expanse." |

[8] "Replicate" was not a term of art in the relevant field. If the inventors meant "copy," there is no obvious reason why they could not have said so.

[9] Geotag has not explained how its proposal differs from that of Google. Indeed, Geotag appears to acknowledge that Google's proposal is on the right track, although arguing that it is too precise. (D.I. 281 at 93).

| (claim 20) | |
| --- | --- |

## C.    The "Topics" Phrases

The third group of phrases is referred to as the "topics" phrases by the parties.  The

parties' proposed constructions follow:

| Term | Google | Microsoft | Geotag |
| --- | --- | --- | --- |
| #16. "topics" (claims 1, 15, 16, 18, 20, 31, 34, 35, 36, 37) | "grouping of goods or services" | "grouping of goods or services" | No need to construe. Plain and ordinary meaning. |
| #17: "wherein said topics are hierarchically organized" (claims 16, 35) | "related goods or services, ordered such that broader general goods or services encompass narrower specific ones" | "interrelated goods or services such that there are parent goods and services and child goods and services" | "an arrangement of related information or data, ordered from broader general categories to narrower specific ones" (same as # 1, 5, 6) |

"Topics" appears throughout the claims.  It is used, for example, as follows in claim 1: "a

database of information organized into a hierarchy of geographical areas wherein entries

corresponding to each one of said hierarchy of geographical areas is further organized into

topics[.]"  Geotag argues that "topic" deserves its plain and ordinary meaning, whereas

Microsoft and Google argue that "topic" should be construed as "a grouping of goods or

services."

Geotag rightly points out that "topic" is used broadly within the specification: "….the

topic list presented to the user includes a list of topics such as business services, entertainment,

news, consumer goods, historic sites, etc." '474 Patent, col. 9 ll. 28-30. "Topics" are further listed within Figure 10 as including "Beaches & Harbors." These descriptions within the specification clash with Microsoft and Google's proposed construction, as the Defendants would limit "topics" to "a grouping of goods and services." A beach, however, is not sensibly described as a good or a service. Further, the patent specifically mentions that "topics" are not so limited: "goods, services, or other topics, (i.e., final destinations)." *Id.* at col. 15 l. 58. There are plainly "other topics" besides "goods and services."

The patent clearly envisions a broader scope for "topics" than the construction offered by Microsoft and Google. Microsoft and Google argue that adopting the plain and ordinary meaning would create an inappropriately broad construction, but they fail to offer any principled basis to narrow the term. They offer no construction accounting for the full scope of the term envisioned by the specification. "Topics" is not a technical term. It is a broad term. Google argues that the plain and ordinary meaning is inapposite because a dictionary defines a "topic" as "the subject of conversation or discussion: to provide a topic for discussion." (D.I. 174, Exh. J at 459). To the contrary, this indicates the extremely broad nature of the word topic, as virtually any subject is amenable to conversation. According to <u>Merriam-Webster</u>, synonyms for "topic" include "content," "subject," and "matter."[10] For this reason, the Court construes "topics" according to its plain and ordinary meaning.

The Court's constructions follow:

| Term Phrase | Court's Construction |
|---|---|
| # 10. "topics" (claims 1, 15, 16, 18, 20, 31, 34, 35, 36, 37) | Plain and ordinary meaning. |

---

[10] http://www.merriam-webster.com/dictionary/topic

| # 11.  "wherein said topics are hierarchically organized"  (claims 16, 35) | "wherein the topics are further organized such that there are parent topics and child topics." |
| --- | --- |

### D.    The "Entries" Phrases

The fourth group of term phrases is referred to as the "entries phrases."  The parties'

proposed constructions follow:

| Term | Google | Microsoft | Geotag |
| --- | --- | --- | --- |
| #18: (collectively) "entry" "entries" (claims 1, 17, 18, 20, 24, 31, 36) | "a record in the database" | "a record in the database" | "data contained in a database" |
| #19: "entries corresponding to each one of said hierarchy of geographical areas is further organized into topics"  (Claim 1)  #20: "entries corresponding to each of said hierarchy of geographical area is further organized into topics"  (Claim 20)  #21: "entries corresponding to | "No need to separately construe; see constructions for terms # 18, 1, and 16: "entries," "hierarchy of geographical areas," and "topics" | No separate construction necessary. See construction for term #2: "a database of information organized into a hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas | "data in the database associated with a geographic area in the hierarchy of geographical areas is further organized to permit selected data to be retrieved into topics" |

| each of said geographical areas is further organized into topics"<br><br>(Claim 26) | | is further organized into topics." | |
|---|---|---|---|
| #22: "organizing said entries corresponding to said plurality of geographical areas into one or more topics"<br><br>(Claim 31) | No need to separately construe; see constructions for terms # 18, 1, and 16. | No separate construction necessary. See construction for term #2. | "organizing data contained in the database corresponding to one or more geographical areas to further permit selected data to be retrieved into one or more topics" |

"Entries" and "entry" are used throughout the claims, including as follows in claim 1: "a database of information organized into a hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas is further organized into topics." Geotag proposes that "entries" should be broadly construed as "data." Google and Microsoft propose that "entries" are more properly understood to be "records."

The dispute between the parties hinges on whether the patent requires "entries" to contain distinct and independently accessible named fields. If so, then the Court should adopt Microsoft and Google's construction, as the patent defines "record" as having "one or more fields wherein each field is given a name so that the field is independently accessible." '474 Patent, col. 27 ll. 3-9. "Data," on the other hand, is a broader term. It is not defined in the patent, but it is well known to mean stored information in essentially any form. There is no requirement that "data" contain individual fields, although it is not excluded from having fields, either. In other words, all "records" are a form of "data," but not all "data" types are "records."

19

**A51**

Microsoft and Google argue that "entries" must be construed as "records" because the invention requires each "entry" to be organized by informational fields. They argue that the patent uses "entries" and "records" interchangeably. They cite passages of the specification where "entries" are described as having fields, including the following:

> Sample entries to the yellow pages database 245 are included as Table 9. An expiration date field 1700 includes the date or dates that this listing expires, while a name field 1705 includes, in text form, the name to be shown on the listing. Address and city fields 1710, 1715, respectively show the street address to be shown on the listing and the city name. In addition, a state field 1720 as well as a zip code field 1725, respectively, include the state name and the postal or zip code of the listing.

*Id.* at col. 24 ll. 30-39. This indeed states that "entries" have fields, at least in some embodiments. There is, however, further evidence that the patentee used these terms synonymously. The specification refers to Table 7 as a representation of the "entries" within the geography database.[11] Each one of the "entries," however, is labeled as a "Record" within the table itself. *See id.* at cols. 31-36.[12] They all have fields. *See id.* "Entries" again are said to contain fields during the discussion of the California "entry." *Id.* at col. 19 ll. 53-63. Table 7's California "entry" is entitled "SPT Record" and has the same fields as discussed in column 19, suggesting the interchangeability of the term "entry" and "record."

An even more persuasive reason to construe "entries" as "records" is to maintain fidelity with the disclosed functions of the claimed invention. As discussed *infra*, claim 1 states that the "entries" are "dynamically replicated," i.e., "automatically inherited," between broader and narrower geographical areas. For "automatic inheritance" to occur, a "parent entry" and a "child entry" must be present. The "parent entry" further contains a "label field" which must not be

---

[11] "Sample entries for the geography database 210 are included in Table 7." '474 Patent, col. 18 ll. 62-63.

[12] For example, Table 7 lists various "entries" labeled, "Continent Record," "Country Record," "SPT Record," "Region Record," etc.

20

changed, lest the "automatic inheritance" function be disrupted. *See* '474 Patent col. 19 ll. 52-63. "Automatic inheritance" is not a term with a well-known meaning in the art, and there is no indication in the specification as to how the function would occur absent "entries" with "label fields." It follows that all "entries" have "fields," and therefore "entries" should be construed as "records."

Geotag argues that the following lines from the specification demonstrate an "entry" without fields: "Normally, when the Dbview parameter is specified as 'CITY,' the displayed entry will simply be the city name designated as the NameKey parameter." *Id.* at col. 12 ll. 3-5. Geotag argues that because the specification does not specifically refer to the field of the "displayed entry," it cannot be a "record." The Court disagrees. First, these lines merely describe the aspect of an "entry" that is "displayed" to the user. The fact that the city name is the only user visible component does not necessarily imply that there is not more to the "entry" as it exists hidden from sight in the database. Second, the lines mention the "NameKey parameter" of the "entry." Table 7 shows that the "NameKey parameter" is a field within each listed "entry."

Elsewhere in the specification, the description explicitly mentions the function of the "Name Key field" in a similar (if not the same) context of Geotag's citation, using "records" in place of "entries" to describe the files within the database:

> Thus, if a user wishes to search for a given file (specified by the Name Key parameter), then only those files within the subdivision of the geographic database 210 defined by Dbview will be searched. For example, if the parameter Dbview is specified as "city," this will cause the search engine to search those records having the designated folder name beneath the city level of the geographic hierarchy so that only points of interest having the given folder name will be searched.

*Id.* at col. 11 ll. 56-64. The "Name Key parameter" specifies the "given file" (i.e., "entry") within the database to be accessed by the user's search. This indicates that the "Name Key

parameter" is a field within the "entry." Thus, Geotag has not referenced any "entry" that does not rely on the presence of fields to perform the function of an entry.

It is thus apparent that the claimed invention can only function where its "entries" have "fields." To put it another way, the patentee did not disclose any information allowing an individual skilled in the art to understand this invention without employing "entries" with fields. Geotag argues that the various ways within which "entries" is used within the specification justify a broad construction, but it fails to locate any example contradicting the idea that all "entries" need a field.

Geotag further makes a claim differentiation argument. The four independent claims all use the term "entries." *See* '474 Patent, claims 1, 20, 26, and 31. There are four corresponding dependent claims that claim "entries" comprised of "data records," arguably indicating that there are differences between these terms. *See* '474 Patent, claims 18, 24, 27, 36. "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. The claim differentiation argument here is a weak one, as the dependent claims do not merely claim "entries" comprised of "data records," which would give rise to a strong presumption of different meanings. Instead, the dependent claims add "data records" with additional narrowing limitations not found in the independent claims.[13] For this reason, Geotag's claim differentiation argument is not persuasive.

---

[13]    For example, dependent claim 18 adds to independent claim 1 the following limitation, "wherein said entries comprises a plurality of data records wherein each of said data records is associated with at least one of said topics and at least one of said geographical areas." The requirement that each "entry" is associated with at least one topic and one geographical area is not found within independent claim 1, meaning there is no presumption that "data records" are narrower than "entries." Dependent claim 24 adds a functionally similar limitation to independent claim 20.

For all these reasons, the Court adopts Microsoft and Google's proposed constructions, construing "entries" as "records."

| Term Phrase | Court's Construction |
|---|---|
| # 12. (collectively)<br><br>"entry"<br><br>"entries"<br><br>(claims 1, 17, 18, 20, 14, 31, 36) | "a record in a database" |

E.    Additional Terms and Phrases

There are nine additional terms and phrases. Microsoft and Google propose that all of these phrases be construed according to their plain and ordinary meaning. Geotag disagrees, proposing instead specific constructions for each phrase. Geotag does not, however, argue that any of the phrases are used within the patent in a manner inconsistent with the plain and ordinary meaning. Instead, Geotag argues that its proposals should be adopted because they are consistent with an Eastern District of Texas opinion construing the '474 Patent. In those cases, however, none of the parties proposed plain and ordinary meaning constructions. *See Geomas (Int'l) Ltd. v. Idearc Media Services-W., Inc.*, 2008 WL 4966933, *5-17 (E.D. Tex. 2008).[14] Thus, the

---

Further, dependent claim 27 adds to independent claim 26 the following limitation, "wherein said entries comprise data records wherein said data records are associated with said topics and wherein said data records contain information about institutions or enterprises." The narrowing of "entries" to "contain information about institutions or enterprises" is not present in independent claim 26, defeating the presumption that "entries" is necessarily different from "data records." Dependent claim 36 adds a functionally similar limitation to independent claim 31.

[14]    The '474 Patent was also construed more recently in *GeoTag, Inc. v. Frontier Commc'ns Corp.*, 2013 WL 693852 (E.D. Tex. Feb. 26, 2013). Claim construction is reviewed without deference by the Court of Appeals. There is no reason for one trial court to pay any deference to another trial court's construction of the same patent. First, if the parties are different, as they are here, they may offer different constructions than what were proposed in the other cases. Courts generally will pick a construction of one party of the other. The parties in the first case may have proposed different constructions, and the first court may pick the better option. When the second or third court is presented with a new option, it may be that newer options are better still. Second, even when the same options are

Eastern District of Texas cannot be said to have rejected the plain and ordinary meaning of these terms. Because Geotag does not proffer any argument that these terms are used in a manner distinct from their plain and ordinary meaning, the Court construes them according to their plain and ordinary meaning as written below:

| Term phrase | Court's Construction |
|---|---|
| # 13. "database"<br><br>(claims 1, 20, 31) | Plain and ordinary meaning |
| # 14. "on-line information"<br><br>(claims 1, 31) | Plain and ordinary meaning |
| # 15. "organizing a database of on-line information into a plurality of geographic areas"<br><br>(claim 31) | Plain and ordinary meaning |
| # 16. "organizer"<br><br>(claim 1) | Plain and ordinary meaning |
| # 17. "search engine"<br><br>(claims 1, 15, 20, 31, 34, 37) | Plain and ordinary meaning |
| # 18. "virtual geographic environment"<br><br>(claim 4) | Plain and ordinary meaning |
| # 19. "said search engine further configured to select one of said hierarchy of geographical areas prior to selection of a topic so as to provide a geographical search area"<br><br>(claim 1) | Plain and ordinary meaning |
| # 20. "said search engine further configured to select at least one geographical area in said hierarchy of geographical areas so as to define a geographical search area" | Plain and ordinary meaning |

presented in the later cases, the evidence offered in support will likely be different. Different factual presentations can lead to varying results.

Throughout the briefing, Geotag relies upon the earlier *Geomas* constructions. But since Microsoft and Google propose constructions that were not considered in the other cases, the other cases are not as persuasive as they might be to resolving the claim disputes here.

24

**A56**

| | |
|---|---|
| (claim 20) | |
| # 21. "directing a search engine executing in a computer to select one or more of said geographical areas so as to select a geographical search area" <br><br> (claim 31) | Plain and ordinary meaning |

The parties should confer and submit a proposed order, suitable for submission to a jury, adopting the foregoing constructions.

US005930474A

# United States Patent [19]

## Dunworth et al.

[11] **Patent Number:** 5,930,474

[45] **Date of Patent:** Jul. 27, 1999

[54] **INTERNET ORGANIZER FOR ACCESSING GEOGRAPHICALLY AND TOPICALLY BASED INFORMATION**

[75] Inventors: **Peter D. Dunworth**, Huntington Beach; **John W. Veenstra**; **Joan Nagelkirk**, both of Balboa Island, all of Calif.

[73] Assignee: **Z Land LLC**, Santa Ana, Calif.

