No. 15-1140

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

MICROSOFT CORPORATION,

*Plaintiff,*

GOOGLE INC.,

*Plaintiff-Appellee,*

TALEO CORPORATION,

*Plaintiff,*

v.

GEOTAG, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Delaware, No. 11-cv-175, Judge Richard G. Andrews

## CORRECTED NON-CONFIDENTIAL
## BRIEF OF APPELLEE GOOGLE INC.

Robert A. Van Nest
Asim M. Bhansali
Matthias A. Kamber
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Daryl L. Joseffer
  *Counsel of Record*
Paul Alessio Mezzina
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
djoseffer@kslaw.com

*Counsel for Appellee Google Inc.*

August 24, 2015          * Additional counsel listed on inside cover

Adam M. Conrad
KING & SPALDING LLP
100 N. Tryon St., Suite 3900
Charlotte, NC  28202
Telephone: (704) 503-2600
Facsimile: (704)-503-2622
aconrad@kslaw.com

*Additional counsel for
Appellee Google Inc.*

# CERTIFICATE OF INTEREST

Counsel for Appellee Google Inc. certifies the following:

1. The full name of the party represented by me is Google Inc.

2. The name of the real party in interest represented by me is Google Inc.

3. Google Inc. is a publicly traded company and no publicly held companies own 10% or more of Google Inc.'s stock.

4. The names of all firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

Arnold & Porter LLP: Michael A. Berta; Marc A. Cohn; Maulik G. Shah

Connolly Bove Lodge & Hutz LLP: Arthur G. Connolly, III; Thatcher A. Rahmeier

Connolly Gallagher LLP: Arthur G. Connolly, III

K&L Gates LLP: Michael J. Abernathy; Brian Arnold; Michael J. Bettinger; Christy V. La Pierre; Irene I. Yang

Keker & Van Nest LLP: Abhishek Bajoria; Asim M. Bhansali; Matthias Kamber; Michael S. Kwun; Rachael E. Meny; Reid P. Mullen; Rebekah L. Punak; Robert A. Van Nest

King & Spalding LLP: Adam M. Conrad; Daryl L. Joseffer; Paul Alessio Mezzina

Perkins Coie LLP: Ramsey M. Al-Salam; Matthew C. Bernstein; Melody K. Glazer; Christopher Kao; Sher Kung; Ryan J. McBrayer; Patrick J. McKeever; Victoria Q. Smith; Stevan R. Stark, Jr.

Potter Anderson & Corroon, LLP: Richard L. Horwitz; David Ellis Moore; Bindu Ann George Palapura

This 24th day of August, 2015.    /s/ *Daryl L. Joseffer*

                                                     Daryl L. Joseffer

# TABLE OF CONTENTS

CONFIDENTIAL MATERIAL DELETED: Pursuant to Federal Circuit Rule 28(d)(1)(B), material subject to a protective order entered by the United States District Court for the District of Delaware has been redacted from this brief. The material omitted on pages 10–11 and 48–50 is from confidential documents Google provided related to the operation of the Google AdWords system.

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF RELATED CASES ...................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 1

INTRODUCTION ..................................................................................... 2

STATEMENT OF THE ISSUES ................................................................ 5

STATEMENT OF THE CASE ................................................................... 5

     A.    The '474 Patent ....................................................................... 5

     B.    Google's AdWords ................................................................. 8

     C.    GeoTag's Lawsuits Against Google's Customers. ............ 11

     D.    Google's Declaratory-Judgment Suit and GeoTag's Counterclaims ................................................................... 13

     E.    The District Court's Decisions on AdWords ..................... 16

SUMMARY OF ARGUMENT ................................................................ 19

STANDARDS OF REVIEW ................................................................... 21

ARGUMENT ......................................................................................... 22

    I.    The District Court Had Subject-Matter Jurisdiction. .............. 22

     A.    The District Court Had Independent Jurisdiction Over GeoTag's Counterclaim Regarding AdWords .......... 22

1. A Court Has Jurisdiction Over a Counterclaim with an Independent Basis for Federal Jurisdiction. ........................................................ 22

2. Although It Makes No Difference, GeoTag's Counterclaim Was Permissive. .............................. 28

B. The District Court Also Had Jurisdiction Over Google's Complaint. .......................................... 34

1. GeoTag's Accusations Against Google's Customers Implied that Google Infringed the '474 Patent. ............................................. 34

a. GeoTag's allegations implied direct infringement by Google. ................................. 36

b. GeoTag's allegations implied induced infringement by Google. ................................. 39

2. The Court Must Consider All Record Evidence, Not Only GeoTag's Express Allegations. ................ 42

II. Google Is Entitled to Summary Judgment of Non-Infringement. ........................................................... 46

A. The District Court Correctly Held that AdWords Does Not Practice "Dynamic Replication." ...................... 47

B. GeoTag's Counterarguments Lack Merit and Make "Dynamic Replication" Meaningless. ............................... 48

III. GeoTag's Claim-Construction Arguments Are Mistaken and Irrelevant to the District Court's Grant of Summary Judgment. ................................................................. 54

A. "Parent-Child" Relationships. .......................................... 55

B. "Automatically Inheriting" vs. "Automatically Copying or Inheriting." ............................................... 60

CONCLUSION ........................................................................ 63

ii

# TABLE OF AUTHORITIES

## Cases

*ABB Inc. v. Cooper Indus., LLC,*
    635 F.3d 1345 (Fed. Cir. 2011)........................................................44

*Accent Packaging, Inc. v. Leggett & Platt, Inc.,*
    707 F.3d 1318 (Fed. Cir. 2013)........................................................21

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.,*
    694 F.3d 1312 (Fed. Cir. 2012)........................................................52

*Acumed LLC v. Stryker Corp.,*
    525 F.3d 1319 (Fed. Cir. 2008)........................................................31

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,*
    261 F.3d 1329 (Fed. Cir. 2001)........................................................54

*Aerojet-Gen. Corp. v. Mach. Tool Works, Oerlikon-Buehrle Ltd.,*
    895 F.2d 736 (Fed. Cir. 1990) (en banc)...........................................25

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
    134 S. Ct. 2347 (2014) ...............................................................53−54

*Allbecker v. Contour Prods., Inc.,*
    578 F. App'x 969 (Fed. Cir. 2014)
    (per curiam) (non-precedential) ......................................................59

*Am. Nat'l Red Cross v. S.G.,*
    505 U.S. 247 (1992) ......................................................................26

*Amoco Prod. Co. v. United States,*
    852 F.2d 1574 (10th Cir. 1988) ...................................................23−24

*Arris Grp., Inc. v. British Telecomms., PLC,*
    639 F.3d 1368 (Fed. Cir. 2011)..........................................35, 44, 46

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,*
    846 F.2d 731 (Fed. Cir. 1988)...........................................44, 46

*Augme Techs., Inc. v. Yahoo! Inc.,*
    755 F.3d 1326 (Fed. Cir. 2014)........................................................51

*Boynton v. United States,*
    566 F.2d 50 (9th Cir. 1977) .............................................................23

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ............................................................... 51–52

*Capo, Inc. v. Dioptics Med. Prods., Inc.*,
387 F.3d 1352 (Fed. Cir. 2004) ............................................. 32

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
508 U.S. 83 (1993) ................................................................. 23

*Coca-Cola Co. v. Pepsi-Cola Co.*,
500 F. Supp. 2d 1364 (N.D. Ga. 2007) .......................... 32, 33

*Columbia Gas Transmission Corp. v. Drain*,
191 F.3d 552 (4th Cir. 1999) ................................................ 23

*Dewey & Almy Chem. Co. v. Am. Anode*,
137 F.2d 68 (3d Cir. 1943) .................................................... 44

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014) ............................................. 53

*El v. Ameri-Credit Fin. Servs., Inc.*,
710 F.3d 748 (7th Cir. 2013) ................................................ 23

*Foster v. Hallco Mfg. Co.*,
947 F.2d 469 (Fed. Cir. 1991) .............................................. 33

*Fujitsu Ltd. v. Tellabs Operations, Inc.*,
No. 12 C 3229, 2013 WL 361810 (N.D. Ill. Jan. 30, 2013).......... 32–33

*Great Lakes Rubber Corp. v. Herbert Cooper Co.*,
286 F.2d 631 (3d Cir. 1961) .................................................. 24

*Hewlett-Packard Co. v. Acceleron LLC*,
587 F.3d 1358 (Fed. Cir. 2009) ...................................... 41, 44

*Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*,
535 U.S. 826 (2002) ......................................................... 25, 26

*Hynix Semiconductor Inc. v. Rambus Inc.*,
Nos. CV-00-20905 et al., 2007 WL 4062845
(N.D. Cal. Nov. 15, 2007)...................................................... 33

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011) ........... 40

*In re EMC Corp.*,
677 F.3d 1351 (Fed. Cir. 2012).......................................... 31, 32

*Int'l Ass'n of Machinists & Aerospace Workers v.*
  *Nw. Airlines, Inc.*,
  673 F.2d 700 (3d Cir. 1982) ............................................................. 42

*Int'l Video Corp. v. Ampex Corp.*,
  484 F.2d 634 (9th Cir. 1973) ........................................................... 29

*Intel Corp. v. Future Link Sys., LLC*,
  No. 1:14-cv-377, 2015 WL 649294 (D. Del. Feb. 12, 2015),
  *adopted by oral order*, No. 1:14-cv-377, Dkt. 94
  (D. Del. Mar. 20, 2015) .................................................................... 37

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015) ....................................................... 53

*Isenberg v. Biddle*,
  125 F.2d 741 (D.C. Cir. 1941) .......................................................... 24