[21] Appl. No.: **08/595,026**

[22] Filed: **Jan. 31, 1996**

[51] **Int. Cl.**[6] ................................. **G06F 17/30**
[52] **U.S. Cl.** ...................................... **395/200.47**; 707/10
[58] **Field of Search** ...................... 395/200.47, 200.48, 395/200.49; 707/4, 10, 103, 501

[56] **References Cited**

PUBLICATIONS

author unknown, Yahoo! Company History, www.yahoo.com/info/misc/history.html, p. 1, Dec. 1994.
Mark Brown et al., Special Edition Using Netscape 2, pp. 182–207, Jan. 1995.
Yahoo Regional category, directory pages, pp. 1–3, Dec. 1994.
Newsbytes, Open Text Teams with Yahoo!, Newsbytes Inc., (Full text), Sep. 1995.
Dennis S. Arnon et al., Using Structured Documents for Implementing Product/Service Yellow Pages Architecture on the Internet, pp. 312–321, Dec. 1994.
Internet release announcing new "Get Local" service, http://www.yahoo.com.docs/pr/release57.html. Aug. 26, 1996.

Noglows, et al., "Coming Soon to a Town Near You: The LocalNet", Hambrecht & Quist LLC Institutional Research, vol. 1, Issue 1, Nov. 1996.
Weintraut, et al., "The Internet: Webbing The Information Economy", Hambrecht & Quist LLC Institutional Research, Sep. 22, 1995.
Screenshot of Home page for online yellow pages located at Internet address: WWW.bigbook.COM (6 pages), Jan. 1996.

*Primary Examiner*—Zarni Maung
*Assistant Examiner*—Patrice L. Winder
*Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear LLP

[57] **ABSTRACT**

A software interface organizes information predicated upon the geographical area of the resources about which the information is desired. A user is presented with a "viewpoint" map which may comprise, for example, an actual visually displayed map of a selected geographical area, or text information which pertains to the resources associated with the selected geographical area. A geography database, a local content database and a yellow pages database are provided to allow the user to obtain information at different levels. The geography database allows the user to browse through different geographic areas of which are ordered hierarchically, while the local content database includes information about general goods and services available within a given geographic location and the yellow pages database includes information about specific goods and services in the geographic location. Thus, the user is provided with a means whereby information which is associated with particular geographic locations can be readily accessed.

**39 Claims, 22 Drawing Sheets**





FIG. 1



FIG.2

| FIG.2A |
| FIG.2B |
| FIG.2C |

FIG.2A



*FIG. 2B*



FIG. 2C

Case: 15-1140    Document: 26    Page: 150    Filed: 03/06/2015



*FIG. 3*



*FIG. 4*



*FIG. 5*



FIG. 6



FIG. 7



FIG. 8



FIG. 9

**U.S. Patent**        Jul. 27, 1999        Sheet 12 of 22        **5,930,474**

City of Los Angeles, Ca.
Folders

Our Town (27 of 27)

- Amusement Parks
- Beaches & Hoarbors
- Calendar
- Chamber of Commerce
- City Government
- Clubs & Organizations
- Convention Center
- Directories
- Emergency Services
- Golf Courses
- Hospitals & Clinics
- Hotels & Motels
- Kid's Interest
- Museums
- Neighborhood Watch
- Opinion & Editorials
- Points of Interest
- Post Office
- Religion
- School Listing
- Shopping Malls
- Sports Teams
- Stadiums
- Theatres
- Tourist Bureaus
- Transportation
- Utilities

*FIG. 10*




Send your letters and comments to: webeditor@mail.zland.com
Copyright © 1995 Z Land, LLC. All rights reserved.

# Martin Luther King Jr. General

Martin Luther King Jr. General
12021 S Wilmington Ave.
Los Angeles, Ca.

Phone: 310−668−4321  Fax:

Electronic Mail Address:

 

Send your letters and comments to: webeditor@mail.zland.com

Copyright © 1995 Z Land, LLC. All rights reserved.

*FIG. 11*

North American Database1
Continents of

 Continents of Earth (7 of 7)

- Africa
- Antartica
- Asia
- Australia
- Europe
- North America
- South America

 

Send your letters and comments to: webeditor@mail.zland.com

Copyright © 1995 Z Land, LLC. All rights reserved.

*FIG. 12*

Case: 15-1140    Document: 26    Page: 160    Filed: 03/06/2015



| | |
|---|---|
| NAMEKEY | 1300 |
| RCITY; RREGION; RSPT; RCOUNTRY; RCONTINENT; RWORLD | 1305 |
| TITLE | 1310 |
| LCITY; LREGION; LSPT; LCOUNTRY; LCONTINENT | 1315 |
| BULLET | 1320 |
| DESCRIPTION | 1325 |
| URL HOST NAME | 1330 |
| URL DB NAME | 1335 |
| MAPS | 1340 |

*FIG. 13*

| | |
|---|---|
| YP/LIST NAME | 1400 |
| YP FORMULA | 1405 |
| YP/LIST FIELDS | 1410 |
| YP/LIST PRINT | 1415 |
| YP LIST FIELD LOGO | 1420 |
| YP LIST LOGO | 1425 |
| YP/LIST CREDITS | 1430 |
| YP/LIST BACK | 1435 |
| YP/LIST HREF | 1440 |
| YP/LIST GEO | 1445 |
| YP/LIST YP | 1450 |

*FIG. 14*

North American Database! — *1505*
CITY

*1515*

# Welcome to Los Angeles

Wheather you're4 here to live, work or play, we hope your stay in our city is prosperous and enjoyable
Our city is really many smaller communities that share diverse culture and lifestyles.

*1520*



*1528*    *1530*    *1525*

 Los Angeles
*1535* — Points of Interest for Los Angeles
Southern California
*1540* — California
United States
North America

*1550*

Send your letters and comments to: webeditor@mail.zland.com
*1560*
Copyright © 1995 Z Land, LLC. All rights reserved.

## *FIG.  15*



FOLDER NAME — *1600*

PARENT FOLDER NAME — *1610*

TITLE — *1620*

PARENT TITLE — *1630*

BULLET — *1640*

URL — *1650*

*FIG. 16*

| | |
|---|---|
| EXPIRE DATE | —1700 |
| NAME | —1705 |
| ADDRESS | —1710 |
| CITY | —1715 |
| STATE | —1720 |
| ZIP CODE | —1725 |
| PHONE | —1730 |
| FAX | —1735 |
| SKELETON HTML | —1740 |
| E—MAIL | —1745 |
| BULLET | —1750 |
| URL | —1755 |
| BUTTON COUNT | —1760 |
| LABEL URLx | —1765 |
| LISTING URLx | —1770 |
| IMAGE URLx | —1775 |
| SIC CODE | —1780 |
| KEYWORDS | —1785 |
| EXT. PRICE | —1790 |
| DESCRIPTION | —1795 |

*FIG. 17*

**U.S. Patent**          Jul. 27, 1999          Sheet 20 of 22          **5,930,474**



Los Angeles Directory
KeywordListing

Hospitals & Health Services (18 of 18)

Health Services Depatment 800–427–8700
Admin. Office–313 N Figueroa Los Angeles

General Hospital 213–226–2622
1200 N State Los Angeles

Womens Hospital 213–226–2622
1240 N Mission Rd Los Angeles

Martin Luther King Jr. General 310–668–4321
12021 S Wilmington Ave. Los Angeles

Health Services Information 213–250–8055 Los Angeles

Children's Hospital 213–226–2622
1129 N State Los Angeles

University Of Southern California Medical Center 213–226–2622
1200 N State Los Angeles

Mental Health Services 213–738–4961
2415 W–6th Los Angeles

Medical Board Of California 800–633–2322

V A Hospital 310–478–3711
Wilshire Blv. & Sawtelle Blv. West Los Angeles

East Los Angeles Neighborhood Clinic 213–725–7557
5400 Olympic Blv. Los Angeles

  

Send your letters and comments to: webeditor@mail.zland.com

Copyright © 1995 Z Land, LLC. All rights reserved.

*FIG. 18*



| | |
|---|---|
| HTML | 1910 |
| BUTTON COUNT | 1920 |
| LABEL URLx | 1930 |
| LISTING URLx | 1940 |
| IMAGE URLx | 1950 |
| OTHER FIELDS | 1960 |

*FIG. 19*

< ! -- #INCLUDE filename -- >                    2005

< !-- #INSERT ZLANDTAG text -- >                 2010

<! -- ANCHOR href text image -- >                2015

< ! -- BUTTON number -- >                        2020

<! -- COLUMNS n filename -- >                     2025

< ! -- FIELD filename -- >                        2030

< ! -- MENU n filename -- >                       2035

< ! -- URL n filename -- >                        2040

*FIG. 20*

5,930,474

**1**

## INTERNET ORGANIZER FOR ACCESSING GEOGRAPHICALLY AND TOPICALLY BASED INFORMATION

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to network interfaces which act to organize information accessible on the network and, in particular, to an Internet browser interface which acts to organize information available on the Internet based upon geographical distribution.

2. Description of the Related Art

On-line computer services, such as the Internet, have grown immensely in popularity over the last decade. Typically, such an on-line computer service provides access to a hierarchically structured database where information within the database is accessed at a plurality of computer servers which are in communication via conventional telephone lines or T1 links, and a network backbone. For example, the Internet is a giant internetwork created originally by linking various research and defense networks (such as NSFnet, MILnet, and CREN). Since the origin of the Internet, various other private and public networks have become attached to the Internet.

The structure of the Internet is a network backbone with networks branching off of the backbone. These branches, in turn, have networks branching off of them, and so on. Routers move information packets between network levels, and then from network to network, until the packet reaches the neighborhood of its destination. From the destination, the destination network's host directs the information packet to the appropriate terminal, or node. For a more detailed description of the structure and operation of the Internet, please refer to "The Internet Complete Reference," by Harley Hahn and Rick Stout, published by McGraw-Hill, 1994.

A user may access the Internet, for example, using a home personal computer (PC) equipped with a conventional modem. Special interface software is installed within the PC so that when the user wishes to access the Internet, a modem within the user's PC is automatically instructed to dial the telephone number associated with the local Internet host server. The user can then access information at any address accessible over the Internet. One well-known software interface, for example, is the NETSCAPE Browser (a species of HTTP Browser), developed by Netscape, Inc.

Information exchanged over the Internet is often encoded in HyperText Mark-up Language (HTML) format. HTML encoding is a kind of script encoding language which is used to define document content information and other sites on the Internet. As is well known in the art, HTML is a set of conventions for marking portions of a document so that, when accessed by a parser, each portion appears with a distinctive format. The HTML indicates, or "tags," what portion of the document the text corresponds to (e.g., the title, header, body text, etc.), and the parser actually formats the document in the specified manner. An HTML document sometimes includes hyper-links which allow a user to move from document to document on the internet. A hyper-link is an underlined or otherwise emphasized portion of text or graphical image which, when clicked using a mouse, activates a software connection module which allows the users to jump between documents (i.e., within the same Internet site (address) or at other Internet sites). Hyper-links are well known in the art.

One popular computer on-line service is the Worldwide Web (WWW) which constitutes a subnetwork of on-line

**2**

documents within the Internet. The WWW includes graphics files in addition to text files and other information which can be accessed using a network browser which serves as a graphical interface between the on-line WWW documents and the user. One such popular browser is the MOSAIC web browser (developed by the National Super Computer Agency (NCSA)). A web browser is a software interface which serves as a text and/or graphics link between the user's terminal and the Internet networked documents. Thus, a web browser allows the user to "visit" multiple web sites on the Internet.

Typically, a web site is defined by an Internet address which has an associated home page. Generally, multiple subdirectories can be accessed from a home page. While in a given home page, a user is typically given access only to subdirectories within the home page site; however, hyperlinks allow a user to access other home pages, or subdirectories of other home pages, while remaining linked to the current home page in which the user is browsing.

Although the Internet, together with other on-line computer services, has been used widely as a means of sharing information amongst a plurality of users, current Internet browsers and other interfaces have suffered from a number of shortcomings. For example, the organization of information accessible through current Internet browsers and organizers such as NETSCAPE or MOSAIC, may not be suitable for a number of desirable applications. In certain instances, a user may desire to access information predicated upon geographic areas as opposed to by subject matter or keyword searches. In addition, present Internet organizers do not effectively integrate the topical and geographically based information in a consistent manner.

In addition, given the large volume of information available over the Internet, current systems may not be flexible enough to provide for organization and display of each of the kinds of information available over the Internet in a manner which is appropriate for the amount and kind of data to be displayed.

### SUMMARY OF THE INVENTION

A user interface organizes information into a consistent presentation of menu selections and geographically organized information. Furthermore, at specified levels of the geographically organized information, the user is presented with the option of accessing topically organized information from among several topic selections, wherein the topical information is defined by the fact that the topical information is associated with a particular geographical area. Thus, a system and method for integrating geographically organized information with topical information is provided by the teachings of the present invention. The user interacts with the web organizer by choosing among menu selections using standard point-and-click techniques. The web organizer of the preferred embodiment translates the user's current menu selections into either a set of search engine queries that provide further menu selections, or a set of web destinations that satisfy the user's search criteria.

Furthermore, the inventors have recognized the need for a system which dynamically generates display documents in order to accommodate the various kinds of information and information formats which may be found on the Internet.

According to one preferred embodiment, the invention comprises a system which associates on-line information with geographic areas. The system comprises a computer network wherein a plurality of computers have access to the computer network and an organizer executing in the com-

5,930,474

3

puter network. The organizer is configured to receive search requests from any one of the plurality of computers. The organizer comprises a database of information organized into a hierarchy of geographical areas. The information corresponding to each one of the hierarchy of geographical areas is further organized into topics. The organizer further comprises a search engine in communication with the database. The search engine is configured to search geographically and topically. The search engine is further configured to select one of the hierarchy of geographical areas prior to selection of a topic so as to provide a geographical search area containing topical information. Finally, the search engine is configured to search the topics within the selected geographical search area.

According to one preferred embodiment, the hierarchy of geographical areas define a virtual geographical environment.

According to another preferred embodiment, the hierarchy has a structure comprising plural geographical levels into which the geographical areas are geographically categorized by size to provide a low level, one or more intermediate levels and a high level. Each of the geographical levels above the lowest level encompasses a plurality of lower level geographical areas.

According to yet a further preferred embodiment, for any given geographical search area, the plurality of topics corresponding to the geographical search area are primarily related by association with physical attributes within the geographical search area.

Under another aspect, the invention comprises a system for composing the display format of remotely accessible information in an on-line network. The system comprises at least one user computer. The user computer is configured to display remotely accessible information. The system further comprises a database which stores the remotely accessible information and a plurality of display formats. The remotely accessible information is organized into a predefined geographical hierarchy of geographical areas. Finally, the system comprises a display page composer in communication with the database and the user computer. The display page composer is configured to merge a portion of the remotely accessible information with one of the display formats to generate a display page which is communicated to the user computer.

According to a further aspect, the invention comprises a machine for locating information organized into geographically-based areas. The machine comprises a database of information accessible by a computer. The database of information is organized into a predetermined hierarchy of geographical areas comprising at least a geographical area of relatively small expanse, a geographical area of intermediate expanse and a geographical area of relatively large expanse. The area of large expanse includes a plurality of areas of intermediate expanse, and the area of intermediate expanse includes a plurality of areas of small expanse. The information corresponding to each of the hierarchy of geographical areas is further organized into topics. The machine further comprises a search engine executing in a computer and in communication with the database. The search engine is configured to select at least one geographical area in the hierarchy of geographical areas so as to define a geographical search area having a predetermined geographical boundary. The search engine is further configured to search the topics within the geographical search area.