*Jacobsen v. Katzer*,
  535 F.3d 1373 (Fed. Cir. 2008) ....................................................... 26

*Jang v. Bos. Sci. Corp.*,
  532 F.3d 1330 (Fed. Cir. 2008) ....................................................... 55

*Key Pharm. v. Hercon Labs. Corp.*,
  161 F.3d 709 (Fed. Cir. 1998) ......................................................... 58

*Kuehne & Nagel (AG & Co) v. Geosource, Inc.*,
  874 F.2d 283 (5th Cir. 1989) .................................................... 23, 29

*Madey v. Duke Univ.*,
  307 F.3d 1351 (Fed. Cir. 2002) ....................................................... 24

*Manildra Milling Corp. v. Ogilvie Mills, Inc.*,
  76 F.3d 1178 (Fed. Cir. 1996) ......................................................... 25

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
  312 U.S. 270 (1941) ......................................................................... 34

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ................................................................... 34, 44

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
  134 S. Ct. 843 (2014) ....................................................................... 26

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ................................................................... 40, 41

*Microchip Tech. Inc. v. Chamberlain Grp., Inc.*,
  441 F.3d 936 (Fed. Cir. 2006) .......................................... 45

*Microsoft Corp. v. DataTern, Inc.*,
  755 F.3d 899 (2014) ................................................ passim

*Microsoft Corp. v. Phx. Sols., Inc.*,
  741 F. Supp. 2d 1156 (C.D. Cal. 2010) ............................. 36

*Nasalok Coating Corp. v. Nylok Corp.*,
  522 F.3d 1320 (Fed. Cir. 2008) ........................... 30, 32, 33

*Nat'l Research Bureau, Inc. v. Bartholomew*,
  482 F.2d 386 (3d Cir. 1973) (per curiam) ............. 24, 25, 29

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ............................................ 54, 58

*Niagara Mohawk Power Corp. v.
  Tonawanda Band of Seneca Indians*,
  94 F.3d 747 (2d Cir. 1996) ........................................... 23

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) .................................... 61

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................... 57

*Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc.*,
  347 F.3d 935 (Fed. Cir. 2003) ..................................... 32

*Powertech Technology, Inc. v. Tessera, Inc.*,
  660 F.3d 1301 (Fed. Cir. 2011) .................................... 44

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
  556 F.3d 1294 (Fed. Cir. 2009) .................................... 44

*Rengo Co. v. Molins Mach. Co.*,
  657 F.2d 535 (3d Cir. 1981) ................................... passim

*Sachs v. Sachs*,
  265 F.2d 31 (3d Cir. 1959) .......................................... 24

*Safeco Ins. Co. of Am. v. City of White House, Tenn.*,
  36 F.3d 540 (6th Cir. 1994) ......................................... 23

*SanDisk Corp. v. STMicroelectronics, Inc.*,
  480 F.3d 1372 (Fed. Cir. 2007) .................................... 46

*Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*,
    482 F.3d 1330 (Fed. Cir. 2007)................................................21, 46

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ........................................................21

*TomTom, Inc. v. Adolph*,
    790 F.3d 1315 (Fed. Cir. 2015)........................................54

*Toste Farm Corp. v. Hadbury, Inc.*,
    70 F.3d 640 (1st Cir. 1995)..............................................23

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)....................................57, 59

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999)......................................29, 32

*World Class Tech. Corp. v. Ormco Corp.*,
    769 F.3d 1120 (Fed. Cir. 2014)......................................60

**Statutes**

28 U.S.C. § 1295 .................................................................1

28 U.S.C. § 1331 .................................................................1

28 U.S.C. § 1338 ..............................................................1, 27

35 U.S.C. § 101 .................................................................53

35 U.S.C. § 299 .................................................................31

Leahy-Smith America Invents Act,
    Pub. L. No. 112-29 (2011), 125 Stat. 284 .........................25

**Rules**

Fed. R. Civ. P. 13.................................................................30

Fed. R. Civ. P. 15.............................................................38, 39

Fed. R. Civ. P. 56.................................................................21

**Other Authorities**

6 C. Wright et al.,
    *Fed. Prac. & Proc. Civ.* § 1414 (3d ed. 2010) ................23, 29

## STATEMENT OF RELATED CASES

This case has not previously come before this or any other appellate court.  Counsel for Google is not aware of any related cases.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338.  It entered final judgment on October 7, 2014.  This Court has jurisdiction under 28 U.S.C. § 1295.

# INTRODUCTION

GeoTag sued numerous Google customers for patent infringement based on their use of Google's mapping services to create store locators on their websites. When Google sought a declaration that the use of its mapping services in this manner was non-infringing, GeoTag counterclaimed by alleging infringement by more than a dozen unrelated Google products and services, including Google's online advertising platform, AdWords.

After litigating GeoTag's counterclaims for more than a year, the parties resolved all of their disputes outside of court, save one: GeoTag's counterclaim alleging infringement by AdWords. GeoTag did not seek to dismiss the AdWords counterclaim at that point. Rather, it continued to litigate the counterclaim, and the district court ultimately granted summary judgment of non-infringement.

GeoTag now argues that the district court lacked jurisdiction over its AdWords counterclaim because Google's declaratory-judgment complaint did not present a ripe case or controversy concerning Google's unrelated mapping services. As the district court concluded, that is wrong for three reasons. *First*, any jurisdictional defect with respect to

the mapping-services claim would not detract from the court's jurisdiction over the permissive AdWords counterclaim, which unquestionably presents a ripe case or controversy. *Second*, even with respect to the mapping services, GeoTag's suits against Google's customers gave rise to a case or controversy by implying that Google itself was liable for direct infringement with respect to any "hosted customers," for whom Google itself performed the acts alleged to infringe. *Third*, GeoTag's suits against other customers (*i.e.*, customers that performed some of the allegedly infringing actions themselves) implied that Google was liable for inducing infringement. Google supplied the mapping software and instructions on how to use it in the allegedly infringing manner.

On the merits, the asserted patent claims a specific way of searching within a geographically organized database that is essentially the opposite of how the accused functionality in AdWords operates. The asserted claims recite searching a narrow geographic area and then automatically adding entries from a broader area through a process called "dynamic replication." In contrast, AdWords conducts a broad

search for all potential candidate ads and then applies filters to narrow those ads.

Because AdWords does not automatically add entries from a broader geographic area to the initial search results, it does not perform "dynamic replication" under any construction of that term. GeoTag's brief refuses to acknowledge "dynamic replication" as a meaningful limitation and suggests instead that the patent covers essentially any search of a geographically organized database—an untenable position.

## STATEMENT OF THE ISSUES

1.     Whether the district court had subject-matter jurisdiction to adjudicate GeoTag's counterclaim for patent infringement.

2.     Whether the district court correctly granted summary judgment of non-infringement because AdWords does not perform dynamic replication.

## STATEMENT OF THE CASE

### A.     The '474 Patent

GeoTag is the current owner of U.S. Patent No. 5,930,474 ("the '474 patent"), which issued in 1999.  That patent claims systems and methods of searching on-line information within a geographically and topically organized database.  *See* A89.  The patent sought to make efficient use of the limited computing power available in the 1990s, which was being outstripped by the Internet's increasingly vast stores of information.  *See, e.g.*, A112, at 2:33−38.

The specification describes a preferred embodiment that organizes websites and files within a directory-like structure of folders categorized by geography and topic.  *See, e.g.*, A121, at 19:52−57; A101 (Fig. 10), A103 (Fig. 12), A109 (Fig. 18).  In that embodiment, an Internet user may navigate to a folder labeled for a particular geographic area and

5

then conduct a topical search within that area, such as for "information about specific goods and services in the geographic location." A89 (Abstract).

The Patent and Trademark Office rejected the initial application, which included claims broadly covering topical searches in a geographical database. A5761–71. The examiner and the applicants agreed, however, that "[t]he dynamic replication of an entry in [a] narrow geographical area would overcome the prior art of record." A5774. Accordingly, the applicants amended all of the independent claims to require "dynamic replication." A5776–79. Claim 1 of the '474 patent, which is representative of the issued claims, describes:

> A system which associates on-line information with geographic areas, said system comprising:
>
> > a computer network wherein a plurality of computers have access to said network; and
> >
> > an organizer executing in said computer network, wherein said organizer is configured to receive search requests from any one of said plurality of computers, said organizer comprising:
> >
> > > a database of information organized into a hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas is further organized into topics; and

6

> a search engine in communication with said database,
> said search engine configured to search geographically
> and topically, said search engine further configured to
> select one of said hierarchy of geographical areas prior
> to selection of a topic so as to provide a geographical
> search area wherein within said hierarchy of
> geographical areas at least one of said entries
> associated with a broader geographical area is
> dynamically replicated into at least one narrower
> geographical area, said search engine further
> configured to search said topics within said selected
> geographical search area.

A130, at 38:36−58, *as corrected*, A133.

The applicants confirmed that the dynamic-replication amendments "clarif[ied] the patentability [sic] distinguishing features of the invention." A5780. But the term "dynamic replication" is not defined in the patent or even used in the specification. Nor is it a term of art with an established meaning. A76.

An example may help illustrate the concept. If an Internet user in North Arlington initiated a search for schools, the '474 patent's approach would search for schools only within a narrow "geographical search area," such as North Arlington. The results displayed to the user, however, would also include results "associated with" one or more "broader geographical areas," such as Arlington County or the Commonwealth of Virginia. Entries from those broader areas would be

7

automatically included in the search results through "dynamic replication." GeoTag has similarly explained the concept of dynamic replication by stating that, "if I do a search for Dallas, it's going to take data from Texas that's available and put it into a display relating to stores in Dallas." A2019.