Under yet another aspect, the invention is a system for organizing on-line information into geographically-based

4

areas. The system comprises a user computer for accessing information in a computer network; and organizer means for processing requests received from the user computer. The organizer comprises a database of information organized into a predefined hierarchy of geographical areas. The information corresponding to each of the geographical areas is further organized into topics. The organizer further comprises a search engine means for selecting one of the geographical areas prior to the selection of a topic so as to define a geographical search area. The search engine means also comprises means for searching the topics associated with the geographical search area.

Under a further aspect, the invention is a method for locating on-line information comprising the steps of: organizing a database of on-line information into a plurality of geographical areas; organizing the information corresponding to the plurality of geographical areas into one or more topics; directing a search engine executing in a computer to select one or more of the geographical areas prior to selecting a topic so as to select a geographical search area containing less than all topical information in the database on the selected topic; and displaying the topics associated with the geographical search area.

According to a still further aspect, the invention is a method of composing the display format of information stored in an on-line database. The method comprises the steps of: providing a computer accessible database which stores on-line information and a plurality of display formats wherein the on-line information is organized into a predefined hierarchy of geographical areas; generating a search request with a computer; processing the search request with a search engine to define a geographical search area containing one or more of the geographical areas; searching the geographical search area to retrieve the display format associated with the geographical search area; and merging a portion of the on-line information associated with the selected geographical search area with the retrieved display format to generate a display page containing the portion of the on-line information.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a simplified schematic block diagram that shows the general structure of a computer on-line Internet work service such as the Internet.

FIGS. 2, 2A–2C depict an overall system flow diagram that illustrates the sequence of data access a user follows to access information in accordance with the preferred embodiment.

FIG. 3 is a system flow diagram that illustrates the sequence of events that occurs when the user chooses the geography query.

FIG. 4 is a system flow diagram that illustrates the sequence of events that occurs when the user chooses the image map query.

FIG. 5 is a system flow diagram that illustrates the sequence of events that occurs when the user chooses the local content query.

FIG. 6 is a system flow diagram that illustrates the sequence of events that occurs when the user chooses the yellow page query.

FIG. 7 is a system flow diagram that illustrates the sequence of events that occurs when the user chooses the display yellow page function.

FIG. 8 is an overall system structure diagram that illustrates the data structures and search engines, as well as the

5,930,474

5

interrelation between the search engines and data structures, used to implement the preferred embodiment.

FIG. 9 is an exemplary screen display which is presented to the user when the user initially calls up the local city or region.

FIG. 10 is an exemplary display which illustrates the local content list presented to the user when the user accesses a list of topics within the selected geographic area.

FIG. 11 is an exemplary screen display which is presented to the user when the user accesses the notes portion of the yellow pages database in order to obtain information about a final destination.

FIG. 12 is an exemplary screen display which is presented to the user when the user accesses information contained within the geographic database.

FIG. 13 is a schematic diagram which illustrates the format of data contained within the geographic database.

FIG. 14 is a schematic diagram which illustrates the format of data contained within the yellow page list description (YPLD) configuration database.

FIG. 15 is an exemplary screen display which is presented to the user when the user has entered a particular city or area for which local topics are able to be accessed.

FIG. 16 is a schematic diagram which illustrates the format of data stored with the local content database.

FIG. 17 is a schematic diagram which illustrates the format of data stored within the yellow pages database.

FIG. 18 is an exemplary screen display which is presented to the user when the user accesses final destination information within the yellow pages database.

FIG. 19 is a schematic diagram which illustrates the format of data stored within the notes portion of the yellow pages database.

FIG. 20 is a schematic diagram which illustrates the format of data contained within the HTML skeleton database.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

As will be described in detail below with respect to the Figures, a preferred embodiment of the invention includes a user interface which organizes information into a consistent presentation of menu selections and geographically organized information. Furthermore, at specified levels of the geographically organized information, the user is presented with the option of accessing topically organized information from among several topic selections, wherein the topical information is customized for each geographic area to reflect topics indigenous to that area. Thus, each of the lists is primarily related by association with physical attributes within a particular geographic area. That is, although the topic selections associated with a particular geographical area may be related by chance (e.g., a particular chain of restaurants may be owned by the same company as another chain of bakeries) the essential reason for grouping the topics together is that they are associated with the same geographic area. Thus, such a system is distinguished from systems which have geographically differentiated listings for the same topic (such as job search databases which include information about jobs in different cities), since these listings are primarily related to the topic (e.g., jobs), not to the geographical area.

FIG. 1 is a simplified schematic block diagram which illustrates the general structure of an on-line computer

6

service such as the Internet. As is well understood to those of skill in the art, the Internet comprises a plurality of geographically distributed servers, interconnected by a high-speed data backbone. For example, as illustrated in FIG. 1, a plurality of routing hubs 100 interconnect via a plurality of high-speed data transfer connections 105. In one advantageous embodiment, the routing hubs 100 comprise domain name system (DNS) servers, as is well known in the art. DNS is a transfer control protocol/Internet protocol (TCP/IP) service that is called upon to translate domain names to and from Internet protocol (IP) addresses. The routing hubs 100 connect to one or more of the other routing hubs 100 via high-speed data links such as T1 links, T3 links, ATM links, etc.

The routing hubs 100 typically connect to Internet access providers (sometimes referred to as service providers) which serve as an interface between stand-alone personal computer (PC) users and the high-speed backbone of the Internet. An Internet access provider is a company or organization which provides Internet access to the public. For example, one Internet access provider is Z-LAND LLC, located in Santa Ana, Calif. As depicted in FIG. 1, an Internet service provider 108 connects to one of the routing hubs 100 via an Ethernet link 110. The ethernet link 110 communicates with a port server 112, a web organizer server 114, an E-mail server 116, a news server 118, as well as other servers (not shown in FIG. 1), as called for by the particular application. The port server 112 communicates with a plurality of modems 120 wherein one or more of the modems 120 communicates with a stand-alone PC 130 via a modem 127 and a modem link 125.

One or more of the routing hubs 100 may also connect to a local area network (LAN), such as a LAN 133 via a high-speed link 135. It should be understood that the LAN 133 may also connect to the routing hub 100 via a conventional telephone line; however, since local area networks typically have a higher volume of data traffic, it is advantageous to include a high data rate connection such as the T1 link 135 to support the volume of information which the LAN 133 will transfer to and from the Internet routing hubs 100. As depicted in FIG. 1, the LAN 133 comprises a plurality of user PCs 140, 141, and 142, which communicate with a LAN server 137 via a communications link such as a token ring link, or some other communications link, as required by the particular application.

When a user desires to access information available on the Internet, the user initiates a connection with the Internet from his PC (e.g., the stand-alone PC 130 or the LAN PCs 140, 141, 142). For instance, in the case of the stand-alone PC 130, the user instructs the modem 127 to establish communication with the port server 112 via the modem link 125 and the receiving modem 120. The port server 112 directs the communication between the stand-alone PC 130 and the routing hub 100. In addition, the port server 112 allows the user to access E-mail services, news services, and the web organizer of the preferred embodiment via the ethernet link 110.

A wide range of information and services are available to the user by accessing information at different addresses via the routing hubs 100. When the user specifies an address at which information is sought, the routing hubs 100 communicate with one another to pass the address request to the appropriate location and, thereafter, to transfer the requested information back to the stand-alone PC 130. As is well known in the art, it may happen that during the course of a single transmission, multiple paths are provided between the routing hubs 100 for the data transactions.

Case: 15-1140    Document: 26    Page: 171    Filed: 03/06/2015

5,930,474

7

In a similar fashion, communication may be established between the LAN PCs **140, 141, 142** and the Internet via the LAN server **137** and the high-speed communication link **135**.

In accordance with the teachings of the preferred embodiment, the web organizer server **114**, together with other like servers in communication with the ethernet link **110** (i.e., in communication with the Internet access provider), provides subscribing users with a geographically organized perspective of the information available by accessing the Internet. Thus, if a user is interested in finding an out-of-print book, or a good price on his favorite bottle of wine, but does not want to travel outside of the Los Angeles area to acquire these goods, then the user can simply designate the Los Angeles area as a geographic location for which a topical search is to be performed. In this example, the Los Angeles area defines a geographical search area, wherein the geographical search area is defined as a area from which topical information can be accessed, and which is a subset of the entire domain of geographic areas which can be searched for topical information. Thus, the geographic/topical organization format provided in accordance with the preferred embodiment provides the user with a valuable Internet organizing tool, since current Internet search techniques might allow the user to find the information which he is interested in, but at an undesirable location so that the user may be required to search for hours in order to find the goods or services in which he is interested at the appropriate geographic areas.

Search Method Overview

FIG. 2 is a flowchart that illustrates the overall method of the preferred embodiment whereby a user may conduct an on-line search of information based upon a geographical organization of the information. After the method begins, the user is presented with a list of geographic areas, as represented within an activity block **200**. In one advantageous embodiment, if the user is a subscriber to an Internet access provider which implements the preferred embodiment, the user's PC is preset to call up a special "local geography" menu of the Internet access provider implementing the preferred embodiment (instead of, for example, the standard Netscape home page which would normally be called up). The user is then presented with a list of geographic locations that correspond to the geography local to the user. For example, if a user lives in Huntington Beach, Calif., the list of geographic locations may include a list of cities, including Huntington Beach, within Southern Calif.

This is advantageously accomplished by loading special software into the user's PC. Typically, the user is provided with a software package including a menu program and one or more local community access discs. The menu program includes, as a pull-down option, the local city or view which the user prefers. The local community options available to the user via the pull-down menu are determined by the local community access discs which, in one embodiment, include one or more Uniform Resource Locators (URLs) designating the site on the web organizer server **114** corresponding to the local community or communities. A URL is one of two basic kinds of Universal Resource Identifiers (URIs), and comprises a string of characters which is used to precisely identify an Internet resource's type and location. Thus, the software causes the map and/or list of locations local to the user to be called up first when the user accesses the organizer.

More specifically, in one preferred embodiment, the user PC, which runs the Netscape browser and menu programs, is preloaded with information appropriate to direct the user

8

to a specified city or area display provided by the web organizer server **114**. In particular, the Netscape browser is provided with the URLs which correspond to the local city or region displays accessible from the web organizer server **114**. The URLs are provided on disc or some other media which may be downloaded to the user terminal as part of the installation software. In one preferred embodiment, the user receives a disc or discs corresponding to the local community or communities which that user designates as preferred "local" communities when the user signs up with the Internet access provider. If, for example, the user travels frequently between Los Angeles and New York City, then the user may request the discs having URLs corresponding to Los Angeles and New York City. Once the user has accessed the system a menu (see FIG. 9) is displayed to the user. As shown in FIG. 9, the menu includes a title **900** which welcomes the user to the page, and a scroll bar **910** which allows the user to select the local region or city to which the user wishes to advance (in the example depicted in FIG. 9, the scroll bar shows the "Greater Los Angeles Area" as the selected region).

If the PC has been loaded with the URL corresponding to more than one city, then the user may scroll the scroll bar up or down to each of the cities for which the PC has a URL. Once the user has scrolled to the city to which he wishes to advance, the user advances to that city by activating a connect button **920** (having a telephone icon as a graphic image). In this manner, the user is able to quickly advance to the region or city local to the user, without having to go through each level of the geographic hierarchy. It should be noted that nonsubscribers would typically be able to access the local geographic region of interest by advancing to the home page of the Internet access provider, and then advancing through the geographic hierarchy of subdirectories (i.e., from the world, to a specific continent, to a specific country, to a specific state, etc.)

Once the user has been presented with the appropriate list of geographic areas, a determination is made if the user has selected another geographic area, as represented within a decision block **205**. For example, the user may desire to obtain information about some geographic area other than the area local to the user, or the user may desire to obtain information about geographic areas within a particular city, such as points of interest within Los Angeles. If it is determined within the decision block **205** that the user has selected another geographic area, then a geography database **210** is accessed in order to call up the geographic information associated with the selection made by the user.

The geography database **210** contains hierarchically ordered geographic information. In a preferred embodiment, an image map file (see FIG. 4) may also be provided wherein the image map file contains reference maps that can be graphically displayed to the user on the user's display screen. These reference maps may be actual, geographically-accurate representations of the particular geographic area which is selected, or may instead be caricatures or icons which represent a place or service associated with the selected geographic area. This provides the topical connection to the geographic region. According to a preferred embodiment of the invention, the databases are organized in a hierarchy which descends from most universal to least universal as follows: the geographic areas are ordered first by designating all of the continents in the world; then by all of the countries in each continent; then by all state, provinces, or territories within each country; then by each region within a state, province, or territory; then by each city within a region; and, finally, by each point of interest within

A84

5,930,474

9

a city. Thus, by means of the geography database 210, a user may ascend or descend in the geographic hierarchy to the particular geographic area about which information is desired.

The geography database 210 outputs the appropriate list of geographic areas to the user so that the method returns to the activity block 200. This process continues until it is determined within the decision block 205 that the user has not selected another geographic area.

Within a decision block 215, a determination is made if the user has selected a local content topic reference. That is, once the user has located the appropriate geographic area about which information is desired, the user changes to topical references using the image map reference. In this manner, topical searches are seamlessly merged with geographical searches so that the user is able to geographically pinpoint the location of the desired goods or services in which the user is interested. For example, FIG. 10 depicts an exemplary screen display which would be presented to the user when the local content topic reference is accessed. If it is determined within the decision block 215 that the user has not selected a local content topic reference, then the method returns to the input of the decision block 205 so that the method continuously loops until the user selects either another geographic area or a local content topic reference. Once the user has selected a local content topic reference, then the user is presented with a topic list, as represented within an activity block 220.

As will be discussed below, the topic list presented to the user includes a list of topics such as business services, entertainment, news, consumer goods, historic sites, etc. Each topic within the topic list may also include a subtopic list. For example, under the topic "schools," the subtopics of elementary, high school, and colleges and universities may be included. Thus, after the user is presented with the topic list, as represented within the activity block 220, a determination is made if the user has selected another topic or subtopic, as represented within a decision block 225. If it is determined within the decision block 225 that the user has selected another topic or subtopic, then a further determination is made, as represented within a decision block 235, if the user has selected a topic for which there is no further subtopic (i.e., if the user has descended to a final destination defined by the most particular topic level for that topic branch).

If it is determined that the user has selected a topic (i.e., by pointing to the particular topic on the displayed list and clicking the mouse button) for which additional subtopics exist, the system searches for the selected topic or subtopic within a local content topic/subtopic index database 230. Once the appropriate topic or subtopic has been found within the local content database 230, the associated list for that subtopic or topic is output by the local content database 230 and presented to the user, as represented within the activity block 220.

Once the user has selected a topic for which there are no further subtopics, the web organizer server 114 accesses information relating to particular companies, enterprises, institutions, organizations, or entities associated with the selected topic. These may include federal, state or local government, businesses, individuals, and the like. For example, a list of particular stores such as "Bill's Hardware" and "ACE Hardware" may be accessible under the topic "hardware stores." Thus, if it is determined that the user has selected a topic having associated information for viewing, as represented within the decision block 235, the system accesses a yellow pages database 245, as represented within an activity block 240.