In short, dynamic replication occurs after the system conducts a search within a limited geographic area. The system includes search results associated with the narrow geographic area and then automatically adds results associated with a broader geographic area through dynamic replication. *See* A130, at 38:35−58.

## B.    Google's AdWords

Although GeoTag at one point accused more than a dozen different Google products and services of infringing the '474 patent, *see* A5585, only one is at issue in this appeal. That accused product, referred to by GeoTag and throughout the case as "AdWords," is Google's online platform for displaying advertisements to users of

Google search.[1]  As the district court recognized, "there is no genuine

dispute as to how [AdWords] itself functions."  A59.

AdWords runs a search against its "entire database" of ads,

yielding "all possible results," which are then "progressively filtered,

using factors such as geography."  A61.  This is a brute-force approach

that eschews efficiency-optimizing techniques like dynamic replication

in favor of raw computing power.  Whereas the '474 patent would search

for schools in North Arlington and then add to the results by

"dynamically replicating" entries associated with Arlington County or

Virginia, AdWords would search for all potentially responsive ads and

then filter out ads targeted at other areas.

The following diagram, which appears in the district court's

summary judgment opinion, *see* A59, depicts the basic structure of

AdWords.

---

[1] Technically, AdWords is the front-end interface that advertisers use to
set up accounts and create ad campaigns that can be shown in
connection with various Google products and services, as well as on
third-party sites.  What GeoTag actually accused of infringement is part
of the system—including and especially the back-end system—for
selecting ads to display in connection with search engine results
specifically on Google.com.  For simplicity's sake, this brief follows
GeoTag's terminology by referring to the accused product as AdWords.

CONFIDENTIAL MATERIAL REDACTED



The AdWords process begins when a Google user inputs a search query, which is sent to Google Web Search [1]. *Id.* Google Web Search sends the query ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ and passes that information back to Google Web Search [3]. *Id.* Google Web Search then forwards the query █████████████████████████ to the AdMixer [4b], which sends them to the Keyword Server [9]. A59–60.

It is in the Keyword Server that the critical step, for purposes of this case, occurs. The Keyword Server associates the query terms with advertisements that could potentially be displayed to the user. A60. To identify ads that might be relevant to the user, the Keyword Server

CONFIDENTIAL MATERIAL REDACTED

"searches a list of millions of different keywords that are not organized by location." *Id.* The Keyword Server searches that list for "all responsive ads independent of any geographic restrictions." *Id.*

After performing that broad search, the Keyword Server "filters the results" by, among other things, ████████████████████████ ███████████████████████. A61. The Keyword Server then returns the results to the AdMixer [10], which forwards them to the Creative Server [11]. The Creative Server performs additional filtering ███████████████████████████████████████████████and passes the eligible ads back to the AdMixer [12], which applies a set of algorithms, runs an auction to determine which ads to display to the user, and sends the results to Google Web Search [13].

## C.    GeoTag's Lawsuits Against Google's Customers.

GeoTag is at least the sixth owner of the '474 patent. Previous owners include entities based in Liechtenstein, Switzerland, the West Indies, and the British Virgin Islands. A5193−95; A5578.

GeoTag's self-described "primary business strategy" is licensing and enforcement of the '474 patent against "companies whose web sites contain a . . . store locator." A5195−96; A5578. A store locator is a

function that allows visitors to a company's website to find the closest brick-and-mortar location at which they can buy the company's products or services. *Id.* Store locators can be found on the websites of manufacturers, wholesalers, retailers, and service providers. *Id.*

In December 2010, GeoTag sued more than 300 entities in the U.S. District Court for the Eastern District of Texas. A36. The suits were largely based on those entities' inclusion of store locators on their websites. *Id.* Hundreds of the defendants in GeoTag's lawsuits were customers of Google or Microsoft who used those companies' mapping services to create their store locators. *Id.* Google and Microsoft received numerous indemnification demands from customers sued by GeoTag. A5306; *see* A5311−24.

The Texas defendants included "hosted customers," for whom all the data and software used to display the accused store locators resided on Google's or Microsoft's servers, and all steps related to operation of the store locators were performed by Google or Microsoft. *See* A7637. "In other words, the customer data about where stores are located and the Mapping Services software needed to return results based on this data, reside entirely on and operate on Google's or Microsoft's servers."

A7642. "The hosted customers' websites simply access the results that are generated by [those] servers and display those results in a Google- or Microsoft-generated map embedded on the customers' websites." *Id.*[2]

GeoTag also sued customers whose store locators, while not hosted entirely on Google's servers, were created using Google's mapping services. Google had published training materials on the Internet instructing its customers on how to use Google's mapping services to create store locators on their websites. *See* A7641−42. The record includes published materials from 2008, 2009, and 2010 containing such instructions, including specific instructions on code to include in customers' websites to use the appropriate Google Maps APIs. *See* A7696−97, A7759, A7762−74.

## D. Google's Declaratory-Judgment Suit and GeoTag's Counterclaims.

After receiving numerous indemnification demands from their customers, *see* A5306, A5311−24, Google and Microsoft filed a declaratory-judgment complaint against GeoTag in the U.S. District

---

[2] Although GeoTag at one point purported to contest these hosted-customer facts, *see* A7710 n.3, it acknowledged the absence of any genuine dispute by stipulating to the existence of hosted customers on more than one occasion. *See, e.g.*, A7109; A7310; A7313.

Court for the District of Delaware on March 1, 2011.  A5192−99.
Although GeoTag denied that its Texas lawsuits were based on the
customers' use of Google's or Microsoft's mapping services, it refused to
sign a covenant not to assert infringement of the '474 patent based on
the customers' use of those services.  A5306−07; *see* A5326−35.

On December 9, 2011, the district court denied GeoTag's motion to
dismiss the declaratory-judgment complaint for lack of jurisdiction.
A35; *see* A2045−46.  Recognizing that GeoTag's customer lawsuits
suggested that Google and Microsoft were liable for both direct and
indirect infringement, *see* A36, the court held there was a genuine
controversy between the parties because (1) some of the accused store
locators "actually reside[d] on [Google's and Microsoft's] servers," and
(2) Google and Microsoft provided a "material component" of the
accused store locators.  A2046.

On February 13, 2012, GeoTag counterclaimed, alleging that more
than 30 different products and services separate from those at issue in
Google's declaratory-judgment complaint—including AdWords—directly
infringed the '474 patent.  A5577−86.  GeoTag proceeded to serve
infringement contentions and engaged in extensive discovery related to

14

its counterclaims. The parties also engaged in claim construction proceedings with all of those products at issue. On May 3, 2013, the district court issued a claim construction opinion. A64−88.

Following discovery and claim construction, the parties resolved, outside of court, GeoTag's infringement counterclaims as to most of the accused products, along with Google's declaratory-judgment claims of non-infringement. On May 30, 2013, GeoTag covenanted not to sue Google "on account of any and all alleged infringement of the '474 patent relating, in any way, to making, Using, selling, offering to sell, or importing the Google Store Locator Technology." A7109. On June 10, 2013, the district court entered a stipulated judgment in which GeoTag agreed that none of the Google products and services involved in the complaint and counterclaims, other than AdWords, "directly or indirectly, by inducement or contribution[,] infringe any claim of the '474 patent." A6171−72.

The stipulated judgment further specified that the only "remaining issue to be tried in [the] action" was GeoTag's counterclaim for direct infringement by AdWords. A6172. In GeoTag's words, the stipulation eliminated any dispute over "the [mapping] services . . .

referenced in [Google's] complaint," leaving only GeoTag's AdWords-related counterclaim for the district court to adjudicate.  Br. 11.

### E.    The District Court's Decisions on AdWords.

After the parties resolved their other disputes, including those raised in Google's declaratory-judgment complaint, GeoTag pressed forward with its counterclaim regarding AdWords.  On February 21, 2014, the district court heard oral argument on Google's motion for summary judgment of non-infringement.  A179.  The parties later filed a joint proposed pretrial order specifying that GeoTag "seeks a judgment" on its counterclaim and that "[t]he jurisdiction of this Court is not disputed" with respect to the counterclaim.  A8004; A8008.

On April 10, 2014, the court granted Google's motion for summary judgment.  It held that AdWords does not practice "dynamic replication" because it does not search a narrow geographic area and automatically add results from a broader area.  Instead, it was "uncontested" that AdWords conducts a broad search for "all responsive ads" and then "consecutively filters" the results.  A60−61.

Shortly before the district court issued its decision, this Court addressed declaratory-judgment jurisdiction in *Microsoft Corp. v.*

*DataTern, Inc.*, 755 F.3d 899 (2014). The court asked for additional briefing on jurisdiction in light of *DataTern*, A180−81, which the parties provided. Without deciding whether the original declaratory-judgment complaint sufficiently established jurisdiction under *DataTern*, the court then exercised its discretion to allow Google and Microsoft to amend their complaint to allege additional jurisdictional facts that were "extant at the time that the original complaint was filed." A7634. The amended complaint, filed on July 17, 2014, provided additional details about how Google had provided both (1) a store-locator service hosted on its own servers, and (2) instructions to its customers on how to create and use store locators. A7636−48.

On August 29, 2014, the district court denied GeoTag's motion to dismiss the amended complaint for lack of jurisdiction. A36−43. It held that GeoTag's allegations against Google's customers constituted an "implied assertion" of both direct and indirect infringement against Google. A38−41.