10

If the user desires to access further information about one of the particular entities listed (for example, if the user desires to contact a particular high school), then the address, phone number, etc., of that entity (e.g., high school) would be presented to the user when the user points to the desired listing and clicks the mouse button.

In one preferred embodiment, the selection of a particular listed entity can result in one of a plurality of different results. For example, in one case, the listing may be an anchor (i.e., a hyper-link) so that the user advances to a home page defined by the selected entity. In another case, upon selection of the listed entity, a special "notes" portion of the yellow pages database 245 is accessed and information relating to the particular entity is then presented to the user.

In either case, the user is presented with the opportunity to view additional information relating to the selected entity, as represented within a view information activity block 250. For example, as shown in FIG. 2C, the yellow pages database may include information such as the address, phone number, fax number, E-mail, other miscellaneous information, etc., which relates to the particular topic or subtopic selected by the user. The miscellaneous information included within the yellow pages database 245 may, for example, include interesting facts or comments about the selected topic, as well as graphical display or text advertisements, directions to the place or places associated with the topic, etc. An exemplary screen display which may be presented to the user upon access to the notes portion of the yellow pages database 245 is depicted in FIG. 11.

Once the user has viewed the information as represented within the activity block 250, the user may opt to perform another search, as represented within a decision block 260. If the user opts to perform another search, then control of the method returns to the activity block 200, where the user is presented with a list of geographic areas. As discussed briefly above, this list is advantageously defined to correspond to the particular geography of the user. If the user does not wish to perform another search, the user ends the session.

Geographic Database and Search Method

FIG. 3 is a system flow diagram that illustrates the method used in accordance with the preferred embodiment to service a geography query by the user. That is, when the user selects a geographic area (from the decision block 205 of FIG. 2), the system of the preferred embodiment processes this request and provides the request to a search engine, which searches the geography database 210 and cooperates with the search engine in order to generate the appropriate HyperText Mark-up Language (HTML) page for display to the user. For example, such a page is depicted in FIG. 12. In one advantageous embodiment of the invention, the geography database 210 includes the information to be displayed, while another database called the yellow page list description (YPLD) configuration database includes the display format information. The search engine combines the information from the geography database 210 and the YPLD configuration database to generate the HTML document.

As depicted in FIG. 3, the user initiates a regional geographic search from, for example, a personal computer (PC) or terminal connected to the Internet. As represented within an activity block 300, the Netscape browser, which is well known to those of skill in the art, assists the user in performing a regional geographic search via the conventional point-and-click method with a system mouse on an HTML anchor. That is, the user positions the mouse pointer over the listed geographic area for which a search is desired,

5,930,474

11

and depresses a mouse button to select the geographic area. The search request is transmitted via an Internet link 305, which, for example, may comprise a T1 link, a telephone line, or some wireless cellular connection that is well understood in the art. Once the search is transmitted over the Internet connection 305, a Uniform Resource Locator (URL) is translated, by a Netscape server hosting the geographical search engine 315, into a formal readable by the search engine within the local Netscape server, as represented within an activity block 310.

As discussed briefly above, a URL is one of two basic kinds of Universal Resource Identifiers (URIs), and comprises a string of characters which is used to precisely identify an Internet resource's type and location. For example, a URL includes a stem (e.g., "http://" if the document is a WWW document); a domain name of the computer on which the resource is stored (e.g., www.bruin.ucla.edu); a location within the directory structure (e.g., wpdata/eaw/); and the document name and extension (e.g., eaw-3001.cmp).

The URL request translated by the custom-designed geographical search engine 315, performs as a subroutine call to a standard database "Read" subroutine represented by a block 320. In one advantageous embodiment, the Read subroutine 320 is accessible with the "C" computer language, and is provided by the database vendor as an applications interface. Such an applications interface is defined in accordance with database application interface standard documentation as is well understood by those of skill in the art. The Read subroutine 320 identifies the records within the geography database 210 which qualify for the search request, and returns the qualifying records to the geographical search engine 315.

In one preferred embodiment, the geographic database 210 is searched with a CGI-script process. This command uses the HTTP search command sequence, and parameter passing is handled on the command line. The HTTP search command sequence defines the path to the program, followed by a question mark, followed by parameters with each parameter separated by a plus sign. For example, the URL syntax would appear as follows:

/SEARCH/GEO1?DBNAME+YPLD$_{13}$configuration+Dbview+m+name key

This exemplary command uses five parameters, as described below. Specifically, the parameter DBNAME corresponds to the name of the geography database to be searched. The YPLD configuration parameter is the name of a configuration document (stored within the YPLD configuration database 328). In one advantageous embodiment, different YPLD configuration documents may be used, depending upon the level of detail which the user desires to view concerning the information searched in the geographic database 210. The Dbview parameter specifies the "view" to use when searching and displaying a set of list entries. A view is defined as the geographic perspective from which the user wishes to conduct a given search. Thus, if a user wishes to search for a given file (specified by the Name Key parameter), then only those files within the subdivision of the geographic database 210 defined by Dbview will be searched. For example, if the parameter Dbview is specified as "city," this will cause the search engine to search those records having the designated folder name beneath the city level of the geographic hierarchy so that only points of interest having the given folder name will be searched.

In the preferred embodiment, when it is desired to display a list of common entries, such as all cities, the Dbview parameter is specified as a POI (Point Of Interest), CITY,

12

REGION, SPT, COUNTRY, CONTINENT, with an appended numerical reference which represents the type of geographic reference requesting the list. Normally, when the Dbview parameter is specified as "CITY," the displayed entry will simply be the city name designated as the NameKey parameter. When it is desired to display a list of entries, however, the Dbview parameter is specified as a point of interest (POI), CITY, REGION, etc., with the appended numerical reference which represents the type of geographic reference requesting the list. The contents of the list will differ, depending on whether it is for a country, region, state, etc. In one advantageous embodiment, the number 10 is the numerical reference associated with continents; the number 20 is the numerical reference for countries; the number 30 is the numerical reference for states, provinces, or territories; the number 40 is the numerical reference for regions; the number 50 is the numerical reference for cities; and the number 60 is the numerical reference corresponding to points of interest. Note that the YPLD configuration parameter and the Dbview parameter should be used in the correct combinations so that the correct HTML is generated for the appropriate geographic view.

As an example, if the Dbview parameter is specified as SPT20, this causes all states, provinces and territories within the parent country to be listed. In this case, the parent country would be the country containing the state, province or territory specified in the NameKey parameter. As used herein, a "parent" entry is an entry (e.g., geographic or topical) which encompasses one or more children entries within the geographic or topical hierarchy, and a "child" entry is an entry which is encompassed by a parent entry within the geographical or topical hierarchy.

The fourth parameter, signified by the letter m, is an integer number that represents the number of entries to skip. This parameter may be used by the Read subroutine 320 whenever there are more than 50 entries in a list and scrolling is to be supported. In a preferred embodiment, the first search has this value always entered as zero, and subsequent scroll searches increment this value to support scrolling. Finally, the NameKey parameter indicates the name of the folder to display. As used herein, a folder is defined as a list of entries designated by a single name and accessible by that single name. Any entry whose parent folder name matches the name specified will be returned by the search.

In addition, the geographical search engine 315 performs the function of merging the information provided in the geography database 210 and the YPLD configuration database 328. The format of information contained within the geography database and the YPLD configuration database is described in greater detail below with reference to FIGS. 13 and 14, respectively.

Once the search engine has processed the request and accessed the appropriate information within the geography database 210 via the Read subroutine 320, an HTML page is generated by the cooperation of the geographical search engine 315, the YPLD configuration database 328, and the geography database 210, as represented within an activity block 325. The generated HTML page includes additional search references, which represent geographical locations associated with the geographic areas selected in the search. For example, if the continent of North America is the geographic area that is selected by the user in the search, then the generated HTML page will include Canada, the United States of America, and Mexico as additional search references listed beneath the selected North American continent. The HTML document is then sent to the user via the

5,930,474

| 13 | 14 |

Netscape server (i.e., one of the routing hubs 100 which serves as the Internet link 305), as represented within an activity block 330. A sample HTML document is included in Table 4. In this manner, the HTML page may be displayed on the user's terminal via the Netscape browser interface, as represented within an activity block 335.

Image Map File and Search Method

FIG. 4 is an exemplary system flow diagram that illustrates the method used in accordance with the preferred embodiment to process an image map query initiated by the user. When the user initiates an image map query, either an actual map or a caricature or icon map) is associated with the specific geographic area selected by the user. This reference map is included in the HTML document which is presented to the user on the user's PC terminal. For example, if the user selects the United States of America, then this query might result in a map of the United States with the borders of each state defined in the map to be displayed on the user's terminal.

As illustrated in FIG. 4, the user initiates an image map query via the Netscape browser, as represented within an activity block 400. An image map query may be a geographical or topical query which is made by clicking a system mouse button while the mouse pointer is positioned over selected coordinates of a graphical image. A URL corresponding to the region of the graphical image over which the mouse pointer is positioned is then generated. For example, a geographical image map query might be generated when the user positions the mouse pointer over the image of the state of California within a map of the United States of America and clicks the mouse button. Alternatively, a topical image map query might be generated when the user positions the mouse pointer over the image of a school house and clicks the mouse button.

More specifically, the user selects a point to visit within the image by using the mouse point-and-click selection method. The image map mouse coordinates are then transmitted via the Internet link 305 to a Netscape server. Within the Netscape server, the image map mouse coordinates are sent to a standard common gateway interface (CGI) program 420 which translates the image map mouse coordinates into a URL reference, as represented within an activity block 410. The image map program 420 acts to read a map file 425 in order to obtain a URL reference that matches the mouse click coordinates. More specifically, the image map program 420 identifies the record within the map file 425 which is associated with the mouse coordinates. The configuration of data stored within the map file 425 and the program structure of the CGI program are well known to those skilled in the art. An example of this image map method is documented in many reference sources including "The HTML Sourcebook" by Ian S. Graham, John Wiley & Sons, 1995 ISBN at 471-11849-4.

In one advantageous embodiment, the geography database 210 and the map file 425 are accessible as if they constituted a single database using industry-standard image map programs, together with ASCII text files, to store topical information references relating to each geographical search. The image map program 420 uses the map file 425 to generate a URL reference, as represented within an activity block 430.

Finally, the URL reference is transmitted back to the Netscape server 440 which transfers the URL reference to the Netscape browser for display to the user 450. The YPLD configuration database 328 includes information concerning what header and trailer information should be displayed when a geographic search result is displayed to the user.

An exemplary HTML document which incorporates an image map is shown in FIG. 15. In one advantageous embodiment, the image map can serve as a bridge between the geographical and topical information accessible to the user via the system of the preferred embodiment. For example, if the user has advanced to the Los Angeles area via the geographical search, and wishes to obtain topical information concerning the educational institutions within the Los Angeles area, the user can position a mouse pointer over the portion of the image map which represents educational institutions, and click the mouse button to pull up information from the topical (i.e., local content) database 230.

Local Content Database and Search Method

FIG. 5 is a system flow diagram that illustrates the general method used in accordance with the preferred embodiment to process a local content query initiated by the user. That is, when the user wishes to obtain topical information, the user initiates a local content search using the conventional point-and-click method with a mouse. As shown in the geographical queries, the local content list (see, for example, FIG. 10) includes a listing of several topics and subtopics over which the user may position a mouse pointer and click to select that particular topic or subtopic as a search query. The result of this query, after processing over the Internet, is the display of a new list which shows the subtopics associated with the selected topic.

As represented within an activity block 505 in FIG. 5, the user performs a local content search using conventional click-and-point techniques with a mouse. As with the regional geographic search, the local content search is performed using the instrumentality of the Netscape browser interface. In one advantageous embodiment, the Internet access provider sends an HTML document to the Netscape browser which includes a list of URI.s for every hyper-link. When the user activates a hyper-link to another document (e.g., by clicking the mouse button while the mouse pointer is positioned over the appropriate region), the corresponding URL is provided to the Netscape server by the browser. The search request is transmitted via the Internet link 305 to one of the Netscape servers, which translates the URL to a format which can be interpreted by a local content search engine 520. The translation of the URL is represented within an activity block 310, which is substantially similar to activity block 310 of FIG. 3.

The local content search engine 520, which in one embodiment comprises an executable file which operates on the Netscape server, passes the translated URL to the Read subroutine 320 which used the URL to search the local content database 230 via the Read subroutine 320.

In one preferred embodiment, the local content database 230 is searched with a CGI-program process. This command uses the HTTP search command sequence, and parameter passing is handled on the command line. The HTTP search command sequence defines the path to the program, followed by a question mark, followed by parameters with each parameter separated by a plus sign. For example, the URL syntax would appear as follows:

/SEARCH/LC1?DBName+YPLD_Configuration+DBView+m+FolderName

This exemplary command uses five parameters, as described below. Specifically, the parameter DBName corresponds to the name of the local content database to be searched. The YPLD configuration parameter is the name of a configuration document (stored within the YPLD configuration database 328). In one advantageous embodiment, different YPLD configuration documents may be used to limit the

5,930,474

15

entries or to affect the ordering of the entries which the user desires to view concerning the information searched in the local content database 230. The Dbview parameter specifies the "view" to use when searching and displaying a set of list entries. A view defines the set of entries from which the user wishes to conduct a given search. Thus, if a user wishes to search for a given topic or list of topics (i.e., the folder specified by the FolderName parameter), then only those entries within the subdivision of the local content database 230 defined by Dbview will be searched. For example, if the parameter Dbview is specified as "city," this will cause the search engine to search those topical records having the designated folder name and which are stored in the view named city.

The fourth parameter, signified by the letter m, is an integer number that represents the number of entries to skip. This parameter may be used by the Read subroutine 320 whenever there are more than 50 entries in a list. This value is always started as zero and incremented to provide a search scrolling feature. Finally, the folder name parameter indicates the name of the folder to display. As used herein, a folder is defined as a list of entries designated by a single common name and accessible by that single name. Any entry whose parent folder name matches the name specified will be returned by the search.

Once the appropriate topic or subtopic information is located within the local content database 230, the local content search engine 520 using information provided by the YPLD configuration database 328, together with the information output by the local content database 230 via the Read subroutine 320, generates an HTML page that lists the topics or subtopics associated with the topic which was the search request. For example, if the topic "schools" was the object of the search request, then an HTML page that lists subtopics such as elementary schools, middle schools, high schools, and colleges and universities would be generated, as represented within an activity block 530. The format of information contained within the local content database 230 is depicted in FIG. 16, and will be described in greater detail below.

In addition, if a given topic or subtopic includes final destinations (i.e., subjects about which information such as telephone numbers, addresses, etc., is available), such information may be presented for viewing by the user by accessing the yellow pages database 245, as described below. Once the HTML document has been generated, this document is sent to the user via the Netscape servers and the Internet link 305, as represented within an activity block 330. A sample local content HTML document is included in Table 3. Finally, the HTML document is displayed on the user's terminal via the Netscape browser interface, as represented within an activity block 335.

Yellow Pages Database and Search Method

FIG. 6 is a system flow diagram that illustrates the general method used in accordance with the preferred embodiment to process a yellow page query initiated by the user. That is, when the user wishes to access information about individual goods, services, or other topics, (i.e., final destinations), the user points to and clicks over the given topic or subtopic in order to view the individual information pertaining to that topic or subtopic. This transfer to the yellow page query is defined as a final destination in the local content HTML document 335.