The court also held that, regardless of whether it had jurisdiction over the "original declaratory judgment complaint," it had "an independent basis for subject matter jurisdiction over" GeoTag's

counterclaim.  A41 & n.5.  The court recognized that "'[a] jurisdictional defect in the complaint will not preclude adjudication of a counterclaim over which the court has an independent basis of jurisdiction.'"  A43 (quoting *Rengo Co. v. Molins Mach. Co.*, 657 F.2d 535, 539 (3d Cir. 1981)).  In part because the declaratory-judgment claims and the AdWords counterclaim concerned "completely separate products," A42, the court concluded that it had jurisdiction over the counterclaim irrespective of any jurisdictional issues concerning the declaratory-judgment action.

Following the denial of its motion to dismiss the amended complaint, GeoTag did not pursue any further challenge to the district court's jurisdiction.  It did not assert that there were any disputed factual issues relevant to jurisdiction that necessitated discovery, an evidentiary hearing, or judicial factfinding.  Instead, GeoTag stipulated to the entry of final judgment in favor of Google based on the district court's summary judgment ruling.  A33.

GeoTag also agreed to dismiss its claims against Microsoft, which had been set for a later trial.  After formally severing those claims, the

district court entered a stipulated final judgment as to the Google-related claims on October 7, 2014.  A32−34.

## SUMMARY OF ARGUMENT

**I.  A.**  The only jurisdictional issue before this Court concerns GeoTag's AdWords counterclaim.    Whether Google's declaratory-judgment complaint presented a justiciable "case or controversy" has no bearing on that question.  The circuit courts unanimously agree that a district court may adjudicate a counterclaim for which there is an independent basis of federal jurisdiction, regardless of any jurisdictional defect in the complaint.  Under that well-established rule, the district court had jurisdiction over GeoTag's counterclaim, which seeks damages under the Patent Act for alleged infringement by AdWords.

A district court may exercise independent jurisdiction over both compulsory and permissive counterclaims.  Thus, GeoTag's assertion that its counterclaim was compulsory is irrelevant.  It is also wrong. The counterclaim was plainly permissive because it involved a product (AdWords) that is unrelated to the one at issue in Google's complaint (mapping services).

**B.**    The district court also had jurisdiction over Google's declaratory-judgment complaint.    GeoTag's suits against Google's customers gave rise to an actual case or controversy between the parties in two ways.  First, because Google provided a "hosted customer" service in which Google itself carried out all the steps of creating a store locator, GeoTag's allegations implied that Google was liable for direct infringement.  Second, because Google provided instructions on how to use its software to create a store locator, GeoTag's allegations implied that Google was liable for inducing infringement.

**II.** The district court correctly granted summary judgment of non-infringement because AdWords does not perform "dynamic replication." To make efficient use of the limited computing resources available in the 1990s, the asserted patent discloses searching within a narrow geographic area and automatically adding results from a broader area through "dynamic replication."  AdWords takes the opposite approach: It uses the brute force of modern computing power to search its entire database without regard to geography, then filters out unwanted entries.  Because no entries are ever added to the initial search results, there is no dynamic replication under any construction of that term.

**III.** This Court need not address GeoTag's claim-construction arguments because they are irrelevant to the district court's summary-judgment ruling. They are also wrong. Especially in combination, GeoTag's claim-construction and non-infringement arguments would deprive the "dynamic replication" limitation of any effect and cause the patent to cover essentially any search of a geographically organized database—contrary to the clear claim language, the specification's description of the claimed invention, and the prosecution history.

## STANDARDS OF REVIEW

This Court generally reviews subject-matter jurisdiction and claim construction *de novo*, but it reviews any underlying factual findings for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015); *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1335−36 (Fed. Cir. 2007).

The Court reviews summary judgment *de novo*, asking whether there is a genuine dispute as to any material fact and whether the movant is entitled to judgment as a matter of law. *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1325 (Fed. Cir. 2013); *see* Fed. R. Civ. P. 56(a).

## ARGUMENT

## I.  The District Court Had Subject-Matter Jurisdiction.

### A.  The District Court Had Independent Jurisdiction Over GeoTag's Counterclaim Regarding AdWords.

GeoTag spends much of its brief arguing that the district court lacked jurisdiction over Google's declaratory-judgment complaint.  *E.g.*, Br. 20−40.  Not only does that argument miss the mark, it is aimed at the wrong target.

The claims in Google's declaratory-judgment complaint—which pertained to the use of Google's mapping services to create store locators on customers' websites—were resolved years ago by mutual agreement between the parties.  *See* A6168−72.  From that point on, this case has concerned only GeoTag's counterclaim for infringement by an unrelated product, AdWords.  That is the only claim at issue in GeoTag's appeal, and the district court had jurisdiction over it.

### 1.  A Court Has Jurisdiction Over a Counterclaim with an Independent Basis for Federal Jurisdiction.

GeoTag's counterclaim, which "actually . . . charged [Google] with infringement of the patent," and sought monetary damages for infringement, unquestionably presented a "case or controversy" within

22

the meaning of Article III of the Constitution. *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993). That is dispositive of the jurisdictional question here because a district court has jurisdiction to adjudicate a counterclaim for which there is an independent basis of jurisdiction, regardless of whether the original complaint had a jurisdictional defect. "If the counterclaim . . . present[s] an independent basis of federal jurisdiction . . . the court may adjudicate it as if it were an original claim . . . ." 6 C. Wright et al., *Fed. Prac. & Proc. Civ.* § 1414, at 128−30 (3d ed. 2010).

At least ten regional circuits have expressly adopted that rule, and none have rejected it. *See, e.g.*, *Toste Farm Corp. v. Hadbury, Inc.*, 70 F.3d 640, 646 (1st Cir. 1995); *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 753 (2d Cir. 1996); *Rengo*, 657 F.2d at 539; *Columbia Gas Transmission Corp. v. Drain*, 191 F.3d 552, 559 (4th Cir. 1999); *Kuehne & Nagel (AG & Co) v. Geosource, Inc.*, 874 F.2d 283, 291 (5th Cir. 1989); *Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 36 F.3d 540, 546 (6th Cir. 1994); *El v. Ameri-Credit Fin. Servs., Inc.*, 710 F.3d 748, 752 (7th Cir. 2013); *Boynton v. United States*, 566 F.2d 50, 52 (9th Cir. 1977); *Amoco Prod.*

*Co. v. United States*, 852 F.2d 1574, 1579 (10th Cir. 1988); *Isenberg v. Biddle*, 125 F.2d 741, 743 (D.C. Cir. 1941).

Because a "dismissal for lack of subject matter jurisdiction is a procedural question not unique to patent law," it is governed by the law of the regional circuit, here the Third Circuit. *Madey v. Duke Univ.*, 307 F.3d 1351, 1358 (Fed. Cir. 2002). That circuit has long held that "a jurisdictional defect in the complaint will not preclude adjudication of a counterclaim over which the court has an independent basis of jurisdiction." *Rengo*, 657 F.2d at 539; *accord Nat'l Research Bureau, Inc. v. Bartholomew*, 482 F.2d 386, 388−89 (3d Cir. 1973) (per curiam); *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 633−34 (3d Cir. 1961); *Sachs v. Sachs*, 265 F.2d 31, 33 (3d Cir. 1959).

In *Rengo*, for example, the plaintiff sued for patent infringement, and the defendant counterclaimed for a declaratory judgment of invalidity and non-infringement. The Third Circuit noted that, although the district court might not have had jurisdiction over the complaint, that was irrelevant to jurisdiction over the counterclaim. 657 F.2d at 539. "'[W]here, as here, jurisdiction is independent, the counterclaim must be allowed to proceed without regard to the fate of

the original claim.'" *Id.* at 539−40 (quoting *Bartholomew*, 482 F.2d at 388−89).

Even if the issue were governed by Federal Circuit law, this Court "conform[s] [its] law to that of the regional circuits when there exists expressed uniformity among the circuits." *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1181 (Fed. Cir. 1996). Such uniformity exists here, where at least nine other regional circuits agree with the Third Circuit on this question and none has disagreed. *See* pp. 23−24, *supra*. This Court has also acknowledged the established rule. Sitting *en banc*, it observed that "courts have repeatedly retained jurisdiction and adjudicated a counterclaim having its own jurisdictional basis even where the court had no jurisdiction over the complaint." *Aerojet-Gen. Corp. v. Mach. Tool Works, Oerlikon-Buehrle Ltd.*, 895 F.2d 736, 742 (Fed. Cir. 1990) (en banc), *abrogated on other grounds*, *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826 (2002), *result in turn overruled by* Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 19(b) (2011), 125 Stat. 284, 331−32.

The Supreme Court's decision in *Holmes Group* has no bearing on this question. It even says so. The Court distinguished, and did not

disturb, the long line of cases holding that "a district court can retain jurisdiction over a counterclaim if . . . a jurisdictional defect in the complaint is identified." *Holmes Grp.*, 535 U.S. at 834 n.4.

*Holmes Group* addressed a different question concerning when, under the well-pleaded complaint rule, an action "arises under" the Patent Act and is thus appealable to this Court as opposed to the regional circuit. The well-pleaded complaint rule has no bearing on Article III's case-or-controversy requirement; instead, it construes the *statutory* requirement that an action arise under the Patent Act or another federal law, a requirement that is not at issue here. *See, e.g.*, *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 258 (1992).[3]

Nor does *DataTern* help GeoTag. In that case, this Court held that counterclaims could not establish jurisdiction over the claims in a declaratory-judgment complaint. 755 F.3d at 906. The Court did not consider the distinct question of jurisdiction over the counterclaims

---

[3] Whereas the original complaint in *Holmes Group* did not arise under the Patent Act because it pleaded only state-law claims, the original declaratory-judgment complaint in this case invoked and depended on the Patent Act, unquestionably establishing statutory, arising-under jurisdiction. *See, e.g.*, *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014); *Jacobsen v. Katzer*, 535 F.3d 1373, 1377 (Fed. Cir. 2008).

themselves.  It had no reason to do so because the counterclaims in that case were expressly "conditional" on the district court's having jurisdiction over the complaint.  *Id.*

GeoTag therefore misses the point in arguing that the district court's decision would "effectively reverse *DataTern*" by allowing a counterclaim to "retroactively establish[] jurisdiction" over a declaratory-judgment complaint.  Br. 35.  As discussed above, the district court did not hold that GeoTag's counterclaim established jurisdiction *over Google's declaratory-judgment complaint*, which the parties had resolved out-of-court.  *See* A41 n.5; A6172.  It held only that there was "an independent basis for subject matter jurisdiction *over the counterclaim*[]," which involved a "completely separate product[]."  A41−42 (emphasis added).