Thus, as depicted in FIG. 6, the user requests a yellow page search via the click-and-point method, as represented within an activity block 610. This request is passed to the Internet via the Netscape browser interface. Once the request

16

is passed over the Internet link 305, the URL generated by the Netscape browser is translated by the local Netscape server 310 into a format that is readable by the yellow pages search engine 620. The translation of the URL into a format that is readable by the Read subroutine 320 is represented within an activity block 620.

Like the geography search engine and the local content search engine, the yellow pages search engine 620 is advantageously implemented as an executable file that operates on the Netscape server, and operates in substantially the same manner as the geography search engine and the local content search engine to translate the URL into the appropriate format for use by the Read program to access the yellow pages database 245. The format of data stored within the yellow pages database 245 is depicted in FIG. 17, and will be described in greater detail below.

A search command used for the yellow pages database differs from the search command used with the geographic or local content databases 210, 230 in that one or more key word parameters may be used in place of the folder name parameter passed for the searches performed on the geographic and local content databases 210, 230. When a key word search is performed, any entry whose key word matches the value specified (partial match, ignoring case) will be returned as a search result. In addition, more than one key word may be searched at a time.

Once the Read subroutine 320 locates the information to be viewed, this information is passed to the yellow pages search engine 620. Thereafter, the search engine 620, in cooperation with the information provided by the yellow page database 245, and the YPLD configuration database, is used to generate an HTML page that lists the desired information. For example, FIG. 18 shows an exemplary screen shot which depicts an HTML page that might be displayed to the user when information from the yellow page database 245 is viewed. The generation of the HTML page is represented within an activity block 630.

Thereafter, the HTML page, together with the appropriate listings and button options (as defined by the YPLD configuration database), is sent to the user via the Netscape server and the Internet link 305, as represented within an activity block 330. A sample yellow pages HTML document is included as Table 2. Finally, the HTML document (e.g., the document of FIG. 18) is displayed to the user on the user's PC terminal in the format provided for by the Netscape browser interface, as represented within an activity block 335.

Yellow Page Note Query and Retrieval

FIG. 7 is a system flowchart that illustrates the method used in accordance with the preferred embodiment to process a yellow page display request initiated by the user. That is, when the user wishes to display information stored within the yellow page database 245 associated with an individual entity (i.e., a final destination of the yellow pages database), the user utilizes the conventional point-and-click method to initiate a yellow page display request. For example, once the user has advanced to a list of final destinations (e.g., Bill's hardware, ACE Hardware, and Handyman's Home Supplies under the topic of "Hardware Stores") using the yellow pages search engine, the user simply positions the mouse pointer over the appropriate final destination and clicks to access further information via the Notes portion of the yellow pages database 245. Thus, as depicted in FIG. 7, the user requests a yellow page search via the click-and-point method, as represented within an activity block 710.

This request is passed to the Internet via the Netscape browser interface. Once the request is passed over the

**A88**

5,930,474

17

Internet link 305, the URL generated by the Netscape browser is translated within a Netscape server 720 into a format that is readable by the note search engine 730. The Note search engine operates in substantially the same manner as the yellow pages search engine 620 to translate the URLs. Of course, it will be understood by those of ordinary skill in the art that due to the difference in the format of the data contained in the Notes portion of the yellow pages database 245 from the format of data contained in the other databases (e.g., the local content database), a slightly modified translation method will be used in the note search engine 730.

The note search engine 730 is advantageously implemented as an executable program that operates on the Netscape server. The format of the data contained within the notes portion of the yellow pages database 245 is shown in FIG. 19. More specifically, the search command used in accordance with the notes search engine is significantly different than that used in accordance with the geographic and local content databases 210, 230. In one actual embodiment, only three parameters are used in the search command. The first search parameter is the database name, which is the name of the yellow page containing the data to print. The second parameter is a note identifier, which defines the database storage or record number for that specific record or document in the notes portion of the yellow pages database 245. Thus, the second parameter constitutes a unique record identifier containing the information to publish. Finally, the third parameter passed is the name of the field in the record which contains the name of the HTML skeleton file 750. For example, the command line \SEARCH\NOTE?HB+YP+23467128 displays the entry 23467128 from the HP\YP database. The HTML skeleton file name is stored in the entry "23467128" in the field HTML.

Once the Read subroutine 320 locates the information to be viewed, this information is passed to the note search engine 730. Thereafter, the note search engine 730, in cooperation with the information provided by the notes portion of the yellow page database 245 and an HTML skeleton file 750, is used to generate an HTML page that lists the desired information. For example, FIG. 11 shows an exemplary screen shot which depicts an HTML page that might be displayed to the user when information from the notes portion of the yellow page database 245 is viewed. The generation of the HTML page is represented within an activity block 740.

The HTML skeleton file 750 serves a function which is similar to that provided by the YPLD configuration database 328. Specifically, the HTML page is generated using format information contained within the HTML skeleton file 750. However, in contrast to the YPLD configuration database 328, the HTML skeleton file 750 stores a template which is configurable based upon the type of information available within the retrieved notes document (i.e., the document 55 retrieved from the notes portion of the yellow pages database 245). A sample HTML skeleton file is included in Table 5. For example, if the information contained within the notes document includes a fax number, an E-mail address and an advertisement graphical image, the notes document will include a header field which designates which template parameters should be used to dynamically construct an HTML page suited for the display of the information contained within the notes document. An exemplary illustration of the format of data contained within the HTML skeleton file 750 is depicted in FIG. 20, and described in greater detail below.

18

Thereafter, the HTML page, together with the appropriate listings and button options, is sent to the user via the Netscape server and the Internet link 305, as represented within an activity block 330. A sample Note HTML document is included as Table 1. Finally, the HTML document (e.g., the document of FIG. 11) is displayed to the user on the user's PC terminal in the format provided for by the Netscape browser interface, as represented within an activity block 335.

Overview System Data Structure

FIG. 8 is an overall system data structure diagram that illustrates the relationships between the multiple databases and executable files used as search engines to access the databases. As shown in FIG. 8, the user interfaces with the Internet via the Internet link 305 and an HTTP browser 830 (e.g., the Netscape browser). An HTTP server 820 represents the local Internet server to which the user connects when communication is established on the Internet. This HTTP server 820 runs a plurality of executable program (or cgi-programs) which act as search engines for accessing information on the several databases within the system of the preferred embodiment. More specifically, the HTTP server 820 is configured to run the GEO1.EXE executable file, which serves as the geographical search engine 315; the IMAGEMAP.EXE executable file, which serves as the image map program 420; the LC1.EXE executable file, which serves as the local content search engine 520; the YP2.EXE executable file, which serves as the yellow pages search engine 620; and the NOTE.EXE executable file, which serves as the note search engine 630.

It will be appreciated by those of skill in the art that although the HTTP server 820 is represented as a single server in FIG. 8, the HTTP server 820 of FIG. 8 may actually represent multiple servers as called for by the specific application. Each of the executable files which act as search engines when run on the HTTP server 820 communicates with one or more databases stored in memory in a LOTUS/NOTES database environment on the HTTP server 820. Specifically, the image map program 420 communicates with the map file 425 the geographical search engine 315 communicates with the geography database 210, as well as the YPLD configuration database 328, which is used in conjunction with the geographical search engine 315 to generate the HTML page; the local content search engine 520 communicates with the local content database 230, as well as the YPLD configuration database 328; the yellow pages search engine 620 communicates with the yellow pages database 245, as well as the YPLD configuration database 328; and the note search engine 630 communicates with the yellow pages database 245, as well as the HTML skeleton file. Each of the search engines outputs data to an HTML document 810, which in turn is processed by the HTTP server 820 and which sends HTML documents to the HTPP Browser 830 through the Internet link 305.

It should be noted that each of the databases described above need not comprise a single database stored in a single computer. In practice, the databases can actually comprise information stored over several of the routing hubs 100.

Geographic Database

FIG. 13 is a schematic diagram which illustrates the format of data stored within the geographic database 210. Sample entries for the geography database 210 are included in Table 7. A first field 1300, designated as the namekey field, contains the data word which is the key under which the geographic hierarchy is recorded and searched. Each namekey should be unique within the database. For example, in a preferred embodiment, the namekey consti-

5,930,474

19

lutes a character string built from other namekey values that appear in the current entry's hierarchy. That is, the namekey character string which designates a particular city is constructed from the namekey of the continent, country, state, and region namekeys for the continent, country, state, and region in which the city is located. For example, the city of Huntington Beach will have a namekey constructed from the namekey corresponding to North America, the United States, California, and Southern California.

Each namekey is made unique by appending text to its parent's hierarchical name. The naming convention is to use two capital letters for continents, four or fewer capital letters for countries, states, provinces or territories, regions and cities. Points of interest can be designated by any text, but a short name is best. A dot is used to separate each name part. For example, the namekey value NA.US.CA.SC.HB where the continent is North America, the country is the United States Of America, the state is California, the region is Southern California and the City is Huntington Beach. Thus, the namekey for the City of Huntington Beach is constructed from the hierarchy of parent namekeys together with the appendix HB designating the particular city.

Once these namekeys have been established, they should not be changed. This is because subentries contain a reference to these names as their parent hierarchy so that to change a namekey for one location would require changing the namekey for all locations contained in the hierarchy beneath the location which has its namekey changed.

The data contained within the geographic database **210** also includes reference fields **1305** which include a reference city, reference region, reference state, province or territory, reference country, reference continent, and reference world values. These values are the parentage name keys related to the current entry, and provide the key to displaying related entries to the internet user, and are automatically inherited from the parent entry. These reference values are used to retrace the path back through the geographic hierarchy when the user wishes to return to a related (e.g., parent) location display screen.

The data stored within the geographic database **210** also includes a title field **1310** which stores text data that is shown to the user as the descriptor for this particular entry. The title may be modified at any time. For example, FIG. 12 includes the title "Earth" which corresponds to the text stored within the title field **1310**.

The data stored within the geographic database **210** further includes label fields **1315** which include text fields shown to the user as folder titles (i.e., listed areas under the selected geographic area) for each of the parent geographic entries related to the current entry. Text fields are included for cities, regions, states, provinces or territories, countries, or continents. For example, if the user selects the state of California as the current entry, then the names of the parent geographic areas related to the state of California (i.e., the United States of America, North America, and the World) will be taken from the label fields **1315** and displayed in the HTML document. In addition, the children entries related to the state of California are then inserted beneath the "California" entry by the geographical search engine **315** based upon the value of the Dbview parameter, as will be discussed in greater detail below. The label field **1315** is automatically inherited from the parent entry, and the values within the label field **1315** should not be changed.

A bullet field **1320** comprises the name of a file containing a graphical image to highlight one or more of the listed text entries from the label field **1315**. Normally, a yellow ball, or other graphic, will be displayed next to each listed entry. If

20

some graphic other than a yellow ball is to be displayed, then the name of a file corresponding to that graphic is entered within the bullet field **1320**. Usually, this will be one of the generic images stored on the server. Advantageously, the bullet field **1320** should contain an absolute path name, for instance, \BULLETS\YELLOWBALL.GIF.

A description field **1325** contains HTML text which is displayed for a nonlist entry. This text may, for example, include information about the current entry, or may provide the user with a greeting, etc. It should be noted that in one embodiment this text does not contain any new line characters (carriage returns), since these denote the end of a text file to the Lotus/Notes interface.

A URL host name field **1330** contains a path name to the URL host associated with each HTML anchor reference generated for an entry. Whenever an HTML anchor reference is generated for an entry, it is first assumed that this anchor reference is on the current HTTP host, unless a different host name is specified within the URL host name field **1330**.

A URL DB name field **1335** specifies a database name whenever an HTML search reference is generated for an entry. It should be noted, however, that whenever an HTML search reference is generated for an entry, that the search reference is first assumed to be within the current database unless a different name is specified within the URL DB name field **1335**.

Finally, the data stored within the geographic database **210** includes a maps field **1340**. The maps field **1340** is an HTML text area which is displayed after the description text. If the field begins with the keyword IMAGEMAP:, then the text immediately following the colon is presumed to be the name of the image map and a matching graphics image format file. When the IMAGEMAP: keyword is found, an HTML anchor and associated ISMAP reference is automatically generated. For example, if the maps field **1340** begins with the keywords IMAGEMAP:SAMPLE, then an anchor will be created using IMAGEMAP, wherein IMAGEMAPS/SAMPLE.MAP is the image map configuration and \HTTP\IMAGEMAPS\SAMPLE.GIF is the graphic image to be displayed. In this manner, graphic image files may be seamlessly merged with text files and displayed to the user within the HTML document.

The YPLD Configuration Database

FIG. 14 schematically depicts the format of data stored within the YPLD configuration database **328**. Sample entries to the YPLD configuration database are included in Table 6. As discussed briefly above, the YPLD configuration database acts as a kind of resource which is accessed during the main operating procedure to generate HTML documents during geographic and topical queries. The data stored within the YPLD configuration database **328** is shown in FIG. 14 to include a header which comprises a YP list name field **1400** which includes the YPLD configuration name specified on the search command line. A YP formula field **1405** contains the formula (in database selection syntax) specifying a subset of the view to search. That is, using the formula field **1405**, a publisher can specify a particular subtopic or subview (as a sort of appendix to the search name) in order to more quickly access the information desired for a given application. Thus, the YP List Formula field **1405** is particularly advantageous in implementations where it is desirable to advance to a prespecified topic without the necessity of advancing through each level of topical information which encompasses the desired topic.

The data contained within the YPLD configuration database **328** further includes a YP list fields field **1410**. The field

5,930,474

21

1410 contains a list of fields to display within the HTML document. These fields are separated by commas and are listed in the order in which they are to be displayed. Empty square brackets can be entered in this field (i.e., instead of a field name) to designate that a button, defined by the label, listing and image URLs, is to be printed in that region of the text.

A YP list print field 1415 stores a text label to display before each field. If no label is to be printed for a given field, a hyphen is used within the YP list print field 1415. The labels are entered in their print order, separated by commas. Furthermore, HTML mark-up tags can be specified within the labels.

A YP list logo field 1420 includes an HTTP relative path name of a graphics image format file to use as the bullet for this list. As discussed above, a bullet is a small logo or graphic icon which is placed before important items within a list displayed to the user. If this field is left blank, the default bullet file (e.g., \BULLET\YELLOW.GIF) is used. A YP list logo field 1425 specifies an HTML string that is displayed at the top of the page. This can include the database title and the database view. In one embodiment, a "%s" symbol is advantageously used where each is to be displayed, in accordance with known script encoding techniques. The parameters are always printed in title and view order. If the YP List Logo field is not specified, the following default string is used:

<center><B>%s</B><br><B>%s</B></center><br>

A YP list credits field 1430 specifies an HTML string that is displayed at the bottom of the page. This should be used to print credits and other trademark text for content that appears on the page displayed to the user.

A YP List Background field 1435 includes the name of a graphics image format file to use as a document's background. For example, a solid color, or some other appealing pattern or design, could be used and stored in a convenient graphic image format.

A YP list HREF field 1440 contains the URL preface to use whenever a URL references HREF. A YP list GEO field 1445 includes the URL preface to use whenever a URL references the geographic database 210. Finally, a YP list YP field 1450 includes the URL preface used whenever a URL references the yellow pages database 245.