Unlike the counterclaim plaintiff in *DataTern*, moreover, GeoTag did not expressly label its counterclaim conditional.  To the contrary, GeoTag affirmatively pleaded that the court had jurisdiction over its counterclaims based on 28 U.S.C. § 1338.  A5580; A5583.  Even after Google's original claims were resolved by a covenant not to sue and a stipulated judgment, GeoTag did not ask the court to dismiss its

counterclaim without prejudice. Instead, it stipulated that "the remaining issue to be tried in this action concerns Google AdWords," A6172, and it continued to aggressively litigate and seek a ruling on its AdWords counterclaim.

Indeed, the parties' joint proposed pretrial order—filed almost a year after the parties resolved Google's original declaratory-judgment claims, and three days after *DataTern*—specified that GeoTag "seeks a judgment" on its counterclaim and that "[t]he jurisdiction of this Court is not disputed" with respect to the counterclaim. A8004; A8008. GeoTag never contested the district court's jurisdiction over the counterclaim until after the hearing on Google's motion for summary judgment. GeoTag's conduct confirms that the counterclaim was not conditional, and that the parties have an ongoing, actual controversy regarding alleged infringement by AdWords.

## 2. Although It Makes No Difference, GeoTag's Counterclaim Was Permissive.

GeoTag retreats to the position that "Third Circuit law . . . permits a counterclaim to serve as an independent basis for jurisdiction [only] if the counterclaim is permissive." Br. 38. That is incorrect as a matter of law and irrelevant on the facts of this case.

The Third Circuit has repeatedly determined that "the status of the counterclaim as compulsory or permissive does not affect jurisdiction" over the counterclaim. *Rengo*, 657 F.2d at 540 n.4; *see also, e.g.*, *Bartholomew*, 482 F.2d at 389. The Third Circuit is not alone in that regard: The Wright and Miller treatise confirms that federal courts can exercise independent jurisdiction over both compulsory and permissive counterclaims. *See* 6 *Fed. Prac. & Proc. Civ.* § 1414, at 128−30; *see also Kuehne & Nagel*, 874 F.2d at 291.

GeoTag cites no contrary authority.[4] Nor did GeoTag attempt to condition its counterclaim on the district court having jurisdiction over

---

[4] In the district court, GeoTag cited this Court's parenthetical description of one Ninth Circuit case, in a string of citations, as "holding that dismissal of [a] declaratory complaint for lack of jurisdiction required dismissal of [a compulsory patent-infringement] counterclaim." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 802 (Fed. Cir. 1999) (citing *Int'l Video Corp. v. Ampex Corp.*, 484 F.2d 634 (9th Cir. 1973)). That brief description of a single case from a different regional circuit—which GeoTag has not cited in this Court—is *dictum*. *Vivid* held only that a counterclaim was compulsory; its holding had nothing to do with jurisdiction. *Id.* Moreover, the compulsory counterclaim in the Ninth Circuit's *International Video* case "expressly assert[ed] . . . that the alleged dispute . . . d[id] not amount to a justiciable controversy," and thus "show[ed] on its face" that there was no Article III jurisdiction over the counterclaim. 484 F.2d at 636. In this case, there is unquestionably a live case or controversy concerning patent infringement by AdWords.

the complaint, or seek to dismiss the counterclaim without prejudice after the claims in the complaint were resolved. Instead, as discussed above, GeoTag affirmatively sought a decision on its AdWords counterclaim until after the hearing on Google's summary judgment motion. *See* pp. 27−28, *supra.*

In all events, GeoTag's counterclaim was permissive. A counterclaim is compulsory only if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a). This Court has articulated various formulations of Rule 13(a)'s "'transaction or occurrence' test" for patent cases, all of which boil down to examining the "extent of factual overlap" between the claim and the counterclaim. *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1325−26 (Fed. Cir. 2008). Under that test, as the district court held, a non-infringement claim and an infringement counterclaim do not arise out of the same "transaction or occurrence" where they pertain to different products. *See* A42−43.

That is the case here. GeoTag's counterclaims concerned more than 30 products, including AdWords, that were "completely separate" from the mapping services at issue in Google's declaratory-judgment

30

complaint. A42; *see also* pp. 12−14, *supra*. GeoTag has acknowledged that AdWords, the "only Google product[] alleged to infringe" in the counterclaim at issue here, was not "the subject of plaintiffs' declaratory judgment complaint." A7791.

This Court has repeatedly held that infringement claims concerning unrelated products are not part of the same transaction or occurrence. For purposes of claim preclusion, claims "do not arise from the same transactional facts unless the accused devices in each claim are 'essentially the same,'" even if the claims are based on the same patent. *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1326 (Fed. Cir. 2008). In determining whether claims against two defendants arise out of the "same transaction, occurrence, or series of transactions or occurrences," such that the defendants may be joined in a single action under Rule 20(a), this Court has likewise held that "joinder is not appropriate where different products or processes are involved," even if "the same patent claims are alleged to be infringed." *In re EMC Corp.*, 677 F.3d 1351, 1359 (Fed. Cir. 2012); *see also* 35 U.S.C. § 299(b) (claims to be joined must involve "the same accused product or process").

This Court has noted the close similarity between Rule 13(a)'s "transaction or occurrence" test and the tests that govern claim preclusion and joinder, suggesting that the same results should obtain under all three tests. *See Nasalok*, 522 F.3d at 1324−25; *EMC*, 677 F.3d at 1357−58. As the district court recognized, there is no reason to take a different approach in this case. *See* A42−43.

GeoTag argues that infringement counterclaims are compulsory whenever they relate to the same *patent* as the complaint, even if they relate to entirely different *products*. Not so: In every case in which this Court has held an infringement counterclaim to be compulsory, the claim and counterclaim involved "the same patent *and the same product*." *Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc.*, 347 F.3d 935, 937 (Fed. Cir. 2003) (emphasis added); *see Capo, Inc. v. Dioptics Med. Prods., Inc.*, 387 F.3d 1352, 1356 (Fed. Cir. 2004); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 800 (Fed. Cir. 1999). As several district courts have recognized, those decisions do not apply where a claim and counterclaim involve *different* products. *See Coca-Cola Co. v. Pepsi-Cola Co.*, 500 F. Supp. 2d 1364, 1374−77 (N.D. Ga. 2007); *Fujitsu Ltd. v. Tellabs Operations, Inc.*, No. 12 C 3229, 2013 WL

361810, at *5 (N.D. Ill. Jan. 30, 2013); *Hynix Semiconductor Inc. v. Rambus Inc.*, Nos. CV-00-20905 et al., 2007 WL 4062845, at *5 (N.D. Cal. Nov. 15, 2007).[5]

GeoTag's contrary position misreads this Court's Rule 13(a) decisions and places them in unnecessary conflict with the Court's precedents concerning claim preclusion and joinder. It would also make a mess of patent litigation. Under GeoTag's approach, whenever a manufacturer sued a patentee to establish that *one* of its products was non-infringing, the patentee would have to bring infringement counterclaims as to *all* of the manufacturer's products that potentially infringed the same patents, or risk losing those claims forever. GeoTag's rule would thus cause discrete, manageable patent disputes to metastasize into sprawling litigation not sought by either party. *Cf. Coca-Cola*, 500 F. Supp. 2d at 1376 (noting the "untenable discovery

---

[5] It makes no difference that Google's complaint also sought a declaration that GeoTag's patent claims were invalid. An infringement claim and an invalidity claim involving the same patent do not arise out of the same transaction or occurrence for purposes of Rule 13(a). *Nasalok*, 522 F.3d at 1327; *see also Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 479−80 (Fed. Cir. 1991) (same result under test for claim preclusion).

and pleading dilemma" that the rule now advocated by GeoTag would create).  There is no reason to go down that road.

## B.   The District Court Also Had Jurisdiction Over Google's Complaint.

As discussed above, the district court's jurisdiction to decide GeoTag's counterclaim is not dependent on its jurisdiction to adjudicate the claims in Google's complaint.  The district court did, however, have jurisdiction over the complaint—and there is no dispute that if the court had jurisdiction over the complaint, it also had jurisdiction over the counterclaim.

### 1.   GeoTag's Accusations Against Google's Customers Implied that Google Infringed the '474 Patent.

For purposes of the Declaratory Judgment Act and Article III, a justiciable controversy exists when "'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  A reasonable apprehension of suit is not required.  *See id.* at 132 n.11.

34

When a patentee accuses customers of infringement based on their use of a supplier's products or services, and the patentee's accusations against the customers contain an "implicit assertion" that the supplier is also liable for infringement, the supplier has standing to commence a declaratory-judgment action against the patentee. *Arris Grp., Inc. v. British Telecomms., PLC*, 639 F.3d 1368, 1375–76 (Fed. Cir. 2011). There is an implicit assertion of infringement when "allegations by the patentee or other record evidence . . . establish at least a reasonable potential that . . . a claim could be brought" against the supplier. *DataTern*, 755 F.3d at 905.