It should be noted that although data stored within the YPLD configuration database 328 may include any one of the fields 1400 through 1450 described above, in practice, not all of these fields are used in each application. More specifically, in one preferred embodiment, when data from the geographic database 210 is merged with the YPLD configuration document, only the fields 1400, 1425, 1430 and 1435 of the YPLD configuration database 328 are used when the YPLD configuration document is used in conjunction with the local content database 230, all of the fields are used, with the exception of the fields 1405 through 1420. Similarly, each of the fields within the YPLD configuration document are used, with the exception of fields 1440 through 1450, when the YPLD configuration file is merged with data provided by the yellow pages database 245.

FIG. 15 illustrates an exemplary display which may be presented to the user when the user accesses a geographic location within the geographic database 210 having anchors which allow the user to access topics from the displayed HTML document. The screen display depicted in FIG. 15 might, for example, be the screen display presented to the user after the user activates the connection button 920 within the screen display of FIG. 9.

As depicted in FIG. 15, the screen display includes a database title and view area 1505 which includes text from

22

the YP list logo field 1425 (FIG. 14). In the example shown in FIG. 15, the database title is "North American Databasel" and the view is "city." A display region 1515 includes a short description text which corresponds to the text stored within the description field 1325 (FIG. 13).

A graphic display 1520 comprises a plurality of icons 1525, 1528, etc. and corresponds to the graphics image format (GIF) file stored within the maps field 1340 of data stored within the geographic database 210. As discussed briefly above, the graphic image 1520 may serve as a bridge between the geographic and local content information. That is, topical information may be accessed via the graphic image 1520, while the graphic image 1520 is associated with a particular geographic location, such as the City of Los Angeles. In order to access topical information, the user may position a mouse pointer over one of the icons and click the mouse button. For example, if the display of FIG. 15, if the user wishes to obtain information about schools, the user would position the mouse pointer over the school icon 1525 and depress the mouse button, while if the user was interested in obtaining information about entertainment, the user would position the mouse pointer over the entertainment icon 1528 and depress the mouse button, etc. In this manner, a seamless interface may be provided between topical and geographic information to provide a seamless search method which bridges between the geographic and topical information in an intuitive and easy-to-use manner.

The display of FIG. 15 further includes an entry display field 1530 which includes the text stored within the field 1310 of FIG. 13, and a bullet display logo 1535 which is taken from the graphics image format file designated within the bullet field 1320 (e.g., a yellow ball). A list of related entries 1540 is also shown in FIG. 15, and this list is derived from the text stored within the label field 1315 of FIG. 13 and from the Dbview parameter specified in the search command. As depicted in FIG. 15, the related fields follow the chain of geographic areas hierarchically back to the most universal area (i.e., North America in this case).

Each of the underlined listings serve as anchors which generate a search request when activated by the user. For example, the entry "Points of Interest for Los Angeles" generates a call to the geographical search engine 315. The URL for this anchor is generated using the DBview parameter (i.e., associated with the search command for the geographical search engine 315) and the NameKey for the city (i.e., the city of Los Angeles in this example). Since the anchor lists the points of interest for the whole city of Los Angeles (as indicated by the suffix "for Los Angeles"), this indicates that the DBview parameter used to generate the URL includes a numerical designation (i.e., POI50) to indicate to the geographical search engine 315 that a list of entries is to be generated in response to the activation of this anchor. In like manner, the entry "Southern California" generates a call to the geographical search engine 315. The URL for this anchor is generated using the DBview parameter (i.e., associated with the search command for the geographical search engine 315) and the NameKey for the region (i.e., the region of Southern California in this example). In this case, however, the DBview parameter is simply "REGION" since the anchor does not designate an entire list of entries. Similarly, the entry "California" generates a call to the geographical search engine 315. The URL for this anchor is generated using the DBview parameter (i.e., associated with the search command for the geographical search engine 315) and the NameKey for the state (i.e., the state of California in this example). In this case, the DBview parameter is simply "SPT" since the anchor does

5,930,474

23

not designate an entire list of entries. A like method is used to generate each of the anchors listed within the list of related entries **1540**.

A pair of standard buttons are displayed as logos **1550**. These buttons **1550** are standard HTML anchors and the reference to these files (i.e., which indicates where the graphics image format file used to generate these logos is stored) is hard-coded into the search engine executable file.

Finally, comments and other footer information are displayed within a footer region **1560** of the screen display. The text which is displayed within the region **1560** is taken from the YP list credits field **1430** of FIG. 14.

Local Content Databases

FIG. 16 schematically illustrates the format of data stored within the local content database **230**. Sample entries to the local content database **230** are included in Table 8. As depicted in FIG. 16, the data within the local content database **230** includes a folder name header field **1600** which provides the key or index under which all of the subentries for this entry will be stored. The folder name should be unique within the database. For this reason, in a preferred embodiment, the folder name is automatically generated. During the folder creation process, the folder name for the parent entry is provided. In one embodiment, once the folder name has been established, it should not be changed, because subentries contain a reference to this folder name as their parent folder. Thus, modifying the folder name would entail modifying each of the subentries beneath that folder name as well.

The data within the local content database **230** further includes a parent folder name field **1610**. This field provides the key to displaying related entries to the user. When a user requests a list of the contents of a folder, the name of a folder which is to be searched is provided by the user (i.e., via the Read subroutine **320**). The database returns a list of all the names whose parent folder name matches the requested name. The parent folder name field is automatically inherited from the parent entry. Like the folder name, the parent folder name should not be changed.

A title field **1620** includes a text which is shown to the user as the descriptor for this particular entry. That is, when this entry is called up by the user by accessing a listed topic (e.g., by clicking over one of the icons displayed in FIG. 15), the text within the title field **1620** is displayed to the user on the display screen at the user's terminal. Like the folder 45 name the title field should not be changed.

A parent title field **1630** includes text which is shown as the folder title to the user for this entry. This field is automatically inherited from the parent entry so that the title of the folder is automatically displayed to the user whenever the user accesses a subtopic entry related to the parent topic.

A bullet field **1640** is substantially the same as the bullet field **1320** of FIG. 13. In particular, a small yellow ball, or other simple logo, will be displayed next to an entry's title. If some other graphic is to be displayed, the name of this graphics file will be entered within the field **1640**.

Finally, a URL field **1650** includes a path name which defines the URL location to which the user is to be sent whenever this title is activated from the Netscape Browser program run on the Netscape server. A plurality of different entries may be entered within the URL field **1650**. For example, the URL field **1650** may be left blank, in which case the user is shown a list of the subentries to this entry. That is, when the URL field is left blank, this is an indication that a final destination has not yet been reached. Thus, this implies that the sub-category related to the current topic should be brought up. In another case, a URL can be entered

24

within the URL field **1650**, in which case the user is sent to the address corresponding to that URL. In one embodiment, spaces in the URL parameter field are replaced by underscores to facilitate NETSCAPE server processing (activity block **820** in FIG. 8).

Alternatively, different keywords such as the HREF keyword, the YP keyword, the GEO keyword or the NOTE keyword, could be specified within the URL field **1650** which will send the user to the database corresponding to that keyword. For example, if the YP (i.e., yellow pages) keyword is entered (e.g., YP:SCHOOL), a yellow page reference to the keyword "school" will be generated. Like references will be generated in the event that the keyword is a HREF, a GEO, or a NOTE keyword.

When HREF:, GEO: and YP: keywords are used, text follows the colon. This text is appended to the configured value to complete a URL. The intent of these keywords is to provided a generic capability for the local content database **230** so that the same list structure can be used to reference many different data sources. For instance, instead of hard-coding the reference to a yellow page directory search, the publisher can simply enter YP:SCHOOL to cause a configured value to be used for references to the yellow pages database **245**. Now the same list can be used without modifications to reference a second database by simply using a different configuration in the yellow pages search command.

YELLOW PAGES DATABASE

FIG. 17 schematically depicts the format of data as stored within the yellow pages database **245**. Sample entries to the yellow pages database **245** are included as Table 9. An expiration date field **1700** includes the date or dates that this listing expires, while a name field **1705** includes, in text form, the name to be shown on the listing. Address and city fields **1710, 1715**, respectively show the street address to be shown on the listing and the city name. In addition, a state field **1720** as well as a zip code field **1725**, respectively, include the state name and the postal or zip code of the listing.

Phone and fax fields **1730, 1735**, respectively, include the phone number of the listing to be displayed to the user and the facsimile phone number for the same listing.

A skeleton HTML field **1740** includes the name of a file containing the HTML text to use for publishing. In addition to the standard HTML tags, extended tags can be used within the skeleton HTML file **750**. As is well known in the art, an HTML tag is a segment of script code which calls a particular function to be performed. Typically, a tag is a kind of identifier that identifies an element of the HTML document (e.g., a heading or list) so that the HTTP browser is told how to display the element. The extended tags constitute a specially defined HTML function, and will be described in greater detail below with reference to FIG. 20. The default skeleton HTML is used when the skeleton HTML field **1740** is left blank.

An E-mail field **1745** includes the electronic mail address to be shown on the listing. If no E-mail address is to be shown on the listing, then this field is left blank.

A bullet field **1750** is substantially similar to the bullet fields **1320, 1640** described above. As discussed above, normally a yellow ball will be displayed next to an entry's title. If some other graphic is to be displayed, then the name of that graphics image format file is entered into this field. Usually, this will be one of the generic images stored on the server.

A URL field **1755** defines the URL location to which the user is to be sent whenever this title is activated from the

5,930,474

25

Netscape browser. If the URL field **1755** is left blank, the user is shown a list of the subentries to this entry. In addition, a URL could be entered within the URL field **1755** in which case the user is sent to the designated URL.

A button count field **1760** includes information defining the number of URL buttons defined for this entry. A label URL field **1765**, a listing URL field **1770**, and an image URL field **1775**, respectively contain information specifying the text label of the URL button X (where X is a number between 1 and button count), the URL reference for the URL button X, and a graphic image label of the URL button X.

An SIC code field **1780** includes the listing (standardized industry code) SIC coding. A keywords field **1785** includes a comma separated list of keywords with which this entry can be listed. An extended price field **1790**, although not used within one actual embodiment, is reserved for the price which the publisher charges an advertiser (e.g., for billing purposes). Finally, a description field **1795** includes text notations which are displayed to the user on the HTML document.

It should be noted that, although the fields described above are the standardly defined fields in one actual embodiment, other fields could be defined by each publisher as called for by the specific application.

FIG. 19 schematically depicts the format of data contained within the notes portion of the yellow pages database **245**. Specifically, as depicted in FIG. 19, an HTML field **1910** includes information defining the name of the HTML skeleton file. That is, as described briefly above, whenever the HTML document is generated by the notes.exe search engine **720**, the data within the notes portion of the yellow pages database **245** is merged with a file format configuration document found within the HTML skeleton database **750**. Since the HTML skeleton document has a variable format which is dependent upon the data stored within the notes portion of the yellow pages database **245**, it is important for each set of stored data, that the appropriate HTML skeleton file be designated as a header with the data so that the data will be shown in the appropriate format to the user on the display screen. The HTML skeleton file should be specified as a complete path name.

A button count field **1920** includes information specifying the number of URL buttons defined for this entry. That is, the number of buttons defined for this entry by which the user may hyper-link to another document.

A label URL field **1930**, a listing URL field **1940**, and an image URL field **1950**, respectively, specify the text label of the URL button X (where X is a number between 1 and button count), the URL reference for the URL button X, and the graphic image label for the URL button X. Finally, other fields which a user desires to publish may also be included in the other fields **1960** of the notes portion of the yellow page database **245**. For example, if it is desired to provide a graphic image as part of the advertisement or other information such as directions, a map, or other information which is desired to be presented to the user, each of these may be included as separate fields within the other fields **1960**.

Note Skeleton HTML File Extended HTML TAGS

FIG. 20 is a table which lists the configuration of the specially defined extended HTML tags incorporated as part of the preferred embodiment. The defined functions associated with the extended tags are stored within the HTML skeleton file **750**. As discussed briefly above, the generated HTML documents are significantly different since the files are dynamically created rather than formed in a static format. That is, rather than coding the text of an HTML document as a set template, the HTML code includes

26

extended tags which typically are defined to call sophisticated functions depending upon the actual data which is provided for input to the HTML skeleton files from the database entry. Thus, the format of the HTML files will vary as a function of the requested entry's data which is provided for input to the HTML skeleton files. In this manner, the note search engine **730** dynamically constructs the HTML document in accordance with the data parameters.

A first extended tag, depicted in FIG. 20, is an include tag **2005** which receives the file name as a parameter. The script form of the extended tag is: "<!-#INCLUDE filename->." When this extended tag is incorporated into an HTML document, and the HTML document is translated by the note search engine **730**, the file (having the file name indicated by the parameter filename) is then included within the displayed HTML document. An insert extended tag **2010** receives data in a text format as a parameter, and this text is then inserted into the HTML document as a tag. The script form of this extended tag is: "<!-#INSERTZLANDTAG text->."

An anchor extended tag **2015** receives up to three parameters to define anchors within the HTML document. The script form of this extended tag is: "<!-ANCHOR href text image->." The parameters href, text, and image designate field names within the yellow page database entry. The contents of these fields are then used to define the anchor. More specifically, the href parameter designates the name of a field which includes information that indicates where the user will go when the user activates the anchor (i.e., the URL location to which the user is sent when the user activates this anchor). The text parameter designates a field which contains the text for the anchor, and the image parameter designates a graphical image field which includes the image associated with the anchor. It should be noted that typically the anchor will be defined either by text or an image, although it is possible to reference the same anchor using both text and an image. Thus, if the text parameter is not passed, then no text is used for the anchor, while if the image parameter is not passed, this means that no graphic image is displayed as an anchor.

A button extended tag **2020** receives a number as a parameter. The script form of this extended tag is: "<!-BUTTON number->." The button extended tag **2020** uses the three database fields **1930**, **1940**, and **1950**, as well as the button count field **1920** (see FIG. 19) to define the button to be inserted into the document.

A columns extended tag **2025** receives two parameters including a number n and a file name. The script form of this extended tag is: "<!-COLUMNS n filename->." Using these two parameters, a menu of directory entries are created from the directories listed in the file designated by the file name parameter. The columns extended tag is particularly suited for applications where the publisher wishes to define a set of menu entries contained as a group of subdirectories on the file screen. Thus, according to this application, the columns extended tag does not generate database calls. Rather, the menu entries are defined in accordance with the specifications of the file server operating system.

Entries are listed in three columns of 28 characters each in one preferred embodiment. The named file advantageously contains one line for each directory, and each directory entry lists the directory of n characters, followed on the same line by the text title for the menu entry. That is, the parameter n specifies the character length of the directory path name. If this directory does not exist, it will be created. In the case where the directory does not exist, the anchor points to a default file in the specified directory.

5,930,474

**27**

A field extended tag 2030 inserts the contents of the field designated by a parameter fieldname into the HTML document. As is well known in the art, records stored within a database format typically include one or more fields, wherein each field is given a name so that the field is independently accessible. Thus, the name of the field which is to be incorporated into the HTML document is passed as the fieldname parameter. The script form of the field extended tag is: "<!-FIELD fieldname->."