When Google filed its original complaint, GeoTag had sued numerous Google customers alleging that they infringed the '474 patent through their use of Google's mapping services to create store locators on their websites. The district court correctly held that GeoTag's suits against Google's customers implied that Google had infringed the '474 patent—both directly with respect to hosted customer services on Google's own servers, and indirectly with respect to other customers. *See* A38–41.

35

### a. GeoTag's allegations implied direct infringement by Google.

For hosted customer services, all the data and software used to display the accused store locator resides on Google's servers, and all steps related to operation of the store locator are performed by Google itself. *See* A7637; pp. 12−13, *supra*. That means that "[Google]—not [its] hosted customers—perform[s] all of the steps that GeoTag could accuse of infringing the '474 patent." A7644. GeoTag's infringement accusations therefore implied a "reasonable potential" that Google itself could be sued for directly infringing the '474 patent through its hosted customer services. *DataTern*, 755 F.3d at 905.

GeoTag argues that a justiciable controversy can never arise from an implication that the supplier is directly (as opposed to indirectly) infringing. According to GeoTag, "implied assertion of direct infringement" is "an entirely new legal concept" that "has never been recognized by any prior court and makes no sense." Br. 25. In fact, district courts have recognized that an implied assertion of direct infringement may give rise to declaratory-judgment jurisdiction. *See, e.g.*, *Microsoft Corp. v. Phx. Sols., Inc.*, 741 F. Supp. 2d 1156, 1161 (C.D. Cal. 2010) (finding an "actual controversy" in part because patentee's

letters to customer suggested supplier was "exposed to a claim for direct infringement"); *Intel Corp. v. Future Link Sys., LLC*, No. 1:14-cv-377, 2015 WL 649294, at *7 & n.10 (D. Del. Feb. 12, 2015) (magistrate's report and recommendation) (finding jurisdiction based on "implied accusation that [supplier] itself has also directly infringed the [asserted] claims"), *adopted by oral order*, No. 1:14-cv-377, Dkt. 94 (D. Del. Mar. 20, 2015).

And for good reason. Although *Arris* and *DataTern* involved indirect infringement, the principles announced in those cases apply to infringement generally, not only to one type of infringement. If a plaintiff with a patent on a hammer sues Home Depot for selling allegedly infringing hammers, the implication of infringement by the manufacturer is inescapable. Indeed, an implication of direct infringement may be even stronger than an implication of indirect infringement, because indirect infringement requires additional elements, such as knowledge and intent. *Cf. DataTern*, 755 F.3d at 905−06. And the legal risk to a declaratory-judgment plaintiff in continuing potentially infringing conduct without obtaining a

clarification of its legal rights is precisely the same whether potential liability rests on direct or indirect infringement.

GeoTag accuses Google of seeking to establish standing "by merely pointing to a complaint in another jurisdiction and alleging, 'I do the same thing.'" Br. 27. But Google did not just claim it did "the same thing" as an unrelated entity sued by GeoTag. Google showed that, when providing hosted customer services, it actually performed the specific, allegedly infringing conduct that formed the basis of GeoTag's accusations of infringement. As the district court observed, "GeoTag could just as easily have asserted a claim of direct infringement against Google . . . based on the same underlying circumstances in the customer suits." A39.

Finally, GeoTag contends that Google first relied on direct infringement in its amended complaint. *E.g.*, Br. 8, 25, 31. That is irrelevant because GeoTag does not contend that the district court abused its considerable discretion in allowing Google to file the amended complaint. *See* Fed. R. Civ. P. 15(a)(2); A7634.

It is also wrong. The district court and GeoTag both understood direct infringement to be at issue all along. The court held at the outset

of the case that GeoTag's customer suits implied direct infringement. *See* p. 14, *supra*. And GeoTag expressly acknowledged, in the stipulated judgment resolving Google's original complaint, that Google had sought a declaration "that certain Google services and products . . . do not directly or indirectly infringe." A6171−72. GeoTag further stipulated at that time that Google's products and services "do not directly or indirectly, by inducement or contribution[,] infringe any claim of the '474 patent." *Id.*; *cf.* Fed. R. Civ. P. 15(b)(2) (issues tried by express or implied consent are treated as if raised in the pleadings).

### b.    GeoTag's allegations implied induced infringement by Google.

Even apart from direct infringement, GeoTag's accusations against Google's non-hosted customers implied that Google was liable for inducing infringement. Google provided non-hosted customers with both the software used to create the accused store locators and "instructions on how to use [its] Mapping Services to create store locators." A7641−42. The record includes Google articles from 2008, 2009, and 2010 containing such instructions, including instructions on specific code to include in customer websites. *See* A7696 (explaining how to "creat[e] a store locator map" for "a fictitious pizza restaurant

chain"); A7759 ("Article: Creating a Store Locator"); A7762 ("Creating a Store Locator"). As the district court noted, "GeoTag does not dispute that Google . . . provided articles on how to create store locators" and "w[as] aware of the '474 patent." A40.

A supplier may be liable for inducing infringement when, among other things, it takes "'active steps . . . to encourage direct infringement,'" such as "instructing how to engage in an infringing use." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005); *see, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851−52 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011). Where, as here, a supplier "provides its customers with the necessary components to infringe" and "instruction manuals for using the components in an infringing manner," there is "a substantial controversy regarding whether [the supplier] induces infringement." *DataTern*, 755 F.3d at 905.

GeoTag complains that Google's instructional articles do not "mention GeoTag or the '474 patent." Br. 32. But inducement liability is often premised on a supplier's instructions to its customers, *see, e.g.*, *Grokster*, 545 U.S. at 936, and such instructions rarely, if ever, mention

the allegedly infringed patent or its owner. GeoTag objects that Google did not show that the articles "played any role in [its] decision to sue GeoTag." Br. 32. But the test for declaratory-judgment jurisdiction is objective and does not require a plaintiff to present evidence of subjective mental processes. *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009). Equally beside the point is GeoTag's contention that Google failed to prove that the customers sued by GeoTag had actually read these particular articles. The articles are relevant because they could be used as evidence of Google's "affirmative intent that the product be used to infringe," an element of inducement. *Grokster*, 545 U.S. at 936; *see also DataTern*, 755 F.3d at 905.

GeoTag's remaining arguments are factual and thus subject only to clear-error review. *See Hewlett-Packard*, 587 F.3d at 1361. There was no such error. Contrary to GeoTag's description of Google's instructions to customers as "internal Google articles," Br. 32, each has a public website address, and the content of each makes clear that it was directed at Google's customers. *See, e.g.*, A7759 (addressing "any chain stores out there that aren't using the Google Maps API yet"). GeoTag did not argue otherwise below, and it is too late to do so now.

GeoTag protests that it lacks "any proof of when the articles were created or published." Br. 33–34. Each article includes a dateline, and there was never any suggestion that Google falsified those datelines (because it did not). In any event, GeoTag did not meaningfully challenge the articles' authenticity before the district court and may not do so here. *See* A40 & n.4. *Cf. Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700, 711–12 (3d Cir. 1982) (absent a sufficient challenge from the defendant, a district court may rely on a plaintiff's jurisdictional allegations). GeoTag merely pointed out that one of the three articles, dated August 2009, bears the notation, "Last updated June 24, 2014." A40 n.4 (quoting A7774); *see* Br. 33–34. As that article is exclusively about creating store locators, any notion that it did not address that topic before the update is specious, as well as irrelevant to the other two articles.

## 2. The Court Must Consider All Record Evidence, Not Only GeoTag's Express Allegations.

GeoTag cannot seriously dispute that its infringement allegations against Google's customers, viewed in light of the facts set forth above regarding Google's hosting activities and its instructions to customers, imply that Google infringed the '474 patent. So GeoTag argues that the

Court should shut its eyes to those facts because *GeoTag itself* did not call attention to them. According to GeoTag, "Google provided no evidence that GeoTag ever asserted that Google performed each and every element of any claim of the '474 patent." Br. 28. Over and over, GeoTag insists that it did not "reference Google" in its lawsuits, Br. 21, did not "threaten[] to sue Google," Br. 22, did not produce "claims charts, demand letters, or pleadings implicating Google," Br. 27, and so on.[6] GeoTag thus asks this Court to look only at its express allegations and not at other information in the record that clarifies the meaning and import of those allegations with respect to Google.

That contention runs headlong into this Court's precedents and the very purpose of declaratory relief. A justiciable controversy does not require an express accusation of infringement by a patentee against a

---

[6] GeoTag's contention that it "never accused any defendant in the Texas lawsuits of infringing based on Google's services and never asserted that Google's mapping services infringed the '474 patent," Br. 28, is false. GeoTag's infringement contentions in the Texas lawsuits contained numerous references to Google source code. *See, e.g.*, A7106; A7112 *et seq*. Although GeoTag served those contentions after Google filed its declaratory-judgment complaint, they provide additional confirmation of what was apparent at the time of Google's original complaint: GeoTag's lawsuits against Google's customers were based in part on Google's mapping services, notwithstanding its protestations to the contrary.

declaratory-judgment plaintiff. *See, e.g.*, *Arris*, 639 F.3d at 1379; *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1347−48 (Fed. Cir. 2011); *Hewlett-Packard*, 587 F.3d at 1362. Justiciability depends, instead, on "all the circumstances." *MedImmune*, 549 U.S. at 127; *see Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 556 F.3d 1294, 1297 (Fed. Cir. 2009).