A menu extended tag 2035 receives the file name and an integer n as parameters, and causes a menu of directory entries to be created from the directories listed in the document designated by the file name parameter. The script form of the menu extended tag is: "<!-MENU n filename->." The parameter n specifies the character length of the directory path name as discussed above.

Finally, a URL extended tag 2040 receives an integer n and a file name as parameters, and creates a menu of URL entries from the URLs listed in the file designated by the file name parameter. The script form of the extended tag is: "<!-URL n filename->." The named file contains one line for each URL and each URL entry lists the URL of n characters followed by the text title for the menu entry. If the URL does not exist, then it will be created. The parameter n specifies, in integer form, the character length of the passed URL name.

It should be noted here that the teachings of the preferred embodiment need not be limited to actual world geographic

**28**

areas. For example, in one embodiment, a similar system could be used in a virtual (e.g., an imaginary or arbitrarily constructed) geography, wherein topical information about fictional geographic areas could be accessed. Such an implementation might have application in gaming or role playing environments as well as in computer simulation environments.

Although the preferred embodiment of the present invention has been described in detail above, it will be appreciated by those of ordinary skill in the art that several obvious modifications could be made to the above-described invention without departing from its spirit or essential characteristics. For example, in addition to the Internet, the preferred embodiment could be incorporated into a centralized system, or host-based system, such as American On-Line, Compuserve, etc. Additionally, the particular geographical divisions used to define the geography database 210 could be altered based upon the particular application of the invention. Furthermore, the particular formats of information stored within each database may vary as called for by the particular implementation of the invention. For example, a publisher may wish to modify the template defined in the YPLD configuration database. Additionally, other extended tags might be defined as needed for the convenience of the publisher. Therefore, the foregoing description should be considered as illustrative and not restrictive, so that the scope of the invention should be interpreted in light of the following appended claims.

TABLE 1

Content-type: text/html
<HTML><HEAD><TITLE>Irvine Directory-</TITLE></HEAD><body background="/gifs/rock1.gif"><p><h>>center><H1>Alderwood Basic Plus</H1></center><hr><p>>center><B>Alderwood Basic Plus</B><br>22 Alderwood<br>Irvine, CA <br><br>Phone:<B>714-559-6754 </B> Fax: <B></B><br><br>Electronic Mail Address: <B></B><br><br><br></center><p><a href ="/guides/default.htm"><img src="/gifs/guidex.gif" align=middle hspace=10 border=0 alt="Guided Tours"></a><a href="/default.htm"><img src="/gifs/zbutton.gif"align=middle hspace=10 border=0 alt="Z Land"></a></p><IMG SRC="/Lines/eyes.gif" alt=" "><p>Send your letters and comments to: <a href="mailto:webeditor@mail.zland.com">webeditor@mail.zland.com </a><br><br></p>Copyright &copy; 1995 Z Land, LLC. All rights reserved.</BODY></HTML>

TABLE 2

Content-type: text/html
<HTML><HEAD><TITLE>Irvine Directory Keyword listing:Secondary_&_ Elementary</TITLE></HEAD><body background="/gifs/rock1.gif"><center><b>Irvine Directory</B><br><B>KeywordList(ng</B>)</center><br><DL><DT><IMG SRC="/icons/folder_open.gif" hspace=10 border=0> <B>Secondary & Elementary</b><a href="/search/yp2?na\ta\ca\sci\r\cityyp+STDYP+Keyword Listing+25+Secondary_&_Elementary"> (25 of 28) </a><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\cityyp+8738">Alderwood Basic Plus</a>714-559-6754 <DD>22 Alderwood Irvine </DL><DD><DL><DT><IMG SRC ="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8742">Bonita Canyon</a>714-854-8111 <DD>1 Sundance Rd. Irvine </DL><DD><DL><DT> <IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8746">Brywood </a>714-857-9230 <DD>1 Westwood Irvine </DL><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8750">College Park </a>714-551-3871 <DD>3700 Chaparral Irvine </DL><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8754">Culverdale </a>714-786-4008 <DD>2 Paseo Westpark Irvine </DL><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8758">Deerfield </a>714-559-0100 <DD>2 Deerfield Irvine </DL><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8762">Eastshore </a>714-552-7228 <DD>155 Eastshore Irvine </DL><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8766">El Toro Marine </a>714-552-7228 <DD>8371 Trabuco Rd. Irvine </DL><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8770">Greentree </a>714-551-2301 <DD>4200 Manzanita Irvine </DL><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+8814">Irvine High </a>714-552-4211 <DD>4321 Walnut Ave. Irvine </DL><DD><DL><DT><IMG SRC="/Bullets/yellow.gif hspace=10 border=0 ALT="?"><a href="/search/note?na\ta\ca\sci\r\ cityyp+9098">Irvine Unified School District </a>714-651-0444 <DD>5050 Barranca Pkwy. Irvine </DL><DD><DL><DT><IMG

**A94**

5,930,474

TABLE 2-continued

```
SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\i\
cityyp+8810">Lakeside Middle </a>714-559-1601 <DD>3 Lemon Grass Irvine </DL><DD><DL><DT><IMG
SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\i\
cityyp+8774">Los Naranjos </a>714-552-5171 <DD>1 Smoke Tree La. Irvine </DL><DD><DL><DT><IMG
SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\i\
cityyp+8778">Meadow Park </a>714-786-0121 <DD>50 Blue Lake South Irvine </DL><DD><DL><DT>
<IMG SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\i\
cityyp+8782">Northwood </a>714-551-8567 <DD>28 Cara on Irvine </DL><DD><DL><DT><IMG
SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\i\
cityyp+8822">Rancho San Joaquin Middle </a>714-786-3005 <DD>4861 Michaelson Dr. Irvine
</DL><DD><DL><DT><IMG SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a
href=/search/note/na\us\ca\sc\i\ cityyp+8818">San Joaquin High </a>714-857-2682 <DD>311 W
Yale Loop Irvine </DL><DD><DL><DT><IMG SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a
href=/search/note/na\us\ca\sc\i\ cityyp+8786">Santiago Hills </a>714-544-5362 <DD>29
Christamon West Irvine </DL><DD><DL><DT><IMG SRC=/Bullets/yellow.gif hspace=10  border=0
ALT="?"><a href=/search/note/na\us\ca\sc\i\ cityyp+8826">SELF Alternative High School
</a>714-786-5190 <DD>311 W Yale Loop Irvine </DL><DD><DL><DT><IMG SRC=/Bullets/yellow.gif
hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\i\ cityyp+8830">Sierra Vista
Middle </a>714-838-5440 <DD>2 Liberty Irvine </DL><DD><DL><DT><IMG SRC=/Bullets/yellow.gif
hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\i\ cityyp+8834">South Lake
Middle </a>714-726-8600 <DD>655 W Yale Loop Irvine </DL><DD><DL><DT><IMG SRC=/Bullets/
yellow.gif hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\i\ cityyp+8790">
Springbrook </a>714-522-6623 <DD>655 Springbrook North Irvine </DL><DD><DL><DT><IMG
SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a href=/search/note/na\us\ca\sc\
i\ cityyp+8794">Stone Creek </a>714-551-1201 <DD>2 Stone Creek South Irvine</DL><DD><DL>
<DT><IMG SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a href=/search/note/na\us\
ca\sc\i\ cityyp+8798">Turtle Rock</a>714-854-7002 <DD>5151 Amalfi Dr. Irvine
</DL><DD><DL><DT><IMG SRC=/Bullets/yellow.gif hspace=10  border=0  ALT="?"><a href=/
search/note/na\us\ca\sc\i\ cityyp+8838">University High</a>714-854-7500 <DD>4771 Campus Dr.
Irvine </DL><br><DL><centers  <IMG SRC=/icons/imgaify1.gif  alt=" " hspace=10  border=0><a
href=/search/yp27na\us\ca\sc\i\ cityyp+STDYP+Keyword listing+25+Secondary_&_Elementary"> More
from all folders...</a></centers><p><a href=/guides/default.htm"></gifs/guides.gif"
align=middle hspace=10  border=0 alt="Guided Tours"></a><a href= /default.htm"> <img
src=/gifs/zbutton.gif" align=middle hspace=10  border=0 alt="Z Land"></a></p><IMG
SRC="/Lines/eyes.gif" alt=" "><p>Send your letters and comments to: <a href="mailto:
webeditor@mail.zland.com">webeditor@mail.zland.com</a></br><br></p>Copyright &copy; 1995 Z
Land, LLC. All rights reserved.</BODY></HTML>
```

TABLE 3

```
Content-type: text/html
<HTML><HEAD><TITLE>City of Irvine, CA:City1.6.3</TITLE></HEAD><body background="/gifs
/rock1.gif"><center><B>City of Irvine, CA</B> <br><B>Folders</B></center><br><DL><DT><IMG
SRC="/icons/folder_open.gif" hspace=10 border=0> <B>School Listing</B> (3 of 3) <DD><IMG
SRC=/Bullets/yellow.gif hspace=10 border=0 ALT=" "> <a HREF="/search/yp27na\us\ca\
sc\i/\cityyp+STDYP+Keyword Listing+0+Colleges_&_Universities"> Colleges & Universities</a>
<DD><IMG SRC=/Bullets/yellow.gif hspace=10 border=0 ALT=" "> <a HREF="/search/yp27na\us\ca\
sc\i/\cityyp+STDYP+Keyword Listing+0+Preschool_&_Kindergarten"> Preschool & Kindergarten</a>
<DD><IMG SRC=/Bullets/yellow.gif hspace=10 border=0 ALT=" "> <a HREF="/search/yp27na\us\ca\
sc\i/\cityyp+STDYP+Keyword Listing+0+Secondary_&_Elementary">Secondary & Elementary </a><br>
</DL> <p><a href="/guides/default.htm"> <img src="/gifs/guides.gif" align=middle hspace=10
border=0 alt="Guided Tours"></a> <a href="/default.htm"> <img src="/gifs/zbutton.gif"
align=middle hspace=10 border=0 alt="Z Land"></a></p> <IMG SRC="/Lines/eyes.gif" alt=" ">
<p>Send your letters and comments to: <a href="mailto:webeditor@mail.zland.com">webeditor@
mail.zland.com</a><br><br></p> Copyright &copy; 1995 Z Land, LLC. All rights reserved.
</BODY>
</HTML>
```

TABLE 4

```
Content-type: text/html
<HTML><HEAD>
<TITLE>North American Database1:NA.US.CA.SC.IR</TITLE></HEAD>
<body background="/gifs/rock1.gif"><center>
<B>North American Database1</B><br><B>CITY</B></center><br><DL>
<center><H1>Welcome to Irvine</H1></center>
<p>Whether you're here to live, work or play, we hope your stay in our city is prosperous and
enjoyable.</p><p>Our city is really many smaller communities that share diverse cultures and
lifestyles. </p>
<center><a href=/cgi-bin/imagemap/~ImageMaps/NA.US.CA.SC.IR.CITYLC.map>
<img src="/ImageMaps/ourtown.gif" border=0 ISMAP alt="Our Town"></a>
```

5,930,474

31                                        32

## TABLE 4-continued

```
</center>
<DD><IMG SRC="/Bullets/yellow.gif hapace=10 border=0 ALT="" "> Irvine<br>
<DL><DD><a href="/search/geo!?geograph/NA1+GeoLoi+PO150+0+NA.US.CA.SC.IR">
Points of Interest for Irvine</a>
<DD><a href="/search/geo!?geograph/NA1+RegionDtl+REGION+ +NA.US.CA.SC">
Southern California</a>
<DD><a href="/search/geo!?geograph/NA1+SPTDtl+SPT+0+NA.US.CA"> California</a>
<DD><a href="/search/geo!?geograph/NA1+CountryDtl+COUNTRY+0+NA.US">
United States</a><DD><a href="/search/geo!?geograph/NA1+ContinentDtl+CONTINENT+0+
NA">
North America</a>
<DD><DL></DL></DL></br><br></DL>
<p><a href="/guides/default.htm"><img src="/gifs/guides.gif" align=middle
hapace=10 border=0 alt="41 Guided Tours"></a>
<a href="/default.htm"><img src="/gifx/zlutions.gif" align=middle
hapace=10 border=0 alt="Z Land"></a></p><IMG SRC="/Lines/syca.gif" ali=" ">
<p>Send your letters and comments to:
<a href="mailto:webeditor@mail.zland.com">webeditor@mail.zland.com</a><br><br></p>
Copyright &copy; 1995 Z Land, LLC. All rights reserved.</BODY></HTML>
```

20

## TABLE 5

```
<body background="/gifs/rock1.gif">
<p><hr><center><H1>
<!--FIELD Name -->
</H1></center><hr></p>
<center><B>
<!--FIELD Name -->
</B><br>
<!--FIELD Address -->
<br>
<!--FIELD City -->

<!--FIELD State -->

<!--FIELD Zipcode -->
<br><br>Phone:<B>
<!--FIELD Work -->
</B> Fax: <B>
<!--FIELD Fax -->
</B><br>Electronic Mail Address: <B>
<!--FIELD EMail -->
<!--ANCHOR ListingURL LabelURL -->
<br>
</center>
```

## TABLE 6

### Yellow Page Listing Descriptor

| | |
|---|---|
| YPListName: | STDYP |
| YPListFormula: | @All |
| YPListFields: | Name, [], Work, Address, City |
| YPListPrint: | -, -, -, <DD>, - |
| YPListField Logos: | |
| YPListLogo: | |
| YPListCredia: | |
| YPListBack: | /gifx/rock1.gif |
| YPListHREF: | /search/yp2?HB/YP+STDYP+KEY+0 |
| YPListGEO: | search/geo!?geograph>co1 |
| YPListYP: | /search/yp2?HB/YP+STDYP+KEY+0 |
| Edit New Descriptor | Done |

## TABLE 7

### Continent Record

| | |
|---|---|
| NameKey: | AF |
| Bullet: | |
| Title: | Africa |

## TABLE 7-continued

| | |
|---|---|
| | _Description_ |
| | _URLs For Listing_ |
| 25 | Maps: |
| | URLHostName: |
| | URLDBName: |
| | RWorld: |
| | |
| | _ Cross References_ |
| | Earth |
| | Continent Record |
| 30 | NameKey: | AN |
| | Bullet: |
| | Title: | Antarctica |
| | _Description_ |
| | _URLs For Listing_ |
| 35 | Maps: |
| | URLHostName: |
| | URLDBName: |
| | RWorld: |
| | _Cross References_ |
| | Earth |
| | Continent Record |
| 40 | NameKey: | AS |
| | Bullet: |
| | Title: | Asia |
| | _Description_ |
| | _URLs For Listing_ |
| 45 | Maps: |
| | URLHostName: |
| | URLDBName: |
| | RWorld: |
| | _Cross References_ |
| | Earth |
| | Continent Record |
| 50 | NameKey: | AU |
| | Bullet: |
| | Title: | Australia |
| | _Description_ |
| | _URLs For Listing_ |
| 55 | Maps: |
| | URLHostName: |
| | URLDBName: |
| | RWorld: |
| | _Cross References_ |
| | Earth |
| | Continent Record |
| 60 | NameKey: | EU |
| | Bullet: |
| | Title: | Europe |
| | _Description_ |
| | _URLs For Listing_ |
| 65 | Maps: |
| | URLHostName: |
| | URLDBName: |