Thus, this Court has relied on facts outside the patentee's express allegations to find a justiciable controversy. *See Powertech Tech., Inc. v. Tessera, Inc.*, 660 F.3d 1301, 1307 & n.4 (Fed. Cir. 2011); *Teva Pharm.*, 482 F.3d at 1341−45. Indeed, this Court has concluded—under the more demanding "reasonable apprehension of suit" test that the Supreme Court later abrogated in *MedImmune*—that a justiciable controversy can exist "even when a patentee first learns of plaintiff's [potentially infringing] conduct upon receipt of the complaint." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 738 (Fed. Cir. 1988) (citing with approval *Dewey & Almy Chem. Co. v. Am. Anode*, 137 F.2d 68, 71 (3d Cir. 1943)).

GeoTag's reliance on *DataTern* is misplaced. That case requires "allegations by the patentee *or other record evidence* that establish at

least a reasonable potential that . . . a claim could be brought" against the declaratory-judgment plaintiff.  *DataTern*, 755 F.3d at 905 (emphasis added).  Far from limiting itself to examining DataTern's express allegations, as GeoTag suggests, this Court repeatedly asked whether other information in the record might complete the picture of Microsoft's potential infringement liability.  *See id.* ("Nothing in the record suggests that Microsoft encouraged the acts accused of direct infringement."); *id.* at 906 ("[O]ur review of the record does not uncover any evidence that Microsoft's [product] is not suitable for substantial non-infringing uses."); *id.* at 907 ("There is no record evidence that Microsoft encouraged the acts that DataTern argues amount to direct infringement by its customers."); *see also Microchip Tech. Inc. v. Chamberlain Grp., Inc.*, 441 F.3d 936, 944 (Fed. Cir. 2006) (concluding there was "nothing in the record to indicate that [the supplier] ha[d] induced or contributed to infringement").

GeoTag's contrary approach would allow a patentee to deprive a supplier of a declaratory-judgment remedy simply by avoiding explicit mention of easily ascertainable facts about the supplier's role in the customers' alleged infringement.  Giving patentees that power would

45

effectively negate the availability of declaratory relief for manufacturers and suppliers—the parties most likely to see a case through to judgment. *See Arrowhead*, 846 F.2d at 734−38. It would also contravene this Court's precedent, which has consistently refused to subject declaratory-judgment jurisdiction to gamesmanship and manipulation by patentees. *See, e.g.*, *Arris*, 639 F.3d at 1380; *Teva Pharm.*, 482 F.3d at 1343−45; *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1382−83 (Fed. Cir. 2007).

## II. Google Is Entitled to Summary Judgment of Non-Infringement.

Far from infringing, the accused functionality in AdWords does the exact opposite of the claimed invention. The '474 patent discloses a system for maximizing search efficiency by searching within a narrow geographic area and then adding to the search results entries "dynamically replicated" from a broader area. In contrast, AdWords takes advantage of the "brute force" of modern computing power by conducting a broad search without regard to geography and then filtering out entries.

### A. The District Court Correctly Held that AdWords Does Not Practice "Dynamic Replication."

The district court construed "dynamically replicating" to mean "automatically inheriting at the time of a search." A78. On appeal, GeoTag largely accepts that construction, arguing only that the court should have substituted "copying or inheriting" for "inheriting." Br. 57.[7] That dispute played no part in the district court's non-infringement analysis. Indeed, GeoTag's brief makes no effort to show that the distinction mattered in this case—because it did not.

Even under GeoTag's construction, "dynamic replication" would require that, when AdWords searches for ads to display to users, certain "entries" are "automatically [copied or] inherited . . . at the time of a search" from a broader geographic area into a narrower geographic area. A78; A130−31. As the district court recognized, no such thing happens in AdWords.

---

[7] The district court held that dynamic replication must occur "at the time of a search." A78. On appeal, GeoTag has not challenged that ruling, *see* Br. 53−54, and has therefore abandoned its argument to the district court that dynamic replication must occur "at the time needed rather than at a time decided or established in advance." A73−74.

AdWords searches its "entire database" of ads without any geographic limitation, identifies "all possible results" independent of geographic restrictions, and then "consecutively filters" those results by, among other things, eliminating results not associated with the targeted areas. A61; *see* pp. 9–11, *supra*. Because AdWords searches its entire database without regard to geography and then culls the results, rather than searching only within a targeted geographic area and automatically adding results from outside that area, it does not practice "dynamic replication" under any construction of that term. A60–62. Indeed, AdWords' performance of a broad search of all possible ads, without regard to geography, means that it has no need or opportunity to "dynamically replicate" entries from a broader geographic area into a narrower one. *See* A58 n.5.

## B. GeoTag's Counterarguments Lack Merit and Make "Dynamic Replication" Meaningless.

GeoTag fails to offer an intelligible account of how, in its view, AdWords practices "dynamic replication." The closest it comes is its assertion that the entire AdWords ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████████ Br.

68. That vague statement fails to identify where in this "process" "dynamic replication" supposedly occurs. GeoTag does not identify any point at which information is "automatically [copied or] inherited" by AdWords "at the time of a search" from a broader to a narrower geographic area.

Instead, GeoTag attacks and distorts the district court's analysis. It asserts, for example, that the court added a "new limitation" to the claims by requiring "dynamic replication" to be implemented through multiple searches. Br. 63. But the district court did not require multiple searches. The claims require both a search and "dynamic replication" at the time of the search. A130, at 38:47−58. The court simply required *some action*—apart from AdWords' broad search of its entire database of ads—that could qualify as "dynamic replication." For example, the court stated, in the disjunctive, that "Google's accused system does not trace up linkages in a hierarchy, *or* repeat the search in order to obtain results from a broader geographic area." A61 (emphasis added). That makes clear that multiple searches are not required. Instead, the court's reference to the absence of a "second search," A62,

CONFIDENTIAL MATERIAL REDACTED

simply contemplated one way in which a system might practice "dynamic replication." AdWords does nothing that could satisfy that limitation.

GeoTag argues that the district court "erred in assuming that *filtering* is not a search." Br. 70. Again, the district court did not require a second search. And there is no competent evidence that AdWords' "progressive filtering" of the results of its broad search, A61, could ever qualify as "dynamic replication."

As explained above, AdWords' filtering *eliminates* from the list of results ads that ███████████████████████████████ ███████████████████████ The filtered-out ads are removed from the search results, not added to them (by a search or otherwise). The ads that remain are not "dynamically replicated," either—they are simply left alone as other ads are given the boot.

GeoTag quotes its expert's conclusory assertion that, "[w]hen the Creative Server filters adgroups by those not being geo-targeted, campaigns with adgroups associated with a broader geographical area . . . are dynamically replicated . . . into the search at the location of the user." Br. 71 (quoting A6875) (emphasis removed). The district court

was appropriately dismissive of this assertion, which "looks only to the result of Google's accused system and not to its method." A61. GeoTag's expert evidently assumed that if AdWords ultimately produced a list of ads, some of which were associated with narrower geographic areas and others of which were associated with broader geographic areas, then AdWords would satisfy the "dynamic replication" requirement.

Like the district court, this Court should reject that results-focused argument. AdWords may produce similar results to those that would be generated by the '474 patent, in the sense that its results include ads associated with geographic areas broader than the specific location of the user. To infringe, however, AdWords would have to produce those results by performing all of the claim limitations, including by "dynamically replicating" ads associated with broader areas into the results for narrower areas. Merely producing that same result in a different way would not suffice. *See, e.g.*, *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1336 (Fed. Cir. 2014). Because the opinion of GeoTag's expert is conclusory and contrary to that legal proposition, it cannot defeat summary judgment. *See, e.g.*, *Brooke Grp.*

*v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012).

GeoTag appears to rely on a startlingly broad view of the claim scope. GeoTag asserts, for example, that "there is nothing in the ['474] patent that would exclude the practice of dynamic replication through the use of a single search aimed at gathering entries associated with both narrower and broader geographical areas." Br. 64. GeoTag appears to mean that simply running a search that could retrieve entries associated with multiple (narrow and broad) geographic areas and returning entries associated with the searched areas—as opposed to "dynamically replicating" entries from other areas—practices the '474 patent.

If so, GeoTag's argument would effectively read the "dynamic replication" limitation out of the claims, and thereby transform the patent into one that would cover virtually every instance of searching within a geographically organized database. That position runs up against the claim language and even GeoTag's proposed claim construction, which requires conducting a search and dynamically

replicating entries (through automatic copying or inheritance) from one geographic area to another.

It would also call the claims' validity into serious question. Although GeoTag now treats the "dynamic replication" limitation as being essentially meaningless, the applicants added that limitation to overcome the prior art. *See* pp. 6−7, *supra*.

Moreover, although the parties have not yet litigated the validity of GeoTag's patent claims under 35 U.S.C. § 101, the claims are drawn to the abstract idea of searching within a geographically organized database. *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) ("retaining information in the navigation of online forms" is abstract); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) ("organizing information through mathematical correlations" is abstract). As noted above, "dynamic replication" is the only feature of the claims that the examiner considered to be patentably distinct. *See* pp. 6−7, *supra*. Shorn of that limitation, the claims would not even arguably contain an "inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice Corp.*

*Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2357 (2014) (internal quotation marks omitted).

If GeoTag believes there are any meaningful limits on the scope of "dynamic replication," its brief fails to identify them. Instead, GeoTag chooses to be as vague as possible about what even its own proposed claim construction means or how AdWords allegedly meets that construction. A patent must, however, "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). By treating the limitation that rendered the claimed invention patentable (in the PTO's view) as a cipher, GeoTag would "inject ambiguity into [its] claims," casting further doubt on their validity. *Id.*

## III. GeoTag's Claim-Construction Arguments Are Mistaken and Irrelevant to the District Court's Grant of Summary Judgment.