5,930,474

**33**

**TABLE 7-continued**

| | |
|---|---|
| RWorld: | _Cross References_ |
| | Earth |
| | Continent Record |
| NameKey: | NA |
| Bullet: | |
| Title: | North America |
| | _Description_ |
| | _URLs For Listing_ |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _Cross References_ |
| RWorld: | Earth |
| | Country Record |
| NameKey: | NA.CA |
| Bullet: | |
| Title: | Canada |
| | _Description_ |
| | _Cross References_ |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _URLs For Listing_ |
| LContinent: | North America |
| | _Cross References_ |
| RContinent: | NA |
| | Country Record |
| NameKey: | NA.MX |
| Bullet: | |
| Title: | Mexico |
| | _Description_ |
| | _Cross References_ |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _URLs For Listing_ |
| LContinent: | North America |
| | _Cross References_ |
| RContinent: | NA |
| | Country Record |
| NameKey: | NA.US. |
| Bullet: | |
| Title: | United States |
| | _Description_ |
| | _Cross References_ |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _URLs For Listing_ |
| LContinent: | North America |
| | _Cross References_ |
| RContinent: | NA |
| | SPT Record |
| NameKey: | NA.US.CA |
| Bullet: | |
| Title: | California |
| | _Description_ |
| | _URLs For Listing_ |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _Labels_ |
| LCountry: | United States |
| LContinent: | North America |
| | _Cross References_ |
| RCountry: | NA.US |
| RContinent: | NA |
| | Region Record |
| NameKey: | NA.US.CA.NC |
| Bullet: | |
| Title: | Northern California |
| | _Description_ |
| | _URLs For Listing_ |

**34**

**TABLE 7-continued**

| | |
|---|---|
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _Labels_ |
| LSPT: | California |
| LCountry: | United States |
| LContinent: | North America |
| | _Cross References_ |
| RSPT: | NA.US.CA |
| RCountry: | NA.US |
| RContinent: | NA |
| | Region Record |
| NameKey: | NA.US.CA.SC |
| Bullet: | |
| Title: | Southern California |
| | _Description_ |

Southern California is the land of sun, golf and beaches galore.<br><br>

| | |
|---|---|
| | _URLs For Listing_ |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _Labels_ |
| LSPT: | California |
| LCountry: | United States |
| LContinent: | North America |
| | _Cross References_ |
| RSPT: | NA.US.CA |
| RCountry: | NA.US |
| RContinent: | NA |
| | City Record |
| NameKey: | NA.US.CA.SC.HB |
| Bullet: | |
| Title: | Huntington Beach |
| | _Description_ |
| | _URLs For Listing_ |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _Labels_ |
| LRegion: | Southern California |
| LSPT: | California |
| LCountry: | United States |
| LContinent: | North America |
| | _Cross References_ |
| RRegion: | NA.US.CA.SC |
| RSPT: | NA.US.CA |
| RCountry: | NA.US |
| RContinent: | NA |
| | City Record |
| NameKey: | NA.US.CA.SC.IR |
| Bullet: | |
| Title: | Irvine |
| | _Description_ |

<center><H1>Welcome to Irvine</H1></center><p>Whether you're here to live, work or play, we hope your stay in our city is prosperous and enjoyable.</p><p>Our city is really many smaller communities that share diverse cultures and lifestyles. </p>

| | |
|---|---|
| | _URLs For Listing_ |
| | OURTOWN:NA.US.CA.SC.IR.CITYLC |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _Labels_ |
| LRegion: | Southern California |
| LSPT: | California |
| LCountry: | United States |
| LContinent: | North America |
| | _Cross References_ |
| RRegion: | NA.US.CA.SC |
| RSPT: | NA.US.CA |
| RCountry: | NA.US |
| RContinent: | NA |
| | City Record |
| NameKey: | NA.US.CA.SC.LA |
| Bullet: | |

5,930,474

35

TABLE 7-continued

| Title: | Los Angeles |
| | _Description_ |

<center><H1>Welcome to Los Angeles</H1><1center><p>Whether you're here to live, work or play, we hope your stay in our city is prosperous and enjoyable,</p><p>Our city is really many smaller communities that share diverse cultures and lifestyles. </p>

| | _URLs For Listing_ |
| | OURTOWN:NA.US.CA.SC.LA.CITYLC |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _Labels_ |
| LRegion: | Southern California |
| LSPT: | California |
| LCountry: | United States |
| LContinent: | North America |
| | _Cross References_ |
| RRegion: | NA.US.CA.SC |
| RSPT: | NA.US.CA |
| RCountry: | NA.US |
| RContinent: | NA |
| | POI Record |
| NameKey: | NA.US.CA.SC.LA.Disney |
| Bullet: | |
| Title: | Disneyland |
| | _Description_ |

36

TABLE 7-continued

World famous as the happiest place on Earth.

| | _URLs For Listing_ |
| Maps: | |
| URLHostName: | |
| URLDBName: | |
| | _Labels_ |
| LCity: | Los Angeles |
| LRegion: | Southern California |
| LSPT: | California |
| LCountry: | United States |
| LContinent: | North America |
| | _Cross References_ |
| RCity: | NA.US.CA.SC.LA |
| RRegion: | NA.US.CA.SC |
| RSPT: | NA.US.CA |
| RCountry: | NA.US |
| RContinent: | NA |

TABLE 8

Local Content List Record

| List Name: | City |
| Folder Name: | City1 |
| Title: | Consumer1 |
| Bullet: | |
| URL: | |
| | _Description_ |

Local Content List Category Record

| Parent Folder Name: | City |
| Parent Folder Title: | City1 |
| Folder Name: | City.1 |
| Title: | Government |
| Bullet: | |
| URL: | |
| | _Description_ |

Local Content List SubCategory Record

| Parent Folder Name: | City.1 |
| Parent Folder Title: | Government |
| Folder Name: | City1.1.2 |
| Title: | County |
| Bullet: | |
| URL: | |
| | _Description_ |

Local Content List SubCategory Record

| Parent Folder Name: | City1.1.2 |
| Parent Folder Title: | County |
| Folder Name: | City1.1.2.1.1 |
| Title: | Adoption |
| Bullet: | |
| URL: | |
| | _Description_ |

5,930,474

37                                                                          38

TABLE 8-continued

Local Content List Category Record

| | |
|---|---|
| Parent Folder Name: | City1 |
| Parent Folder Title: | City |
| Folder Name: | City1.6 |
| Title: | Our Town |
| Bullet: | |
| URL: | |
| | _Description_ |

Local Content List SubCategory Record

| | |
|---|---|
| Parent Folder Name: | City.6 |
| Parent Folder Title: | OurTown |
| Folder Name: | City1.6.2 |
| Title: | Directories |
| Bullet: | |
| URL,URL: | http://www.zfind.com/search/1e?NA/US/CA/SC/LA/CITYLC+GeoLat+Folders+0+City1.5 |
| | _Description_ |

Local Content List SubCategory Record

| | |
|---|---|
| Parent Folder Name: | City1.6 |
| Parent Folder Title: | OurTown |
| Folder Name: | City1.6.3 |
| Title: | School Listing |
| Bullet: | |
| URL: | |
| | _Description_ |

Local Content List SubCategory Record

| | |
|---|---|
| Parent Folder Name: | City1.6.3 |
| Parent Folder Title: | School Listing |
| FolderName: | B61AD84452EE438288256292007LB123 |
| Title: | Preschool & Kindergarten |
| Bullet: | |
| URL: | /search/yp2?na\us\ca\sc\la\cityyp+STDYP+KeywordListing+0+Pre-School_&_Kindergarten |
| | _Description_ |

TABLE 9

| | | | |
|---|---|---|---|
| Expire Date: | 12/04/96 | | |
| Name: | Children's Hospital | | |
| Address: | 1129 N State | | |
| City, State: | Los Angeles, CA | Zipcode: | |
| Phone: | 213-226-2622 | Fax: | |
| EMail: | | | |
| Skeleton HTML:/HTTPSKEL/STDYP.HTM | | | |
| Bullet: | | | |
| URL: | | | |
| | _Buttons_ | | |
| Button Count: | 0 | | |
| More . . . : | Image: | | |
| | _Keywords_ | | |
| SIC Code: | | | |
| Keywords: | City Government, Hospitals & Health Services | | |
| Ext. Price: | 0 | | |
| | _Description_ | | |
| Expire Date: | 12/04/96 | | |
| Name: | General Hospital | | |
| Address: | 1200 N State | | |
| City, State: | Los Angeles, CA | Zipcode: | |
| Phone: | 213-226-2622 | Fax: | |
| EMail: | | | |
| Skeleton HTML:/HTTPSKEL/STDYP.HTM | | | |
| Bullet: | | | |
| URL: | | | |
| | _Buttons_ | | |
| Button Count: | 0 | | |
| More . . . : | Image: | | |
| | _Keywords_ | | |
| SIC Code: | | | |
| Keywords: | City Government, Hospitals & Health Services | | |
| Ext. Price: | 0 | | |
| | _Description_ | | |

What is claimed is:

1. A system which associates on-line information with geographic areas, said system comprising:

a computer network wherein a plurality of computers have access to said computer network; and

an organizer executing in said computer network, wherein said organizer is configured to receive search requests from any one of said plurality of computers, said organizer comprising:

a database of information organized into a hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas is further organized into topics; and

a search engine in communication with said database, said search engine configured to search geographically and topically, said search engine further configured to elect one of said hierarchy of geographical areas prior to selection of a topic so as to provide a geographical search area wherein within said hierarchy of geographical areas at least one of said entries associated with a border geographical area is dynamically replicated into at least o e narrower geographical area, said search engine further configure to search said topics within said selected geographical search area.

2. The system of claim 1, wherein said computer network is the internet.

3. The system of claim 1, wherein said computer network is a host-based computer system.

4. The system of claim 1, wherein said hierarchy of geographical areas define a virtual geographical environment.

5. The system of claim 1, wherein said hierarchy has a structure comprising plural geographical levels into which

**A99**

5,930,474

the geographical areas are geographically categorized by size to provide a low level, one or more intermediate levels and a high level, each of the geographical levels above the lowest level encompassing a plurality of lower level geographical areas.

6. The system of claim 5, wherein said low level is a city, said intermediate level is a territory and said high level is a state.

7. The system of claim 1, wherein said geographical search area is the world.

8. The system of claim 1, wherein said geographical search area is a continent.

9. The system of claim 1, wherein said geographical search area is a country.

10. The system of claim 1, wherein said geographical search area is a state.

11. The system of claim 1, wherein said geographical search area is a provence.

12. The system of claim 1, wherein said geographical search area is a territory.

13. The system of claim 1, wherein said geographical search area is a city.

14. The system of claim 1, wherein said geographical search area is a point of interest.

15. The system of claim 1, wherein said search engine selects one of said topics associated with said geographical search area.

16. The system of claim 1, wherein said topics are hierarchically organized.

17. The system of claim 1, wherein at least one of said entries corresponding to said geographical search area is primarily related by association with physical attributes within said geographical search area.

18. The system of claim 1, wherein said entries comprises a plurality of data records wherein each of said data records is associated with at least one of said topics and at least one of said geographical areas.

19. The system of claim 18, wherein said plurality of data records contains information about a plurality of institutions or enterprises.

20. A machine for locating information organized into geographically-based areas, said machine comprising:

a database of information accessible b a computer, said database of information organized into a predetermine hierarchy of geographical areas comprising at least a geographical area of relatively smaller expanse and a geographical area of relatively larger expanse, said area of larger expanse including a plurality of areas of smaller expanse and wherein entries corresponding to each of said hierarchy of geographical area is further organized into topics; and

a search engine executing in a computer and in communication with said database, said search engine configured to select at least one geographical area in said hierarchy of geographical areas so as to define a geographical search area wherein at least one of said entries in said geographical area of relatively larger expanse is dynamically replicated into at least one of said geographical areas of smaller expanse, said search engine further configured to search said topics within said geographical search area.

21. The machine of claim 20, wherein said hierarchy of geographical areas define a virtual geographical environment.

22. The machine of claim 20, wherein said search engine displays a list of said geographical areas when one of said requests directs said search engine to access said database.

23. The machine of claim 20, wherein at least one of said entries corresponding to said geographical search area are primarily associated with physical attributes within said geographical search area.

24. The machine of claim 20, wherein said entries comprise data records wherein each of said data records is associated with at least one of said topics.

25. The machine claim 24, wherein each of said data records contains information about a particular institution or enterprise.

26. A system for organizing on-line information into geographically-based areas, said system comprising

a user computer for accessing information in a computer network; and

organizer means for processing requests received from said user computer, said organizer comprising:

a database of information organized into a predefined hierarchy of geographical areas, wherein entries corresponding to each of said geographical areas is further organized into topics; and

search engine means for selecting one of said geographical areas wherein at least one of said entries associated with a broader geographical area is dynamically replicated into a narrower geographical area, said search engine means also comprising means for searching said topics associated with said geographical search area.

27. The system of claim 26 wherein said entries comprise data records wherein said data records are associated with said topics and wherein said data records contain information about institutions or enterprises.

28. The system of claim 26 wherein said database of information further contains a plurality of display formats, wherein each of said display formats specify a display format.

29. The system of claim 28 further comprising a display page composer means for merging said information in said data records with one of said display formats to generate a display page which is communicated to said user computer.

30. The system of claim 29 wherein said display page composer means varies the layout of said display page based on the content of said information in said data records.

31. A method for locating on line information comprising the steps of:

organizing a database of on-line information into a plurality of geographical areas, said geographical areas having a plurality of entries associated therewith;

organizing said entries corresponding to said plurality of geographical areas into one or ore topics;

directing a search engine executing in a computer to select one or more of said geographical areas so as to select a geographical search area;

dynamically replicating an entry from broader geographical area into said geographical search area; and

displaying said topics associated with sa d geographical search area.

32. The method of claim 31 wherein said geographical areas are hierarchically organized.

33. The method of claim 31 wherein said geographical search area defines a virtual geographical world.

34. The method of claim 31 further comprising the step of directing said search engine to maneuver among said topics associated with said geographical search area.

35. The method of claim 31 wherein said topics are hierarchically organized.

36. The method of claim 31 herein said entries comprise data records containing information about institutions or

5,930,474

41

enterprises, wherein each of said data records is associated with at least one of said topics.

37. The method of claim 36 further comprising the step of directing said search engine to select one of said topics associated with said geographical search area.

38. The method of claim 37 further comprising the step of displaying said data records associated with said selected topic.

42

39. The method of claim 36 wherein at least one of said entries corresponding to said geographical search area are primarily related by association with physical attributes within said geographical search area.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 5,930,474                                    Page 1 of 1
DATED          : July 27, 1999
INVENTOR(S)    : Dunworth et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 38,
Line 50, delete "to elect one" and replace with -- to select one --.
Line 54, delete "a border" and replace with -- a broader --.
Line 55, delete "least o e" and replace with -- least one --.

Column 39,
Line 34, delete "comprises a" and replace with -- comprise a --.
Line 43, delete "b a computer" and replace with -- by a computer --.

Column 40,
Line 49, delete "or ore" and replace with -- or more --.
Line 55, delete "with sa d" and replace with -- with said --.

Signed and Sealed this

Ninth Day of April, 2002

Attest:

JAMES E. ROGAN
*Attesting Officer*                    *Director of the United States Patent and Trademark Office*