GeoTag raises two claim-construction issues that played no role in the district court's grant of summary judgment, and that are thus beyond the proper scope of this appeal. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1334 n.2 (Fed. Cir. 2001); *see also TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1322 (Fed. Cir. 2015);

*Jang v. Bos. Sci. Corp.*, 532 F.3d 1330, 1336 (Fed. Cir. 2008).  GeoTag's claim-construction arguments are also wrong.

## A. "Parent-Child" Relationships.

The district court construed the claim term "hierarchy of geographical areas" to mean "interrelated geographic areas such that there are parent geographic areas and child geographic areas." A73.  As noted above, the district court relied solely on "dynamic replication" in granting summary judgment.  *See* pp. 47–48, *supra*.  Thus, the construction of "hierarchy of geographical areas" cannot affect the outcome of this appeal.

GeoTag notes that the district court adopted the parent-child construction of "hierarchy of geographical areas" based in part on its determination that "dynamic replication" could not occur without parent-child relationships.  A69−72.  But the court's non-infringement analysis for AdWords does not even mention, much less rely on, the parent-child requirement.  A56−63.  It was Microsoft, not Google, that proposed the parent-child construction.  A68.  And the summary judgment opinion's only reference to parent-child relationships comes in

a pair of footnotes suggesting that certain AdWords databases *are* organized according to parent-child relationships.  A59 nn.6−7.

At any rate, GeoTag fails to show any error in the district court's construction.  The court explained, for example, that there is no way for "dynamic replication," which appears in every one of the '474 patent's independent claims, to take place unless the hierarchical database is organized according to parent-child relationships.  *See, e.g.*, A70 ("There is nothing in the patent indicating how [dynamic replication] would occur absent a 'parent-child' hierarchy."); A71 (finding "no clue" how dynamic replication "would possibly function in any other context").

GeoTag has not shown how the claimed invention could work without a parent-child hierarchy.  Instead, GeoTag mischaracterizes the district court's reasoning.  It begins by asserting that the court "determined that [the claims] must always include a parent-child relationship because a parent-child hierarchy was taught in an embodiment in the specification."  Br. 45.  But the district court did not simply assume that the claims were limited by the embodiment.  *See* A70.  On the contrary, the court properly considered the embodiment

because it provided the only available hint of how "dynamic replication," which is not a term of art, could operate. *See id.*

Uncertain claim terms "must be defined by reference to the specification." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1317 (Fed. Cir. 2014). Although a court may not "import[] limitations from the specification into [a] claim," it can and should "us[e] the specification to interpret the meaning of a claim," as the specification is "'the single best guide to the meaning of a disputed [claim] term.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315, 1323 (Fed. Cir. 2005) (en banc). That is especially so where, as here, there is "'nothing . . . to indicate that the patentee contemplated any alternative'" to the embodiment taught in the specification. *Id.*

GeoTag itself led the district court down this path by admitting that "dynamic replication," which is not a term of art and is not defined in the patent, can be understood only by reference to the concept of parent-child inheritance that appears in the preferred embodiment. At the *Markman* hearing, for example, GeoTag's counsel told the court that while "the words dynamically replicating don't appear in the specification," the "concept of dynamic replication [is] encompassed in

the description of the preferred embodiment." A2165−66. According to GeoTag, "the concept [of dynamic replication] comes from the description of the preferred embodiment, so that's where the support is in the specification. *Automatically inherited from the parent entry*." A2171 (emphasis added).

A party may not complain on appeal about "errors" the party itself invited. *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 715 (Fed. Cir. 1998). And to the extent GeoTag is now arguing that "dynamic replication" includes something other than the method disclosed in the specification, its construction would cause the patent claims to be invalid under the written-description requirement, which requires a description of the full scope of the claimed invention. *Nautilus*, 134 S. Ct. at 2129.

GeoTag asserts that the district court erroneously "assumed" that "dynamic replication" required a parent-child relationship based on a note made by the patent examiner during prosecution of the '474 patent. Br. 56. The note in question reads, "<u>Synonyms:</u> dynamic replication = automatic inheritance = parent-child = inheriting attributes." A5784. That note is not especially hard to understand: the

examiner plainly thought a parent-child structure was essential to (or even synonymous with) the patent's concept of "dynamic replication."

The district court correctly observed that the note "bolstered" its conclusion that dynamic replication required a parent-child relationship. A71. Contrary to GeoTag's assertions, however, the court did not treat this note as a dispositive disclaimer. It stressed that it was not "adopting unilateral examiner statements as [a] disclaimer," but was merely "using the file history to understand the contours of the invention." A72. That was appropriate. *See, e.g.*, *Allbecker v. Contour Prods., Inc.*, 578 F. App'x 969, 972 (Fed. Cir. 2014) (per curiam) (non-precedential) (looking to "examiner's statements" to "support . . . the district court's construction").

Finally, GeoTag's reliance on the doctrine of claim differentiation, Br. 51–53, is misplaced. That doctrine "disfavors reading a limitation from a dependent claim into an independent claim." *VirnetX*, 767 F.3d at 1316. But none of the dependent claims impose a parent-child limitation. Instead, they add *other* limitations, such as requiring a three-level hierarchy (claim 5) or requiring that a hierarchy include levels for city, territory, and state (claim 6). Because those additional

limitations are fully consistent with construing "hierarchy" to entail a parent-child relationship, there is no claim-differentiation concern here. *See World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1125 (Fed. Cir. 2014) (construction of independent claim that did "not give [it] the same scope as" dependent claim did not violate claim differentiation).

## B. "Automatically Inheriting" vs. "Automatically Copying or Inheriting."

GeoTag quibbles with the district court's construction of "dynamically replicating" to mean "automatically inheriting" rather than "automatically copying or inheriting." Br. 57−59. As discussed above, that dispute has nothing to do with the summary judgment of non-infringement that is the subject of this appeal. *See* pp. 47–48, *supra*.

Indeed, throughout this case, GeoTag has *never* articulated any way in which adding the word "copying" would materially change the claim construction. At the *Markman* hearing, the district court asked whether GeoTag's and Google's proposed constructions were "both saying more or less the same thing." A2170. GeoTag's counsel responded, "More or less, your Honor." *Id.* GeoTag opined that the word "copying" would be more clear to a lay jury, A2169, a contention

that is irrelevant for present purposes and that only reinforces GeoTag's failure to identify to the district court a material, substantive difference in the proposed claim constructions. Without such a showing, the court had no obligation to include GeoTag's extra language in the claim construction. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (claim construction is necessary only "[w]hen the parties raise an actual dispute regarding the proper scope of the[] claims").

In any event, the district court's construction is correct. As explained above, "dynamic replication" is not a term of art and is not even used, much less defined, in the specification. GeoTag encouraged the district court to equate "dynamic replication" with the automatic-inheritance mechanism in the preferred embodiment, presumably to avoid indefiniteness or written-description issues. *See* pp. 57–58, *supra*. GeoTag cannot now complain that the district court adopted the approach GeoTag itself suggested. GeoTag has never pointed to anything in the patent that suggests "dynamic replication" can occur through mere automatic copying, as opposed to the preferred embodiment's automatic inheritance.

*        *        *

Especially when taken together, GeoTag's arguments concerning claim construction and infringement show that GeoTag is determined to read all meaningful limitations out of the '474 patent, including the "dynamic replication" limitation without which the patent would not have issued in the first place.  GeoTag's apparent position that the asserted patent covers essentially any search of a geographically organized database cannot be reconciled with the claim language, even under GeoTag's own proposed construction of "dynamic replication."

## CONCLUSION

The parties settled all of their disputes out of court save one: GeoTag's AdWords counterclaim. This Court should affirm the judgment of the district court on that claim.


DATED: August 24, 2015

                                 Respectfully submitted,

                                */s/ Daryl L. Joseffer*

Robert A. Van Nest                   Daryl L. Joseffer
Asim M. Bhansali                     *Counsel of Record*
Matthias A. Kamber               Paul Alessio Mezzina
KEKER & VAN NEST LLP         KING & SPALDING LLP
633 Battery Street                 1700 Pennsylvania Ave., NW
San Francisco, CA  94111       Washington, DC  20006
Telephone: (415) 391-5400     Telephone: (202) 737-0500
Facsimile: (415) 397-7188      Facsimile: (202) 626-3737
rvannest@kvn.com                djoseffer@kslaw.com
abhansali@kvn.com               pmezzina@kslaw.com
mkamber@kvn.com

                                   Adam M. Conrad
                                   KING & SPALDING LLP
                                   100 N. Tryon St., Suite 3900
                                   Charlotte, NC  28202
                                   Telephone: (704) 503-2600
                                   Facsimile: (704)-503-2622
                                   aconrad@kslaw.com


                      *Counsel for Appellee Google Inc.*

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(a)(7)(C), I certify that the foregoing brief, exclusive of the exempted portions as provided in Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), contains 11,368 words and therefore complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(A)(i).

DATED: August 24, 2015

*/s/ Daryl L. Joseffer*
Daryl L. Joseffer

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25 and Fed. Cir. R. 25, I certify that I have this day served the foregoing Non-Confidential Brief via the Court's CM/ECF on all counsel of record, and the Confidential Brief by email and U.S. Mail postage prepaid as follows:

> Joel W. Reese
> Adam C. Sanderson
> Kendal C. Simpson
> REESE GORDON MARKETOS LLP
> 750 N. Saint Paul Street, Suite 610
> Dallas, TX 75201
> Telephone: (214) 382-9810
> joel.reese@rgmfirm.com
> adam.sanderson@rgmfirm.com
> kendal.simpson@rgmfirm.com

DATED: August 24, 2015

> */s/ Daryl L. Joseffer*
> Daryl L. Joseffer